## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARTSEARCH TECHNOLOGIES, INC., | ) Case No. 11-10282 (MG) |
| | ) |
| Debtor | ) |
| | ) |

## DEBTOR'S FIRST MODIFIED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Dated: August 16, 2011

**BROWN RUDNICK LLP**
Counsel to the Debtor and the
Debtor-in-Possession
William R. Baldiga, Esq.
Nina E. Andersson, Esq.
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND INTERPRETATION.................................................................1

    1.1    DEFINITIONS.................................................................................................................1
    1.2    INTERPRETATION..........................................................................................................1
    1.3    APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION CONTAINED IN THE BANKRUPTCY CODE. ...1
    1.4    OTHER TERMS..............................................................................................................1

ARTICLE II. FUNDING OF PLAN.................................................................................................1

ARTICLE III. CLAIMS BAR DATE................................................................................................1

ARTICLE IV. UNCLASSIFIED CLAIMS.........................................................................................2

    4.1    UNCLASSIFIED CLAIMS.................................................................................................2
    4.2    ADMINISTRATIVE CLAIMS.............................................................................................2
    4.3    STATUTORY FEES..........................................................................................................3
    4.4    PRIORITY CLAIMS.........................................................................................................3

ARTICLE V. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .....................................3

    5.1    CLASSIFIED CLAIMS AND EQUITY INTERESTS.................................................................3
    5.2    ELIMINATION OF CLASSES.............................................................................................4
    5.3    IMPAIRMENT CONTROVERSIES.......................................................................................4

ARTICLE VI. TREATMENT OF CLASSES IMPAIRED BY THE PLAN...........................................4

    6.1    CLASS 1 (SECURED CLAIMS).........................................................................................4
    6.2    CLASS 2A (GENERAL UNSECURED CLAIMS) AND CLASS 2B (BEST BUY CLAIM). ...............4
    6.3    CLASS 3 (EQUITY INTEREST AND ALLOWED SUBORDINATED EQUITY CLAIMS)...................5

ARTICLE VII. ACCEPTANCE OR REJECTION OF THE PLAN......................................................5

    7.1    CLASSES ENTITLED TO VOTE.........................................................................................5
    7.2    NONCONSENSUAL CONFIRMATION..................................................................................5

ARTICLE VIII. EXECUTORY CONTRACTS/UNEXPIRED LEASES................................................5

    8.1    REJECTION AND ASSUMPTION OF CONTRACTS.................................................................5
    8.2    CURE...........................................................................................................................6
    8.3    BEST BUY PAYABLE.....................................................................................................6

ARTICLE IX. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN........................7

    9.1    EQUITY SALE...............................................................................................................7
    9.2    OPERATIONS BETWEEN THE CONFIRMATION DATE AND THE EFFECTIVE DATE. ...................7
    9.3    OTHER GENERAL CORPORATE MATTERS..........................................................................7
    9.4    CONTINUED CORPORATE EXISTENCE OF THE DEBTOR.......................................................7
    9.5    RE-VESTING OF ASSETS................................................................................................8
    9.6    MANAGEMENT..............................................................................................................8
    9.7    BOARD OF DIRECTORS..................................................................................................8
    9.8    OFFICERS.....................................................................................................................8
    9.9    CANCELLATION OF DEBTOR EQUITY INTERESTS..............................................................8
    9.10   PLAN TRUST................................................................................................................9
    9.11   TRANSFERS TO THE PLAN TRUST...................................................................................9
    9.12   AVOIDANCE ACTION AND OTHER RECOVERIES...............................................................9
    9.13   LIQUIDATION OF ASSETS..............................................................................................9
    9.14   ASSET PURCHASE AGREEMENT......................................................................................9

**ARTICLE X. PLAN TRUSTEE** ........................................................................................................ 10

| | | |
|---|---|---|
| 10.1 | AUTHORITY OF THE PLAN TRUSTEE. | 10 |
| 10.2 | COMPENSATION OF PLAN TRUSTEE. | 10 |
| 10.3 | AUTHORIZATION, EMPOWERMENT, RIGHTS AND DUTIES OF PLAN TRUSTEE. | 10 |
| 10.4 | PARTICIPATION BY THE PLAN TRUSTEE. | 11 |
| 10.5 | INVESTMENTS OF CASH PENDING DISTRIBUTIONS. | 11 |
| 10.6 | LIMITATION OF LIABILITY OF THE PLAN TRUSTEE. | 11 |
| 10.7 | CERTAIN RECORDS. | 12 |
| 10.8 | TERMINATION OF THE PLAN TRUST AND PLAN TRUSTEE. | 12 |

**ARTICLE XI. DISTRIBUTIONS** ...................................................................................................... 13

| | | |
|---|---|---|
| 11.1 | DISTRIBUTIONS TO PLAN TRUSTEE. | 13 |
| 11.2 | DISTRIBUTIONS. | 13 |
| 11.3 | ROUNDING OF PAYMENTS. | 14 |
| 11.4 | COMPLIANCE WITH TAX REQUIREMENTS. | 14 |
| 11.5 | UNDELIVERABLE DISTRIBUTIONS, VOIDED CHECKS AND DISTRIBUTION OF UNCLAIMED PROPERTY. | 14 |
| 11.6 | SETOFF. | 15 |

**ARTICLE XII. PROCEDURES FOR RESOLVING OBJECTIONS TO CLAIMS** ............................ 15

| | | |
|---|---|---|
| 12.1 | OBJECTIONS TO CLAIMS. | 15 |
| 12.2 | TREATMENT OF DISPUTED CLAIMS. | 15 |
| 12.3 | ADMINISTRATIVE CLAIMS. | 16 |
| 12.4 | PROFESSIONAL FEE CLAIMS. | 16 |
| 12.5 | SUBORDINATED CLAIMS. | 16 |
| 12.6 | ESTIMATION OF CLAIMS. | 16 |

**ARTICLE XIII. EFFECTS OF PLAN CONFIRMATION** .................................................................. 16

| | | |
|---|---|---|
| 13.1 | BINDING EFFECT OF CONFIRMATION. | 16 |
| 13.2 | GOOD FAITH. | 16 |
| 13.3 | INJUNCTION. | 16 |
| 13.4 | RELEASES BY THE DEBTOR AND THE REORGANIZED DEBTOR. | 17 |
| 13.5 | RELEASES BY SPONSOR. | 17 |
| 13.6 | EXCULPATION AND LIMITATION OF LIABILITIES. | 18 |
| 13.7 | NO RELEASES FROM PLAN OBLIGATIONS. | 19 |

**ARTICLE XIV. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS** ............................... 19

| | | |
|---|---|---|
| 14.1 | CONDITIONS PRECEDENT TO PLAN CONFIRMATION. | 19 |
| 14.2 | CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE | 19 |
| 14.3 | WAIVER AND/OR MODIFICATION OF CONDITIONS. | 21 |

**ARTICLE XV. RETENTION OF JURISDICTION** ............................................................................ 21

| | | |
|---|---|---|
| 15.1 | RETENTION OF JURISDICTION. | 21 |

**ARTICLE XVI. MODIFICATION OR WITHDRAWAL OF PLAN** .................................................... 23

| | | |
|---|---|---|
| 16.1 | MODIFICATION OF PLAN. | 23 |
| 16.2 | WITHDRAWAL OF PLAN. | 23 |

**ARTICLE XVII. MISCELLANEOUS** .............................................................................................. 23

| | | |
|---|---|---|
| 17.1 | SATURDAY, SUNDAY OR LEGAL HOLIDAY. | 23 |
| 17.2 | HEADINGS. | 23 |
| 17.3 | NOTICES. | 23 |
| 17.4 | GOVERNING LAW. | 25 |
| 17.5 | SUCCESSORS AND ASSIGNS. | 25 |

ii

17.6    SEVERABILITY OF PLAN PROVISIONS. ...................................................................................25
17.7    NO WAIVER. .........................................................................................................................25
17.8    PAYMENT OF POST-PETITION INTEREST AND ATTORNEYS' FEES...........................................25
17.9    CREDITORS' COMMITTEE. ......................................................................................................26
17.10  POST-EFFECTIVE DATE FEES AND EXPENSES. ........................................................................26
17.11  FINAL DECREE AND CASE CLOSURE........................................................................................26
17.12  EXEMPTION FROM CERTAIN TRANSFER TAXES. .....................................................................26
17.13  INCONSISTENCIES. .................................................................................................................26
17.14  POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS OR EQUITY INTERESTS. ...............27
17.15  OTHER DOCUMENTS AND ACTIONS.........................................................................................27

**EXHIBIT A  GLOSSARY OF DEFINED TERMS**.................................................................................1

**EXHIBIT B  PLAN TRUST AGREEMENT** ..........................................................................................1

**EXHIBIT C  ASSET PURCHASE AGREEMENT**.................................................................................2

## TABLE OF EXHIBITS AND SCHEDULES

| Exhibit | Name |
|---------|------|
| A | Glossary of Defined Terms |
| B | Plan Trust Agreement |
| C | Asset Purchase Agreement |

| Schedule | Name |
|----------|------|
| A | Prepetition Released Parties |
| B.1 | Plan Trust Assumed Executory Contracts and Unexpired Leases |
| B.2 | Reorganized Debtor Assumed Executory Contracts and Unexpired Leases |

Partsearch Technologies, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 case under title 11 of the United States Code (the "Bankruptcy Code"), hereby proposes this plan of reorganization pursuant to chapter 11 of the Bankruptcy Code (together with the exhibits hereto, the "Plan").

**Article I. Definitions and Interpretation**

**1.1**     **Definitions.**

The capitalized terms used herein shall have the respective meanings set forth in the Glossary of Defined Terms attached hereto as **Exhibit A** or as otherwise defined herein.

**1.2**     **Interpretation.**

Unless otherwise specified, all paragraph, section, article and exhibit references in the Plan are to the respected paragraph in, section in, article of or exhibit to, the Plan, as the same may be amended, supplemented, waived or modified from time to time in accordance with the terms hereof. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender.

**1.3**     **Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.**

Words and terms defined in Bankruptcy Code Section 101 shall have the same meanings when used in the Plan unless a different definition is given in the Glossary of Defined Terms. The rules of construction contained in Bankruptcy Code Section 102 shall apply to the construction of the Plan.

**1.4**     **Other Terms.**

The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan as a whole and not to any particular paragraph, proviso, section, subsection or clause contained in the Plan.

**Article II. Funding of Plan**

The Plan will be funded from the Equity Consideration, the Debtor's Cash on hand as of the Effective Date and the Excluded Assets.

**Article III. Claims Bar Date**

By Order dated March 2, 2011, the Bankruptcy Court established a deadline of April 11, 2011 for the filing of pre-petition and Bankruptcy Code 503(b)(9) claims against the Debtor by all creditors other than governmental entities, who are subject to a deadline of July 26, 2011. The March 2, 2011 Order was amended by Order dated March 28, 2011, which established certain special provisions for designated former employees of the Debtor (the March 2, 2011 and March 28, 2011 Orders together being the "Bar Date Order").

This Plan establishes separate bar dates for (i) Administrative Claims other than claims under Section 503(b)(9) and (ii) claims for rejection damages.

# Article IV.  Unclassified Claims

**4.1      Unclassified Claims.**

As provided by Bankruptcy Code Section 1123(a)(1), Administrative Claims and Priority Claims shall not be classified under the Plan.  Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of Bankruptcy Code Sections 1123, 1124, 1125, 1126 or 1129. Administrative Claims and Priority Claims shall be treated as described below.

**4.2      Administrative Claims.**

All Administrative Claims shall be treated as follows:

(a)      Time for Filing Administrative Claims.

The holder of an Administrative Claim, other than (i) a Professional Fee Claim, (ii) a liability incurred and payable in the ordinary course of business by the Debtor (and not past due or a liability of the Sponsor pursuant to the Operating Lease Agreement), (iii) an Administrative Claim that has been Allowed on or before the Effective Date or (iv) an Administrative Claim asserted under section 503(b)(9) of the Bankruptcy Code (the last being governed by the Bar Date Order), must file with the Bankruptcy Court and serve on the Debtor, the Plan Trustee and the Office of the United States Trustee, notice of such Administrative Claim within forty (40) days after service of the Notice of Confirmation (the "Administrative Bar Date").  Such notice of Administrative Claim must include at a minimum (A) the name of the holder of the Claim, (B) the amount of the Claim and (C) the basis of the Claim.  **Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred and discharged—without further order of the Court**.  Objections to any filed request for payment of an alleged Administrative Claim must be filed and served on the claimant and the Debtor on or before the Effective Date and the Plan Trustee after the Effective Date within ninety (90) days of the Administrative Bar Date.  The deadline for filing objections to Administrative Claims may be extended by the Court, for cause.

(b)      Time for Filing Professional Fee Claims.

Each Professional Person who holds or asserts a claim for services rendered to the Estate before the Effective Date (a "Professional Fee Claim") must file with the Bankruptcy Court and serve on the Debtor and the Office of the United States Trustee a Professional Fee Application within thirty (30) days after service of the Notice of Confirmation (the "Professional Fee Claim Bar Date"), which Professional Fee Claim shall include an estimate of fees and expenses for the period from the Confirmation Date through the Effective Date.  **The failure to timely file and serve such Professional Fee Application shall result in the Professional Fee Claim being forever barred and discharged**.  Objections to any Professional Fee Claim must be filed and served on the claimant, the Debtor, the Plan Trustee and the Office of the United States Trustee within fifteen (15) days of the filing of the Professional Fee Claim, whereupon the Bankruptcy Court shall schedule a hearing thereon.

(c)      Allowance of Administrative Claims and Professional Fee Claims.

An Administrative Claim with respect to which notice has been properly filed and served pursuant to Paragraph 4.2(a) shall become an Allowed Administrative Claim if no objection is filed in accordance with Paragraph 4.2(a) or such later date as may be approved by the Bankruptcy Court on

motion of a party in interest, without notice or a hearing. If an objection is filed within the ninety (90) day period as described in Paragraph 4.2(a) (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order. A Professional Fee Claim in respect of which a Professional Fee Application has been properly filed and served pursuant to Paragraph 4.2(b) shall become an Allowed Administrative Claim when, as and if approved by the Bankruptcy Court.

(d)     Payment of Allowed Administrative Claims.

Each Allowed Administrative Claim shall, at the option of the Debtor on or prior to the Effective Date and the Plan Trustee after the Effective Date, receive (i) on the Plan Distribution Date, the amount of such Allowed Claim in Cash from the Estate or the Plan Trust Assets (as the case may be), (ii) with respect to Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtor, payment when and as such Administrative Claims become due and owing by their ordinary course terms or (iii) such other treatment as may be agreed upon in writing by the Debtor on or prior to the Effective Date, and the Plan Trustee after the Effective Date, and the holder of such Claim; provided, however, that such treatment shall not provide to the holder of such Claim a return having a present value as of the Effective Date in excess of such Allowed Administrative Claim. If a portion of an Administrative Claim is disputed, the undisputed portion of such Administrative Claim shall be timely paid as provided above.

**4.3     Statutory Fees.**

The Debtor, or the Plan Trustee, as the case may be, shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of business, until the entry of a Final Decree, dismissal of the Chapter 11 Case, or conversion of the Case to Chapter 7 as provided in Section 17.11 of this Plan.

**4.4     Priority Claims.**

All Priority Claims shall be treated as follows: Each Person holding an Allowed Priority Claim shall be paid in Cash in full (subject to any applicable cap under Bankruptcy Code Section 507(a)) on the Plan Distribution Date.

## Article V. Classification of Claims and Equity Interests

**5.1     Classified Claims and Equity Interests.**

Claims that are required to be classified under Bankruptcy Code Section 1123(a)(1) and Equity Interests are hereby divided into the following classes for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to Bankruptcy Code Sections 1122 and 1123(a)(1):

| Class | Designation | Impairment | Whether Entitled to Vote |
|-------|-------------|------------|--------------------------|
| Class 1 | Secured Claims | Unimpaired | No |
| Class 2a | General Unsecured Claims | Impaired | Yes |
| Class 2b | Best Buy Claim | Impaired | Yes |

| Class 3 | Equity Interests and Subordinated Equity Claims | Impaired | Yes |

Class 2a and Class 2b shall be deemed separate Classes for all purposes.

## 5.2 Elimination of Classes.

Any Class of Claims that does not consist, as of the date of the Confirmation Hearing, of at least one Allowed Claim, Disputed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed deleted from this Plan for all purposes.

## 5.3 Impairment Controversies.

If a controversy arises as to whether any Claim or any Class of Claims is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## Article VI. Treatment of Classes Impaired by the Plan

### 6.1 Class 1 (Secured Claims).

Each Allowed Secured Claim shall be unimpaired under the Plan and, at the sole option of the Plan Trustee, shall receive the following treatment: (i) shall receive on the Plan Distribution Date on account of such Allowed Secured Claim a Cash payment in an amount equal to the amount of the Allowed Secured Claim as of the Effective Date with Post-Petition Interest from the Petition Date through the Effective Date; (ii) except as to Included Assets, shall retain its liens securing such Allowed Secured Claim and receive on account of such Allowed Secured Claim deferred cash payments having a present value on the Effective Date equal to the amount of such Allowed Secured Claim with Post-Petition Interest from the Petition Date through the Effective Date; (iii) shall realize the "indubitable equivalent" of such Allowed Secured Claim; (iv) the property securing the Allowed Secured Claim (that is not an Assumed Liability) shall be sold or vested in the Reorganized Debtor (as the case may be) free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on such proceeds as provided in clauses (ii), (iii) or (vi) of this subparagraph; (v) if such Allowed Secured Claim is subject to a valid right of recoupment or setoff, such Claim shall be setoff to the extent of the amount subject to setoff in accordance with sections 506(a) and 553 of the Bankruptcy Code; or (vi) shall receive such other treatment as may be agreed upon in writing by the holder of such Claim and the Plan Trustee; provided that such agreed upon treatment may not provide the holder of such Claim with a return having a present value as of the Effective Date that is greater than the amount of such Allowed Secured Claim.

### 6.2 Class 2a (General Unsecured Claims) and Class 2b (Best Buy Claim).

On the Plan Distribution Date, each holder of an Allowed General Unsecured Claim and the Best Buy Claim shall be entitled to receive, in full and final satisfaction of its Allowed General Unsecured Claim and the Best Buy Claim, after all Allowed Administrative Claims and Allowed Priority Claims have been satisfied in full and all Allowed Class 1 Claims have been satisfied in full in accordance with Section 6.1 hereof, Cash on a Pro Rata basis to the holders on account of their Allowed General Unsecured Claims and the Allowed Best Buy Claim until such Claims are satisfied in full; and, thereafter on a Pro Rata basis to the holders on account of accrued interest at a rate of 3.25% per annum on their Allowed General Unsecured Claims and the Allowed Best Buy Claim.

4

**6.3     Class 3 (Equity Interest and Allowed Subordinated Equity Claims).**

On the Effective Date, all Equity Interests of the Debtor shall be extinguished, and any certificates and all other documents representing such Equity Interests shall be cancelled and of no force and effect; provided, however, that such Equity Interests shall be given effect for the sole purpose of calculating the amount of distribution, if any, to be received by holders of Equity Interests hereunder. Each holder of an Equity Interest or Allowed Subordinated Equity Claim shall be entitled to receive on account of their respective Equity Interests and/or Allowed Subordinated Equity Claims, any distribution of Residual Cash on a Pro Rata basis on the next available Plan Distribution Date. For the avoidance of doubt, distributions pursuant to this subparagraph shall only be made after all costs and expenses of the Estate, the Plan Trust, and the Plan Trustee, including the satisfaction in full of all Allowed Administrative Claims, Allowed Priority Claims, and all Allowed Claims in Classes 1, 2(a) and 2(b), including interest thereon, in accordance with the terms of the Plan and the Plan Trust Agreement

## Article VII.  Acceptance or Rejection of the Plan

**7.1     Classes Entitled to Vote.**

Classes 2a, 2b and 3 shall be entitled to vote to accept or reject the Plan.  Class 1, which is unimpaired, is, by operation of law, deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

**7.2     Nonconsensual Confirmation.**

To the extent that this Plan cannot be confirmed on a consensual basis, the Debtor reserves the right to seek to effect a non-consensual confirmation pursuant to the provisions of Bankruptcy Code Section 1129.  Specifically, the Debtor reserves the right to seek confirmation of the Plan pursuant to Bankruptcy Code Section 1129(b) if all of the applicable requirements of Bankruptcy Code Section 1129(a) have been met other than Bankruptcy Code Section 1129(a)(8).

## Article VIII.  Executory Contracts/Unexpired Leases

**8.1     Rejection and Assumption of Contracts.**

On the Effective Date, all executory contracts and unexpired leases, regardless of whether entered into before or after the Petition Date, will be deemed rejected by the Debtor unless such contracts or leases were either (a) expressly assumed by the Debtor prior to the Confirmation Date, (b) are the subject of a pending motion to assume by the Debtor, as of the Confirmation Date or (c) are assumed pursuant to this Plan including those listed on Schedule B.1 assumed by the Plan Trust and Schedule B.2 assumed by the Reorganized Debtor, as such schedules may be amended no later than 21 days prior to the date of the Confirmation Hearing.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, with rejection effective as of the Confirmation Date.

Any Claim for damages arising from rejection of any executory contract or unexpired lease pursuant to entry of an order (which may be the Confirmation Order) authorizing the rejection of the applicable executory contract or unexpired lease (each, a "Rejection Damages Claim") shall be forever barred unless a proof of claim therefor in proper form is filed with the Bankruptcy Court within the later of: (i) the applicable Claims Bar Date or Government Bar Date or (ii) thirty (30) days after the

Bankruptcy Court's entry of the Confirmation Order or other order approving the rejection of the applicable executory contract or unexpired lease (the later of these dates, the "Rejection Damages Bar Date"). All such Claims shall constitute Class 2a Claims. Objections to any rejection damages claim must be filed and served on the claimant and the Plan Trustee within ninety (90) days of the Rejection Damages Bar Date. The deadline for filing objections to rejection damages claims may be extended by the Court, for cause.

## 8.2 Cure.

At the election of the Debtor, any monetary defaults under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease, provided that any cure costs for executory contracts or unexpired leases to be assumed by the Debtor under this Plan at the direction of the Sponsor (including those listed on Schedule B.2) shall be paid by the Sponsor in accordance with the provisions set forth in (a) or (b) of this sentence.

In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. Any subsequently filed "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" will set forth the Debtor's cure obligations for each agreement which a cure obligation must be satisfied as a condition to the assumption or assumption and assignment of such agreement. Any non-Debtor counterparty to an agreement listed on any subsequently filed "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtor, Sponsor and any committee, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by no later than three (3) days prior to the commencement of the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on any subsequently filed "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption or assumption and assignment of the relevant agreement as proposed by the Debtor.

## 8.3 Best Buy Payable.

On the Effective Date, in exchange for the allowance of the Best Buy Claim, and in full satisfaction of all prepetition amounts payable by Best Buy to the Debtor under the Best Buy Services Agreement, Sponsor shall pay by release of the Escrowed Funds and the balance in Cash to the Debtor the aggregate amount of $5,083,645.

## Article IX.  Means for Execution and Implementation of the Plan

**9.1      Equity Sale.**

At the Plan Closing on the Effective Date, the Reorganized Debtor shall issue to the Sponsor one hundred percent (100%) of one hundred (100) New Common Shares in exchange for the Equity Consideration ("Equity Sale"), consisting of Cash in the amount of $1,321,355 for twenty-five (25) New Common Shares and satisfaction of $8,850,000 of the Best Buy Claim in exchange for seventy-five (75) New Common Shares.

As of the Effective Date, the reservation for issuance, as applicable, and the issuance by Reorganized Debtor of one hundred (100) New Common Shares is hereby authorized without further act or action under applicable law, regulation, order or rule.  The Confirmation Order shall provide that the issuance of the New Common Shares issuable shall be exempt from the registration requirements of the Securities Act in accordance with section 1145 of the Bankruptcy Code or, to the extent section 1145 does not apply Section 4(2) of the Securities Act.

**9.2      Operations between the Confirmation Date and the Effective Date.**

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate its business as Debtor in Possession, subject to the Bankruptcy Code, the Bankruptcy Rules, the Operating Lease Agreement and all orders of the Bankruptcy Court that are then in full force and effect. All actions taken by the Debtor during the period from the Confirmation Date through the Effective Date shall be, and shall be taken in a manner, consistent in all material respects with the Confirmation Order, this Plan and the Operating Lease Agreement. Best Buy Co., Inc. shall continue to be liable for the payment of expenses pursuant to the Operating Lease Agreement through the Effective Date, and costs and expenses incurred by the Debtor prior to the Effective Date for which Best Buy Co., Inc. is obligated to reimburse the Debtor pursuant to the Operating Lease Agreement and payable on or after the Effective Date shall be paid by Best Buy to the Plan Trustee.

**9.3      Other General Corporate Matters.**

On or after the Effective Date, the Reorganized Debtor will be authorized to take such action as is necessary under the laws of the State of Delaware, federal law and other applicable law to effect the terms and provisions of this Plan, including, without limitation, the filing of an amended certificate of incorporation and/or other amended organizational documents. Without limiting the foregoing, the issuance of the New Common Shares, the election and the appointment of directors and officers, and any other matter involving the corporate structure of the Reorganized Debtor shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to section 303 and other applicable provisions of the Delaware General Corporation Law, without any requirement of further action by the stockholders or directors of the Debtor or the Reorganized Debtor.

**9.4      Continued Corporate Existence of the Debtor.**

The Debtor shall continue to exist after the Effective Date as the Reorganized Debtor as a separate entity, with all the powers available to such legal entity. On or after the Effective Date, the Reorganized Debtor may, within its sole and exclusive discretion, take such action as permitted by applicable law and their constituent documents, as it determines may be reasonable and appropriate.

## 9.5    Re-vesting of Assets.

Upon the occurrence of the Effective Date, title to all of the Included Assets, including all of the Debtor's federal income tax attributes, and Assumed Liabilities (and only the Assumed Liabilities) shall vest in the Reorganized Debtor free and clear of all liens, Claims, Causes of Action, interests, security interests and other encumbrances and without further order of the Bankruptcy Court other than the Assumed Liabilities (such vesting, the "Plan Closing"). On and after the occurrence of the Effective Date, the Reorganized Debtor may operate its business and may use, acquire and dispose its assets free of any restrictions of the Bankruptcy Code, subject to the terms of this Plan and Confirmation Order. From and after the Effective Date, (a) the Reorganized Debtor shall have no obligation to pay, satisfy or perform any Excluded Liabilities, and (b) the Plan Trustee shall be solely liable for all of the Excluded Liabilities.

## 9.6    Management.

Except as set forth in Section 9.7 hereof, upon the occurrence of the Effective Date, the management and operation of the Reorganized Debtor shall be the general responsibility of the Reorganized Debtor's board of directors, which may appoint new management personnel. The Confirmation Order shall ratify and approve all actions taken by the Reorganized Debtor from the Petition Date through the Effective Date.

## 9.7    Board of Directors.

Upon the Effective Date, all of the Debtor's officers and directors in office immediately prior to the Effective Date shall be deemed to have resigned from their positions with the Debtor (without the necessity of any further action or writing or Bankruptcy Court order) and shall have no further responsibilities, duties and obligations arising after the Effective Date.

On the Effective Date, the board of directors of Reorganized Debtor shall consist of one member, who shall be Todd Hartman.

## 9.8    Officers.

Subject to any applicable employment agreements and applicable law, from and after the Effective Date, the officers of the Reorganized Debtor shall be selected and appointed by its board of directors.

## 9.9    Cancellation of Debtor Equity Interests.

On the Effective Date: (i) the Debtor's Equity Interests and any note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor related to the Debtor's Equity Interests shall be canceled and terminated; and (ii) the obligations of the Debtor under any agreements, indentures or certificates of designation governing the Debtor Equity Interests and any note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor related to the Debtor Equity Interests shall be cancelled and terminated; provided, that the provisions of clause (ii) of this paragraph shall not affect the discharge of the Debtor's liabilities under the Bankruptcy Code and the Confirmation Order or result in any expense or liability to the Reorganized Debtor and provided further that such cancellation and discharge shall not impair the rights of any person to receive distributions under the Plan.

**9.10    Plan Trust.**

On the Effective Date, a newly-formed Delaware trust with no prior assets or liabilities shall be created to hold the Plan Trust Assets and Plan Trust Liabilities and make distributions pursuant to Paragraph 11.2 and liquidate any business related to the Plan Trust Assets and Plan Trust Liabilities (the "Plan Trust"). The Plan Trustee shall be designated by the Creditors' Committee (after consultation with the Debtor and the Sponsor) and appointed as the Plan Trustee and shall serve as the trustee of the Plan Trust with the rights and duties set forth in Article X and otherwise herein. For the avoidance of doubt, the Plan Trustee, on the Effective Date, shall have the sole authority to administer the Plan Trust Assets and Plan Trust Liabilities.

**9.11    Transfers to the Plan Trust.**

On the Effective Date, the Debtor and the Estate shall transfer, shall be deemed to have irrevocably transferred and assigned, without any further action by the Debtor, the Estate or any other party to the Plan Trust all of the Plan Trust Assets (but subject to all rights, defenses and setoffs of any defendant) and all of the Plan Trust Liabilities.

**9.12    Avoidance Action and other Recoveries.**

The Plan Trustee shall be granted the right under the Plan to pursue all Estate causes of action arising under chapter 5 of the Bankruptcy Code, which are expressly preserved and survive confirmation of the Plan (the "Avoidance Claims"); provided, however, that preference actions under section 547 of the Bankruptcy Code against holders of General Unsecured Claims who are not insiders of the Debtor and were not insiders of the Debtor in the two years prior to the Petition Date shall be waived upon the Effective Date. Additionally, the Plan Trustee shall be authorized to pursue on behalf of the Estate all Commercial Tort Claims and other claims and causes of action belonging to the Estate and shall succeed to all rights and privileges of the Debtor with respect to same.

Any recoveries in actions brought pursuant to the authority granted by this Paragraph 9.12 (net of reasonable costs and professional fees incurred by the Plan Trustee and the Plan Trustee's professionals in discharge of their duties) shall become Plan Trust Assets and shall be distributed to holders of Allowed Class 1, 2a and 2b Claims and Allowed Class 3 Equity Interests pursuant to the terms of this Plan.

**9.13    Liquidation of Assets.**

The Plan Trustee shall be authorized to liquidate the Plan Trust Assets and shall make distributions of such Cash proceeds as provided in Paragraphs 4.2, 4.3, 4.4, 6.1, 6.2, 6.3 and 9.12 respectively.

**9.14    Asset Purchase Agreement.**

On the Effective Date, (a) the Asset Purchase Agreement shall be deemed terminated pursuant to Section 9.1(a) thereof and (b) Section 9.2 of the Asset Purchase Agreement shall be deemed to be amended by deleting it in its entirety and replacing it with "[Reserved]".

9

# Article X.  Plan Trustee

## 10.1     Authority of the Plan Trustee.

The Plan Trustee shall have the authority set forth in this Plan until all Avoidance Claims and other actions have been resolved and all distributions required to be made to holders of Allowed Claims (including recoveries on account of the Avoidance Claims and other actions) have been made in accordance with the Plan.  The Plan Trustee may retain counsel and/or other professionals as may be reasonably necessary to carry out its obligations under the Plan and shall be authorized to reimburse counsel and any such other professionals for such professionals' reasonable fees and expenses in accordance with the provisions of Paragraph 11.2 and the Bankruptcy Code.  The Debtor shall not have any liability for any such fees and expenses.

The Plan Trustee is expressly given discretion to decide which actions to bring and which actions not to bring in relation to the Avoidance Claims, the Commercial Tort Claims and other claims and causes of action.  The Plan Trustee is expressly granted the power to settle any such actions, either before or after suit is brought.  Furthermore, the Plan Trustee is expressly authorized to liquidate the Plan Trust Assets in a reasonable manner.

## 10.2     Compensation of Plan Trustee.

The Plan Trustee shall be entitled to compensation from the proceeds of the Plan Trust Assets in accordance with Paragraph 11.2(a) herein on account of its service pursuant to the terms of the Plan Trust Agreement approved by the Bankruptcy Court, provided however, that nothing herein shall preclude the Plan Trustee from engaging counsel and any such other professionals as may be reasonably necessary to carry out its obligations under the Plan.

## 10.3     Authorization, Empowerment, Rights and Duties of Plan Trustee.

(a)     The Plan Trustee shall be authorized and empowered to preserve, protect and maximize the value of the Plan Trust causes of action, as promptly and efficiently as is reasonably possible, and distribute all income and proceeds therefrom in accordance with the terms of the Plan.

(b)     The Plan Trustee may engage such attorneys, accountants and other professionals as are reasonably required to effectively and efficiently perform his responsibilities under the Plan and shall pay the reasonable fees, charges and expenses of such attorneys, accountants and other professionals who provide services after the Effective Date as an expense in accordance with Paragraph 11.2(a) herein.  The Plan Trustee may retain professionals who were retained by the Debtor or the Creditors' Committee during the Case.

(c)     The Plan Trustee shall have the right and duty to examine all rights of action, including, without limitation, the Avoidance Claims, Commercial Tort Claims and other claims and causes of action of the Estate and to commence an action, litigate to final judgment, settle, withdraw or otherwise resolve such rights of action.

(d)     The Plan Trustee shall have the right and duty to examine all Claims, not previously allowed as of the Effective Date, and file, litigate to final judgment, seek to estimate or subordinate, settle, withdraw or otherwise resolve objections to such Claims in accordance with the Plan Trust Agreement.

(e)     Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Plan Trustee shall have authority to settle (i) all Avoidance Claims, Commercial Tort Claims and other claims and causes of action on behalf of the Estate and (ii) all Claims, not previously allowed as of the Effective Date, without further review or approval of the Bankruptcy Court as set forth in the Plan Trust Agreement.

(f)     The Plan Trustee shall make distributions under the Plan as often as in the Plan Trustee's discretion and judgment there is an amount of funds sufficient to make a meaningful distribution to holders of Allowed Claims, and to holders of Allowed Class 3 Equity Interests, if any. In making such determinations, the Plan Trustee shall exclude from distributions amounts of Cash necessary to meet other obligations of the Plan Trust and/or the Plan Trustee, held for withholding Taxes or other charges, or otherwise needed to pay the present or future expenses, debts, charges, liabilities and obligations of the Plan Trust and/or the Plan Trustee in accordance with the terms of the Plan.

(g)     The Plan Trustee may resign by giving written notice of his resignation to the Bankruptcy Court, the Office of the United States Trustee and all parties who filed notices of appearance and requests for service of pleadings in this Case. Unless the Bankruptcy Court (on motion of any party) orders otherwise, (i) such resignation shall become effective on the date on which the Bankruptcy Court appoints a successor Plan Trustee or a replacement Plan Trustee is appointed pursuant to the terms of the Plan Trust Agreement and (ii) the Plan Trustee shall be entitled to compensation up to the date on which the Plan Trustee's resignation becomes effective.

(h)     The Plan Trustee shall retain and may enforce any and all claims, causes of action and rights of the Debtor or the Estate, including, without limitation, Avoidance Claims and Commercial Tort Claims.

(i)     The Plan Trustee shall be authorized to take any and all necessary actions to comply with the requirements of any taxing authorities, including in connection with its duties pursuant to Paragraph 11.4 herein, including, but not limited to, (i) compile, draft and file any necessary local, state and federal Tax returns on behalf of the Debtor and the Plan Trust and (ii) obtain any necessary tax identification numbers. Any claimant that does not provide a tax identification number to the Plan Trustee timely upon receipt of a request for such number shall not be entitled to any distribution on account of its claims and such claims shall be disallowed.

**10.4    Participation by the Plan Trustee.**

The Plan Trustee shall have the right to participate in any (i) hearings on proposed modifications or amendments to the Plan, notwithstanding the provisions of Bankruptcy Code Section 1127, (ii) actions to enforce or interpret the Plan, and (iii) proceedings regarding Disputed Claims.

**10.5    Investments of Cash Pending Distributions.**

Any Cash recovered by the Plan Trustee in satisfying its obligations hereunder shall be invested as the Plan Trustee determines is reasonable.

**10.6    Limitation of Liability of the Plan Trustee.**

The Plan Trustee and its counsel are hereby exculpated by holders of Claims from any and all claims, causes of action and other assertions of liability (including breach of fiduciary duty) arising out

of the discharge by the Plan Trustee of the powers and duties conferred upon him, her or it by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the gross negligence, willful misconduct or fraud of the Plan Trustee or its counsel. No current holder of a Claim, or representative thereof, or other party in interest shall have or pursue any claim or cause of action against the Plan Trustee or its counsel for making payments or distributions in accordance with the Plan.

The Plan Trustee and any supplemental Plan Trustee and its members, agents, representatives, employees and professionals shall not be liable to the Debtor, Sponsor, creditors or any other entity or party in interest for any error of judgment made in good faith, but only for gross negligence, willful misconduct or fraud. The Plan Trustee shall not be liable for any action taken or omitted in good faith and believed by it to be authorized within the discretion or rights or powers conferred upon it by the Plan. The Plan Trustee makes no representation as to the value or condition of the Debtor's assets or any part thereof, or as to the security afforded by the Plan, or as to the validity, execution (except its own execution), enforceability, legality or sufficiency of the Plan and the Plan Trustee shall incur no liability or responsibility with respect to such matters. In performing its duties under the Plan, the Plan Trustee may retain and consult with counsel selected by it and shall have no liability for any action taken upon the advice of such counsel. None of the provisions of the Plan shall require or be construed as requiring the Plan Trustee to expend or risk its own funds or otherwise incur or expose it to personal financial liability in the performance of any of its duties under the Plan or in the exercise of any of its rights and powers. The Plan Trustee may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper Person. The Plan Trustee shall, pursuant to the terms of the Plan Trust Agreement, be indemnified and receive reimbursement from the Estate and the Plan Trust against and from any and all loss, liability or damage, including payment of attorneys' fees and other costs of defending itself, which it may incur or sustain, other than as a result of gross negligence, willful misconduct or fraud in the exercise and performance of its duties hereunder and under the Plan.

## 10.7 Certain Records.

A complete copy of book and records for the period January 1, 2000 through the Effective Date, which may be in electronic format, which the Debtor has in its possession, shall be provided to the Plan Trustee on the Effective Date. Upon written request to the Estate and/or the Reorganized Debtor, as applicable, which requests shall be reasonable in scope and related to the duties of the Plan Trustee, the Plan Trustee shall (at no material cost or expense to the Estate and/or the Reorganized Debtor, as the case may be), also be afforded reasonable access (with no obligation on the part of the Estate or the Reorganized Debtor to advance photocopying or other costs related to the Plan Trustee's efforts) to such other pre-Effective Date records of the Debtor as the Plan Trustee shall deem necessary to fulfill its obligations.

## 10.8 Termination of the Plan Trust and Plan Trustee.

Upon substantial completion of its functions as designated herein, but no later than five (5) years from the Effective Date, which date may be extended as provided in the Plan Trust Agreement, the Plan Trustee shall be discharged and the Plan Trust shall be terminated.

# Article XI. Distributions

## 11.1 Distributions to Plan Trustee.

On the Effective Date, the Debtor shall transfer the Plan Trust Assets and Plan Trust Liabilities, to the Plan Trust, and effective as of the Effective Date, the Plan Trust Assets and the Plan Trust Liabilities are hereby transferred and assigned, to the Plan Trust.

## 11.2 Distributions.

### (a) Debtor and Plan Trustee.

Prior to the Effective Date, the Debtor shall be solely responsible for making all of the distributions under the Plan including distributions to holders of Allowed Administrative Claims. From and after the Effective Date, the Reorganized Debtor shall be solely responsible for discharging all Assumed Liabilities and the Plan Trustee shall be solely responsible for making all other distributions under the Plan including distributions to (i) holders of Allowed Administrative Claims; (ii) holders of Allowed Priority Claims; (iii) holders of Allowed Class 1, 2a and 2b Claims, and holders of Allowed Class 3 Equity Interests, if any, according to the terms of the Plan and (iv) required to be made on the Plan Distribution Date.

All costs and expenses in connection with distributions made by the Plan Trustee, including, without limitation, the fees and expenses of the Plan Trustee and its professionals, shall be borne solely out of proceeds of the Plan Trust Assets.

### (b) Dates of Distributions.

Unless otherwise provided, all distributions required to be made in the Plan shall be made on the Plan Distribution Date. Any distribution required to be made on the Effective Date shall be deemed to be made on such date if made as soon as practicable after such date and, in any event, within thirty (30) days after such date. The Plan Trustee or the Debtor, as applicable, shall make distributions in accordance with the Plan and the Plan Trust Agreement as often as in their respective discretion and judgment, the Plan Trust or the Debtor, as applicable, have sufficient funds to make a meaningful distribution. The Plan Trustee or the Debtor, as applicable, shall exclude from distributions amounts of Cash necessary to meet other obligations of the Plan Trust and/or the Plan Trustee and the Debtor, as applicable, held for withholding Taxes or other charges, or otherwise needed to pay the present or future expenses, debts, charges, liabilities and obligations of the Plan Trust and/or the Plan Trustee and the Debtor, as applicable, in accordance with the terms of the Plan and the Plan Trust Agreement.

### (c) Manner of Payment.

At the option of the Plan Trustee and the Debtor, as applicable, with respect to the distributions to be made by it, distributions may be made in Cash, by wire transfer or by a check drawn on a domestic bank.

### (d) Minimum Distributions.

Notwithstanding anything to the contrary herein, the Plan Trustee and the Debtor, as applicable, shall not be obligated to make any distribution to the holder of an Allowed Claim or Equity Interest in the

aggregate amount of $10.00 or less. To the extent Cash remains undistributed as a result of this Paragraph 11.2(d), such Cash shall be treated as "Unclaimed Property" under Paragraph 11.5(d) of the Plan.

## 11.3    Rounding of Payments.

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under Paragraph 11.5(d) of the Plan.

## 11.4    Compliance with Tax Requirements.

The Plan Trustee and the Debtor shall comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

## 11.5    Undeliverable Distributions, Voided Checks and Distribution of Unclaimed Property.

(a)    If any distribution by the Plan Trustee or the Debtor to the holder of an Allowed Claim or Equity Interest is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies the Plan Trustee or Debtor, as applicable, in writing, in accordance with Paragraph 17.4, of such holder's then-current address, at which time all missed distributions shall, subject to Paragraph 11.5(d), be made as soon as is practicable to such holder, without interest.

(b)    Checks issued by or on behalf of the Plan Trustee or the Debtor in respect of Allowed Claims or Equity Interests shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check shall be made in accordance with the notice provisions of Paragraph 17.4 by the holder of the Allowed Claim or Equity Interest to whom such check was originally issued. No further distributions to such holder shall be made unless and until the holder notifies the Plan Trustee or the Debtor, as applicable, in writing of such holder's claim for the voided check, at which time and as soon as is practicable, subject to Paragraph 11.5(d), a check shall be re-issued to such holder, without interest.

(c)    Notwithstanding anything to the contrary herein, nothing contained in the Plan shall require the Plan Trustee or the Debtor to attempt to locate the holder of an Allowed Claim or Equity Interest which is the subject of an undeliverable distribution or voided check.

(d)    All claims for undeliverable distributions or voided checks shall be made on or before one hundred and fifty (150) days after the date such undeliverable distribution or check was initially made or issued, respectively. After such dates, all such distributions shall be deemed Unclaimed Property under Bankruptcy Code Section 347(b). The holder of any Claim or Equity Interest for which an undeliverable distribution or voided check has been deemed Unclaimed Property shall not be entitled to any other or further distribution under the Plan on account of such Claim or Equity Interest. The Unclaimed Property and accrued interest or dividends earned thereon shall become the property of, and shall be released to, the Plan Trustee for distribution in accordance with the Plan and the Plan Trust Agreement.

**11.6     Setoff.**

The Plan Trustee and the Debtor, as applicable, may, but are not required to, set off against any Claim and the distribution to be made pursuant to the Plan in respect of such Claim, any claims of any nature which the Estate may have against the holder of such Claim. Neither the failure by the Plan Trustee or the Estate to affect such a setoff nor the allowance of any Claim shall constitute a waiver or a release of any claim which the Estate may have against the holder of a Claim.

## Article XII.  Procedures for Resolving Objections to Claims

**12.1     Objections to Claims.**

Prior to the Effective Date, the Debtor shall be responsible for pursuing any objection to the allowance of any Claim. From and after the Effective Date, the Plan Trustee shall be solely responsible for pursuing any objection to the allowance of any and all Claims.

Unless another date is established by the Bankruptcy Court or this Plan, any objection to a Claim shall be filed with the Bankruptcy Court and served on the Person holding such Claim within ninety (90) days of the Effective Date ("Claims Objection Bar Date"). The Plan Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of such dates if cause exists for such an extension.

**12.2     Treatment of Disputed Claims.**

(a)     No Distribution Pending Allowance.

If any portion of a Claim is a Disputed Claim, no payment or distribution provided for under the Plan shall be made on account of the portion of such Claim that is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim, but the payment or distribution provided for under the Plan shall be made on account of the portion of such Claim that is an Allowed Claim.

(b)     Distribution After Allowance.

As soon as practicable after the date on which a Disputed Claim becomes an Allowed Claim and, in any event, within three months after such date, the Plan Trustee shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if such Claim had been an Allowed Claim on the Effective Date.

(c)     Reserves for Disputed Claims.

In the event that Disputed Claims are pending, the Plan Trustee shall establish reasonable reserves for such Disputed Claims, and the aggregate property to be distributed to holders of Allowed Claims on any Plan Distribution Date shall be adjusted to reflect such reserves. No amounts shall be reserved for Claims filed more than forty-five (45) days after the Effective Date, and such Claims shall be deemed disallowed without any action by the Debtor or the Plan Trustee or further order of the Bankruptcy Court.

**12.3    Administrative Claims.**

The resolution of Administrative Claims shall be governed by Paragraph 4.2 of this Plan.

**12.4    Professional Fee Claims.**

The resolution of Professional Fee Claims shall be governed by Paragraph 4.2 of this Plan.

**12.5    Subordinated Claims.**

Either the Debtor prior to the Effective Date or the Plan Trustee from and after the Effective Date shall commence appropriate proceedings in the Bankruptcy Court with respect to any Claims it believes should be subordinated pursuant to Bankruptcy Code Section 510(b) or otherwise.

**12.6    Estimation of Claims.**

Prior to the Effective Date, the Debtor, and from and after the Effective Date, the Plan Trustee may, at any time, request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Plan Trustee, as applicable, has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## Article XIII.  Effects of Plan Confirmation

**13.1    Binding Effect of Confirmation.**

Confirmation will bind the Debtor, all holders of Claims or Equity Interests and all other parties in interest to the provisions of the Plan whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not the holder of such Claim or Equity Interest has accepted the Plan.

**13.2    Good Faith.**

Confirmation of the Plan shall constitute a finding that: (i) this Plan has been proposed by the Debtor and the Sponsor in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all Persons' solicitations of acceptances or rejections of this Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**13.3    Injunction.**

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold or may hold a debt, Claim or Equity Interest discharged pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on

account of any such discharged debt, Claim or Equity Interest: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, the Reorganized Debtor, their successors or their respective property; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Reorganized Debtor, their successor or its respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the Reorganized Debtor, their successors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due to the Debtor, the Reorganized Debtor, their successors or their respective property; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

## 13.4    Releases by the Debtor and the Reorganized Debtor.

As of the Effective Date, for good and valuable consideration, *the Debtor (in its individual capacity and as Debtor in Possession), the Estate, the Reorganized Debtor, and its subsidiaries, directors, officers, shareholders, general and limited partners, members, managers, operators, agents, servants, employees, trustees, beneficiaries, heirs, executors, administrators, representatives, attorneys, and the affiliates, predecessors in interest, successors and assigns of the foregoing,* **release and forever waive and discharge all Claims, actions, complaints, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, guarantees. variances, trespasses, damages, judgment decrees, extents. executions, claims, demands and losses of any kind, and nature whatsoever whether known or unknown, asserted or unasserted, accrued or unaccrued, absolute or contingent. in law or in equity, (other than the right to enforce the obligations under the Plan and the contacts, instruments, releases and other agreements and documents delivered thereunder), whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place (i) on or prior to the Effective Date (with respect to the Pre-petition Released Parties and the Best Buy Released Parties) and (ii) on or after the Petition Date and prior to the Effective Date (with respect to the Post-petition Released Parties and the Best Buy Released Parties); and in any way relating to the Debtor (in its individual capacities and as Debtor in Possession), the Reorganized Debtor, the Estate and the Plan Trustee, the Chapter 11 Case, this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtor, the Estate or the Reorganized Debtor *against* any of the Released Parties or Best Buy Released Parties** <u>provided</u>**, however, that nothing in this Section shall be construed to release any party or entity from (x) fraud, willful misconduct or gross negligence as determined by a Final Order, or (y) any objections by the Debtor, the Reorganized Debtor or Plan Trustee to Claims or Equity Interests filed by such party or entity against the Debtor and/or its Estate or (z) any of its obligations or liabilities under this Plan. For avoidance of doubt, nothing contained in this Section or the Plan generally is or shall be deemed a release of any Post-petition Released Parties from any claims relating to or arising from actions or failures to act prior to the Petition Date.**

## 13.5    Releases by Sponsor.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Sponsor shall be presumed conclusively absolutely, unconditionally and

irrevocably to have released and forever waived and discharged any cause of action and any and all Claims, actions, complaints, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, guarantees, variances, trespasses, damages, judgment decrees, extents, executions, claims, demands and losses of any kind, and nature whatsoever whether known or unknown, asserted or unasserted, accrued or unaccrued, absolute or contingent in law or in equity, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place (i) on or after the Petition Date (with respect to the Post-petition Released Parties) and (ii) on or prior to the Effective Date (with respect to the Pre-petition Released Parties, the Debtor, the Estate, the Reorganized Debtor and the Plan Trustee) and in any way relating to the Chapter 11 Case, this Plan, the Disclosure Statement, the Debtor, the Debtor's restructuring or the purchase, sale or rescission of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Case or any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan *against* any of the Released Parties, the Debtor, the Estate, the Reorganized Debtor and the Plan Trustee; provided, however, that nothing in this Section shall be construed to release any party from fraud, willful misconduct or gross negligence as determined by a Final Order.

13.6     <u>Exculpation and Limitation of Liabilities.</u>

To the maximum extent permitted by law, neither the Debtor (in its individual capacity or as Debtor-in-Possession), the Reorganized Debtor, the Estate, the Plan Trustee, the Sponsor nor any of their respective subsidiaries, shareholders, present or former (provided that with respect to the Debtor, the exculpation pertains solely to persons serving and actions taken on or after November 1, 2010) employees, officers, directors, agents, members, representatives or the professionals employed or retained by any of them, whether or not by Bankruptcy Court order (each, an "<u>Exculpated Person</u>"), shall have or incur liability to any Person for any act taken or omission made in good faith in connection with or related to the wind-down or reorganization of the Debtor's business, the Asset Purchase Agreement and the transactions contemplated thereunder and any interim arrangements between the Debtor and the Sponsor as of November 1, 2010, the preparation for and formulation of the Plan, the Disclosure Statement or a contract, instrument, release or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan or the consummation and implementation of the Plan and the transactions contemplated therein as well as with respect to Argus Management Corporation and its employees and officers any actions taken in the scope of their crisis management of the Debtor as of November 1, 2010. Each Exculpated Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan. Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in this Paragraph is necessary to, inter alia, facilitate confirmation and to minimize potential claims arising after the Effective Date. The Confirmation Order's approval of the Plan also constitutes a res judicata determination of the matters included in the exculpation provisions of the Plan.

For avoidance of doubt, nothing in this Section shall be construed to release or exculpate any party or entity from (i) fraud, willful misconduct or gross negligence as determined by a Final Order, (ii) any objection by the Debtor, the Reorganized Debtor or the Plan Trustee to Claims or Equity Interests filed by or on behalf of such party against the Debtor and/or its estate, or (iii) any obligations under this Plan. Moreover, nothing contained in this Section or the Plan generally is or shall be deemed a release or exculpation of any of the Debtor's present or former officers or directors for any act or omission prior to November 1, 2010. Further, nothing in this Section or the Plan shall limit the liability of the professionals of the Debtor to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

**13.7** **No Releases from Plan Obligations.**

Nothing contained in this Article 13 shall release any party from its obligations under this Plan.

## Article XIV. Conditions to Confirmation and Effectiveness

**14.1** **Conditions Precedent to Plan Confirmation.**

The following are conditions precedent to confirmation of the Plan:

(a) The Clerk of the Bankruptcy Court shall have entered on the docket of the Chapter 11 Case an order or orders (i) approving the Disclosure Statement and, (ii) authorizing the solicitation of votes with respect to the Plan;

(b) The proposed Confirmation Order shall be in form and substance acceptable to the Debtor, the Creditors' Committee and the Sponsor;

(c) The proposed Confirmation Order shall include determinations that all of the settlements and compromises contained in the Plan meet the applicable standards under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation; and

(d) The transfer to the Debtor of the Nondebtor Subsidiary Included Assets pursuant to Section 5.8 of the Asset Purchase Agreement shall have occurred, and evidence thereof shall have been delivered to Sponsor in terms and substance reasonably satisfactory to the Sponsor.

**14.2** **Conditions Precedent to the Occurrence of the Effective Date**

It shall be a condition precedent to the occurrence of the Effective Date of the Plan that:

(a) the Confirmation Order shall have been entered;

(b) no stay of the Confirmation Order shall be in effect; and

(c) the Debtor shall have complied with or performed in all material respects (without giving effect to any limitation as to materiality set forth therein) all of the covenants and agreements in Sections 5.2, 5.4, 5.7, 5.8, and 5.9 of the Asset Purchase Agreement with which the Debtor is obligated to comply or that the Debtor is obligated to perform, in each case, pursuant to the Asset Purchase Agreement;

provided, however, that purposes of this Paragraph 14.2(c), any references to the terms "Closing" or "Closing Date" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Plan Closing and the Effective Date, respectively;

(d)     the representations and warranties of the Debtor in the Asset Purchase Agreement shall be true and correct except as would not individually or in the aggregate constitute, or be reasonably likely to result in, a Material Adverse Effect (without giving effect to any limitation as to materiality set forth therein) as of the date of the Asset Purchase Agreement and as of the Bring Down Date as if made on the Bring Down Date (except for any representation or warranty made as of a specified date prior to or as of the Bring Down Date, which shall be true and correct in all respects except as would not individually or in the aggregate constitute, or be reasonably likely to result in, a Material Adverse Effect (without giving effect to any limitation as to materiality set forth therein) as of such specified date) provided, however, that purposes of this Paragraph 14.2(d), (i) any references to the terms "Closing" or "Closing Date" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Plan Closing and the Effective Date, respectively and (ii) any references to the term "Sale Order" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Confirmation Order;

(e)     Best Buy Co., Inc. shall have complied with or performed in all material respects (without giving effect to any limitation as to materiality set forth therein) all of the covenants and agreements in the Asset Purchase Agreement to be complied with or performed by Best Buy Co., Inc. on or before the Effective Date; provided, however, that purposes of this Paragraph 14.2(e), any references to the terms "Closing" or "Closing Date" in the covenants and agreements in the Asset Purchase Agreement referred to above shall be deemed to refer to the Plan Closing and the Effective Date, respectively;

(f)     the representations and warranties of Best Buy Co., Inc. set forth in Article IV of the Asset Purchase Agreement shall be true and correct in all material respects (without giving effect to any limitation as to materiality set forth therein), in each case, as of the date of the Asset Purchase Agreement and as of the Bring Down Date as if made on the Bring Down Date (except for any representation or warranty made as of a specified date prior to or as of the Bring Down Date, which shall be true and correct in all material respects (without giving effect to any limitation as to materiality set forth therein) as of such specified date) provided, however, that purposes of this Paragraph 14.2(f), (i) any references to the terms "Closing" or "Closing Date" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Plan Closing and the Effective Date, respectively and (ii) any references to the term "Sale Order" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Confirmation Order;

(g)     the Debtor shall have delivered or cause to be delivered to the Sponsor the following items and documents:

(i)     a certificate, dated the Effective Date, representing and certifying that the conditions set forth in Paragraph 14.2(c) and (d) have been fulfilled, duly executed by the Debtor;

(ii)     right to possession of the Included Assets including keys, locks, safe combinations, passwords, access codes and otherwise required to obtain immediate control of the Included Assets;

(iii)    escrow instructions, instructing (A) disbursement on the Effective Date of the Escrowed Funds to a bank account of the Debtor or the Plan Trust, as the case may be, designated in writing by the Debtor or the Plan Trust, as the case may be, to the Sponsor, and (B) delivery of the Purchaser Escrowed Closing Documents to the Sponsor, and the Seller Escrowed Closing Documents to the Debtor; and

(iv)    a certificate, dated as of the Effective Date, executed on behalf of the Debtor, by an authorized executive officer thereof, describing all facts and circumstances existing as of the Effective Date that result in any of the representations and warranties of the Debtor set forth in Article III of the Asset Purchase Agreement not being materially true and correct as of the Effective Date; provided, however, that for the avoidance of doubt, the existence of any fact or circumstance described in such certificate shall not be a condition to the occurrence of the Effective Date;

(h)    the Sponsor shall have delivered or cause to be delivered to the Debtor the following items and documents:

(i)    a certificate, dated the Effective Date, representing and certifying that the conditions set forth in Paragraph 14.2(e) and (f) have been fulfilled, duly executed by the Sponsor;

(ii)    escrow instructions, instructing (A) disbursement on the Effective Date of the Escrowed Funds to a bank account of the Debtor or the Plan Trust, as the case may be, designated in writing by the Debtor the Plan Trust to the Sponsor, as the case may be, and (B) delivery of the Purchaser Escrowed Closing Documents to the Sponsor, and the Seller Escrowed Closing Documents to the Debtor; and

(iii)    the cash portion of the Equity Consideration and Cash payments payable pursuant to paragraph 8.3.

(i)    all other agreements and instruments contemplated by, or to be entered into pursuant to, the Plan, shall have been duly and validly executed and delivered to the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

## 14.3    Waiver and/or Modification of Conditions.

Each of the conditions precedent specified in Paragraph 14.1 and 14.2 may only be waived and/or modified by the Debtor and (a) with respect to conditions precedent specified in Paragraph 14.1 and 14.2(a), (b), (c), (d), (g) and (i), with the written consent of the Sponsor prior to the Outside Date; and (b) with respect to conditions precedent specified in Paragraph 14.1 and 14.2(a), (b), (e), (f), (h) and (i), the written consent of the Creditors' Committee at any time.

## Article XV.  Retention of Jurisdiction

## 15.1    Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case and any of the proceedings arising from or relating to, the Case pursuant to Bankruptcy Code Section 1142 and 28 U.S.C. § 1334 to the fullest

extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out. Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)     to hear and determine any and all objections to the allowance, or requests for estimation, of Claims or the establishment of reserves pending the resolution of Disputed Claims;

(b)     to consider and act on the compromise and settlement of any Claim against, or cause of action on behalf of, the Debtor or the Estate;

(c)     to hear and determine any motions pending on the Effective Date to reject any executory contract or unexpired lease and to determine the allowance of any Claim resulting therefrom;

(d)     to enter such orders as may be necessary or appropriate in connection with the recovery of the Debtor's assets wherever located;

(e)     to hear and determine any and all applications for allowance of compensation and reimbursement of expenses;

(f)     to hear and determine any and all controversies, suits and disputes arising under or in connection with the interpretation, implementation or enforcement of the Plan and any of the documents intended to implement the provisions of the Plan or any other matters to be resolved by the Bankruptcy Court under the terms of the Plan;

(g)     to hear and determine any motions or contested matters involving Taxes, Tax refunds, Tax attributes and Tax benefits and similar and related matters with respect to the Debtor arising prior to the Effective Date or relating to the administration of the Case, including, without limitation, matters involving federal, state and local Taxes in accordance with Bankruptcy Code Sections 346, 505 and 1146;

(h)     to hear and determine any and all applications, adversary proceedings and contested matters pending on the Effective Date or that may be commenced thereafter as provided in the Plan;

(i)     to effectuate distributions under and performance of the provisions of the Plan;

(j)     to hear and determine any applications to modify any provision of the Plan to the full extent permitted by the Bankruptcy Code;

(k)     to correct any defect, cure any omission or reconcile any inconsistency in the Plan, the exhibits to the Plan and annexes thereto or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan;

(l)     to determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(m)     to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with the Case or the Plan;

(n)     to enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(o)     to determine any other matter not inconsistent with the Bankruptcy Code or the Plan; and

(p)     to resolve any disputes regarding fees and expenses of professionals employed by the Plan Trustee.

## Article XVI.  Modification or Withdrawal of Plan

### 16.1     Modification of Plan.

At any time prior to confirmation of the Plan, the Debtor may supplement, amend or modify the Plan after providing at least three (3) Business Days written notice to the Sponsor and the Creditors' Committee, _provided_, however, that any Plan Modification Amendment shall require the prior written consent of the Sponsor and the Creditors' Committee.

After confirmation of the Plan, the Debtor or the Plan Trustee may apply to the Bankruptcy Court, pursuant to Bankruptcy Code Section 1127, to modify the Plan.  After confirmation of the Plan, the Debtor or Plan Trustee may apply to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.  The Plan may not be altered, amended or modified without the written consent of the Debtor or Plan Trustee.

### 16.2     Withdrawal of Plan.

The Debtor reserves the right, which right shall be subject to the Sponsor's consent prior to the Outside Date, to revoke and withdraw the Plan at any time before the Confirmation Date.

## Article XVII.  Miscellaneous

### 17.1     Saturday, Sunday or Legal Holiday.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 17.2     Headings.

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

### 17.3     Notices.

(a)     All notices and requests in connection with the Plan shall be in writing and shall be sent by facsimile, hand delivered or sent by mail addressed to:

If to the Debtor:

Argus Management Corporation
15 Keith Hill Road, Suite 100
Grafton, MA 01519
Attention: Lawton Bloom
Facsimile: (617) 687-7791

with copies to:

BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Attention: William R. Baldiga, Esq.
Facsimile: (212) 209-4801

If to the Plan Trustee:

{_____}

If to the Sponsor:

Best Buy Enterprise Services, Inc.
7601 Penn Avenue South
Richfield, MN 55423-3645
Attention: Legal Department – M&A.
Facsimile: (612) 292-2323

with copies to:

Foley & Lardner LLP
90 Park Avenue
New York, NY 10026
Attention: Richard J. Bernard
Facsimile: (212) 687-2329

If to the Creditors' Committee:

Herman Electronics
7350 NW 35th Street
Miami, FL 33122
Attention: David Wolf, President
E-Mail: dwolf@hermanelectronics.com

With copies to:

Halperin Battaglia Raicht LLP

555 Madison Avenue, 9th Floor
New York, NY 10022
Attention: Walter Benzija, Esq.
Facsimile: (212) 765-0964
E-Mail: wbenzija@halperinlaw.net

(b)     All notices and requests to any Person holding of record any Claim or Equity Interest shall be sent to such Person at its last known address or to the last known address of its attorney of record. Any such Person may designate in writing any other address for purposes of this Paragraph 17.3, which designation will be effective on receipt.

**17.4     Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware.

**17.5     Successors and Assigns.**

The rights, duties and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity; provided, however, that the Plan Trustee is not and shall not be deemed a successor to the Debtor, but shall have the rights and duties enumerated in this Plan.

**17.6     Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtor, and prior to the Outside Date to the extent affecting the Sponsor or its interests, the Sponsor, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

**17.7     No Waiver.**

The failure of the Debtor to object to any Claim for purposes of voting shall not be deemed a waiver of the Debtor's or Plan Trustee's right to object to or examine such Claim, in whole or in part.

**17.8     Payment of Post-Petition Interest and Attorneys' Fees.**

Unless otherwise expressly provided in the Plan or allowed by Final Order of the Bankruptcy Court, the Debtor or the Plan Trustee shall not be required to pay to any holder of a Claim any interest accruing on or after the Petition Date or any attorneys' fees with respect to such Claim.

**17.9    Creditors' Committee.**

The Creditors' Committee shall terminate on the Effective Date, provided however, that to the extent final applications for payment of professional fees and reimbursement of expenses are heard by the Bankruptcy Court after the Effective Date, the Creditors' Committee shall remain in existence for the limited purpose of reviewing and if necessary responding to such applications.

**17.10    Post-Effective Date Fees and Expenses.**

From and after the Effective Date, the Estate and/or the Plan Trustee shall, without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of the Professional Persons thereafter incurred by the Estate and/or the Plan Trustee related to the implementation and consummation of the Plan to the extent that such fees and expenses accrue after the Effective Date (i.e., fees and expenses that are not Administrative Claims – payment of Administrative Claims being dealt with elsewhere in the Plan). Such fees and expenses shall be paid within fifteen (15) days of the client's receipt of the applicable invoice, absent objection by the client.

**17.11    Final Decree and Case Closure.**

The Case shall remain open until the earlier of (a) the date on which all actions authorized under the Plan that are brought by the Plan Trustee are resolved and (b) the date on which the Plan Trustee determines that no actions will be brought by the Plan Trustee. In accordance with Bankruptcy Code Section 1129(a)(12) and 28 U.S.C. § 1930, all quarterly fees payable to the Office of the United States Trustee, including any interest due pursuant to 37 U.S.C. § 3717, shall be paid in full on or before their respective due dates and shall continue to be assessed and paid until such time as a final decree closing, converting or dismissing this Case is entered by the Bankruptcy Court. The Debtor and the Estate shall be liable for payment of such quarterly fees during the period through and including the Effective Date and the initial distribution made pursuant to the Plan, including the distributions to the Plan Trustee, and the Plan Trustee shall be liable for all other quarterly fees payable to the Office of the United States Trustee thereafter until the Case is closed, converted or dismissed. The Debtor or the Plan Trustee shall promptly file an application for a final decree with the Court to close the Case, upon notice to each other and the United States Trustee.

**17.12    Exemption from Certain Transfer Taxes.**

Pursuant to Bankruptcy Code Section 1146(c), any transfers made pursuant to the Plan, including any transfers from the Debtor, the Estate and/or the Plan Trustee to any other Person or entity, shall not be subject to any document recording Tax, stamp Tax, conveyance fee, intangibles or similar Tax, mortgage Tax, stamp act, real estate transfer Tax, mortgage recording Tax or other similar Tax or governmental assessment.

**17.13    Inconsistencies.**

In the event the terms or provisions of the Plan are inconsistent with the terms and provisions of the exhibits to the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

**17.14   Post-Effective Date Effect of Evidences of Claims or Equity Interests.**

Except as otherwise expressly provided in the Plan, notes, bonds, stock certificates and other evidences of Claims against or Equity Interests in the Debtor shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

**17.15   Other Documents and Actions.**

The Debtor, Plan Trustee and other appropriate Persons may execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

Dated: August 16, 2011

Respectfully submitted,

Partsearch Technologies, Inc.

By:  ___/s/ Lawton W. Bloom_____
Name:  Lawton W. Bloom
Title:   Chief Restructuring Officer

## EXHIBIT A

## GLOSSARY OF DEFINED TERMS

1.    <u>Administrative Bar Date</u>     has the meaning set forth in Paragraph 4.2.

2.    <u>Administrative Claim</u>     means any Claim for an administrative expense of the kind described in Bankruptcy Code Section 503(b), including, without limitation, the actual and necessary costs and expenses of preserving the Estate of the Debtor incurred after the commencement of the Case, Claims for fees and expenses pursuant to Bankruptcy Code Sections 330 and 331 (covering the period through the Effective Date) and fees, if any, due to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6).

3.    <u>Allowed Claim</u>     means a Claim to the extent (a) such Claim is listed by the Debtor on its Schedules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined or disputed; or (b) proof of such Claim or any portion thereof was timely filed, or deemed timely filed, with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable Final Order; and (i) as to which no objection to allowance or request for estimation has been interposed on or before the expiration of such applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or the Bankruptcy Court; (ii) as to which any objection to its allowance has been settled, waived through payment or withdrawn or has been denied by a Final Order; (iii) that has been allowed by a Final Order; (iv) as to which the liability of the Debtor and the amount thereof are determined by Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (v) that is expressly allowed in the Plan; or (vi) that is not subject to disallowance under Bankruptcy Code Section 502(d).  Unless otherwise specified in the Plan or in the Final Order allowing such Claim, "Allowed Claim" shall not include interest on the amount of such Claim maturing or accruing from and after the Petition Date, or any punitive or exemplary damages or any fine, penalty or forfeiture.

4.    <u>Asset Purchase Agreement</u>     means that certain contingent Asset Purchase Agreement by and between the Debtor and Best Buy Co., Inc. dated as of March 31, 2010, a copy of which is attached to the Plan as **<u>Exhibit C</u>**.

| | | |
|---|---|---|
| 5. | <u>Assumed Liabilities</u> | has the meaning set forth in the Asset Purchase Agreement; <u>provided</u>, <u>however</u>, that with respect to any Liabilities (as defined in the Asset Purchase Agreement) that are Assumed Liabilities and are determined in part by reference to the Closing (as defined in the Asset Purchase Agreement), the Closing Date (as defined in the Asset Purchase Agreement) or the Sale Order (as defined in the Asset Purchase Agreement), for purposes of the Plan, "Closing" shall mean the Plan Closing, the "Closing Date" shall mean the Effective Date, and "Sale Order" shall mean the Confirmation Order. |
| 6. | <u>Avoidance Claims</u> | has the meaning set forth in Paragraph 9.13. |
| 7. | <u>Bankruptcy Code</u> | means the Bankruptcy Reform Act of 1978, as amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as now in effect or hereafter amended. |
| 8. | <u>Bankruptcy Code Section</u> | means except where otherwise indicated, a section of the Bankruptcy Code (title 11, United States Code), as in effect with respect to the Case. |
| 9. | <u>Bankruptcy Court</u> | means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Case. |
| 10. | <u>Bankruptcy Rules</u> | means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to 28 U.S.C. § 2075 and as applicable to the Case. |
| 11. | <u>Bar Date Order</u> | has the meaning set forth in Paragraph 3.1. |
| 12. | <u>Best Buy</u> | means Best Buy Co., Inc., Best Buy Enterprise Services, Inc. and their respective affiliates. |
| 13. | <u>Best Buy Claim</u> | means all of the Claims of Best Buy Enterprise Services, Inc. including but not limited to Claims for overpayments pursuant to the Best Buy Services Agreement, which Claims total $11,146,683. After satisfaction of $8,850,000 of Best Buy's Claim in exchange for seventy-five (75) New Common Shares, the Allowed Best Buy Claim shall be $2,296,683. |
| 14. | <u>Best Buy Services Agreement</u> | means that certain Services Agreement, dated as of July 24, 2009, by and between Best Buy Enterprise Services, Inc. and the Debtor |

| 15. | Best Buy Released Parties | Best Buy and all of its current or former employees, subsidiaries, directors, officers, agents, shareholders, general and limited partners, members, managers, operators, agents, servants, trustees, beneficiaries, heirs, executors, administrators, estates, representatives, attorneys, financial advisors and professionals, and affiliates, predecessors in interest, successors and assigns of the foregoing. |
|---|---|---|
| 16. | Bring Down Date | has the meaning set forth in the Asset Purchase Agreement. |
| 17. | Business Day | means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a). |
| 18. | Case or Chapter 11 Case | means the case under title 11 of the United States Code with respect to the Debtor pending in the Bankruptcy Court. |
| 19. | Cash | means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America. |
| 20. | Causes of Action | means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise. |
| 21. | Claim | means a claim, as defined in Bankruptcy Code Section 101(5), against the Debtor that currently exists or arises before the Effective Date, proof of which has been established in accordance with the Bankruptcy Code, applicable orders of the Bankruptcy Court and this Plan. |
| 22. | Claims Bar Date | has the meaning set forth in Paragraph 3.1. |
| 23. | Claims Objection Bar Date | has the meaning set forth in Paragraph 12.1. |
| 24. | Class | means each class of Claims or Equity Interests established pursuant to Article V of the Plan with Class 2a and 2b being separate classes. |

| 25. | Commercial Tort Claims | means a claim arising in tort, including but not limited to a claim for negligence, gross negligence, lack of good faith, lack of fair dealing, breach of fiduciary duty, intentional misconduct or fraud, which claim arose in the course of the claimant's or the Debtor's business or profession. Claims for damages arising out of personal injury to or the death of an individual shall not be Commercial Tort Claims. |
| --- | --- | --- |
| 26. | Confirmation Date | means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court. |
| 27. | Confirmation Hearing | means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan. |
| 28. | Confirmation Order | means an order of the Bankruptcy Court confirming the Plan. |
| 29. | Creditors' Committee | means the official committee of unsecured creditors appointed in the Chapter 11 Case. |
| 30. | Debtor | means Partsearch Technologies, Inc. |
| 31. | Disclosure Statement | means the disclosure statement filed with respect to the Plan, together with the exhibits thereto, as the same may be amended or modified by the Debtor from time to time pursuant to the Plan, Disclosure Statement, the Bankruptcy Code or the Bankruptcy Rules. |
| 32. | Disputed Claim | means any Claim not otherwise an Allowed Claim or paid pursuant to the Plan or an order of the Bankruptcy Court (a) which has been or hereafter is listed on the Debtor's Schedules filed in the Case as unliquidated, contingent or disputed and which has not been resolved by written agreement of the parties or an order of the Bankruptcy Court; (b) proof of which was required to be filed by the Plan or by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) proof of which was timely and properly filed and which has been or hereafter is listed on the Debtor's Schedules as unliquidated, contingent or disputed; (d) that is disputed in accordance with the provisions of this Plan; or (e) as to which the Debtor or the Plan Trustee has interposed a timely objection or request for estimation in accordance with the Plan, Bankruptcy Code, the Bankruptcy Rules and any orders of the Bankruptcy Court or is otherwise disputed by the Debtor or the Plan Trustee in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order. Any portion of a Claim which is not disputed by the Debtor or Plan Trustee shall, for purposes of receiving distributions under the Plan, be deemed to be an Allowed Claim. |

| 33. | Effective Date | means 12:01 a.m. prevailing Eastern Time on the first Business Day upon which the conditions set forth in Article XIV of the Plan have been satisfied or waived as provided in the Plan and the Plan is confirmed by the issuance of the Confirmation Order, but in no event earlier than the date which is fifteen (15) days after the Confirmation Date (except as may be permitted by the Confirmation Order). |
|---|---|---|
| 34. | Equity Consideration | means the consideration paid by the Sponsor for one hundred percent (100%) of the one hundred (100) New Common Shares consisting of Cash in the amount of $1,321,355 in exchange for twenty-five (25) New Common Shares and satisfaction of $8,850,000 of the Best Buy Claim in exchange for seventy-five (75) New Common Shares. |
| 35. | Equity Interest | means the interest represented by any equity security, as defined in Bankruptcy Code Section 101(16), of the Debtor. |
| 36. | Equity Sale | has the meaning set forth in Section 9.1. |
| 37. | Escrow Agreement | means that certain Escrow Agreement dated as of March 31, 2011 by, between and among Best Buy Co., Inc., the Debtor and Brown Rudnick LLP. |
| 38. | Escrowed Funds | has the meaning set forth in the Escrow Agreement. |
| 39. | Estate | means the Debtor's estate created by Bankruptcy Code Section 541(a). |
| 40. | Excluded Assets | has the meaning set forth in the Asset Purchase Agreement provided, however, that with respect to any assets, properties or rights that are Excluded Assets and are determined in part by reference to the Closing (as defined in the Asset Purchase Agreement), the Closing Date (as defined in the Asset Purchase Agreement) or the Sale Order (as defined in the Asset Purchase Agreement), for purposes of the Plan, "Closing" shall mean the Plan Closing, the "Closing Date" shall mean the Effective Date, and "Sale Order" shall mean the Confirmation Order |

| 41. | Excluded Liabilities | has the meaning set forth in the Asset Purchase Agreement provided, however, that with respect to any Liabilities (as defined in the Asset Purchase Agreement) that are Excluded Liabilities and are determined in part by reference to the Closing (as defined in the Asset Purchase Agreement), the Closing Date (as defined in the Asset Purchase Agreement) or the Sale Order (as defined in the Asset Purchase Agreement), for purposes of the Plan, "Closing" shall mean the Plan Closing, the "Closing Date" shall mean the Effective Date, and "Sale Order" shall mean the Confirmation Order. |
|---|---|---|
| 42. | Exculpated Person | has the meaning set forth in Section 13.6. |
| 43. | Final Order | means an order or judgment of any court, administrative agency or other tribunal as to which (a) the time has expired within which a proceeding for review (whether by way of rehearing, appeal, certiorari or otherwise, but not pursuant to Bankruptcy Code Section 1144 or Bankruptcy Rule 9024) may be commenced, without any such proceeding having been commenced or (b) if such a proceeding has been timely commenced, such order or judgment has been affirmed by the highest tribunal in which review is sought or such proceeding for review was otherwise terminated without modification of such order or judgment and the time has expired within which any further proceeding for review may be commenced. |
| 44. | General Bar Date | shall have the meaning set forth in the Bar Date Order. |
| 45. | General Unsecured Claims | means any Claim against the Debtor other than an Administrative Claim, a Priority Claim, a General Secured Claims, the Best Buy Claim, a Subordinated Equity Claim, or an Equity Interest. |
| 46. | Government Bar Date | shall have the meaning set forth in the Bar Date Order. |
| 47. | Governmental Claim | means a Claim against the Debtor by a Governmental Unit. |
| 48. | Governmental Unit | is defined in Bankruptcy Code Section 101(27). |
| 49. | Included Assets | has the meaning set forth in the Asset Purchase Agreement; provided, however, that (with respect to any assets, properties, rights or claims that are Included Assets and are determined in part by reference to the Closing (as defined in the Asset Purchase Agreement), the Closing Date (as defined in the Asset Purchase Agreement) or the Sale Order (as defined in the Asset Purchase Agreement), for purposes of the Plan, "Closing" shall mean the Plan Closing, the "Closing Date" shall mean the Effective Date, and "Sale Order" shall mean the Confirmation Order.. |

| 50. | Local Rules | means the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York. |
| 51. | Material Adverse Effect | has the meaning set forth in the Asset Purchase Agreement. |
| 52. | New Common Shares | means a total of one hundred (100) shares of common stock of the Reorganized Debtor to be issued pursuant to the terms of the Plan. |
| 53. | Nondebtor Subsidiary Included Assets | has the meaning set forth in the Asset Purchase Agreement. |
| 54. | Notice of Confirmation | means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed to holders of Claims and Equity Interests and counter-parties to executory contracts and unexpired leases within three (3) Business Days of the Confirmation Date. The notice shall inform holders of Claims that taxpayer identification numbers must be provided to the Debtor within thirty (30) days of the date of the Notice. |
| 55. | Office of the United States Trustee | means the Office of the United States Trustee with jurisdiction over the Case. |
| 56. | Operating Lease Agreement | means that certain Operating Lease Agreement dated as of March 31, 2011 by and between the Debtor and Best Buy Co, Inc. |
| 57. | Outside Date* | means November 4, 2011, or such later date as may be mutually agreed to by the Debtor and Best Buy; provided however, that if the Effective Date does not occur by October 7, 2011, then Best Buy will pay $1,667 per day to the Estate until the earlier of: (i) the occurrence of the Effective Date; or (ii) November 4, 2011. |
| 58. | Paragraph | means an enumerated paragraph in the Plan as specified. |
| 59. | Person | means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated associated, unincorporated organization, governmental entity or political subdivision thereof or any other entity. |
| 60. | Petition Date | means the date on which the Case of the Debtor was commenced. |
| 61. | Plan | means the Debtor's Plan of Reorganization as set forth herein, together with the exhibits thereto, as the same may be amended or modified by the Debtor from time to time pursuant to the Plan, the Bankruptcy Code or the Bankruptcy Rules. |
| 62. | Plan Closing | has the meaning set forth in Paragraph 9.5. |

| 63. | Plan Distribution Date | means (a) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim or (b) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date. |
|---|---|---|
| 64. | Plan Modification Amendment | means any amendment, modification or supplement to the Plan that (i) has any material impact on the treatment of the Best Buy Claims; or (ii) has any material adverse overall economic effect (direct or consequential) on the Reorganized Debtor. |
| 65. | Plan Trust | has the meaning set forth in Paragraph 9.10 and shall be governed by the Plan Trust Agreement. |
| 66. | Plan Trust Agreement | is the agreement governing the Plan Trust as attached to the Plan as **Exhibit B**. |
| 67. | Plan Trust Assets | means (a) the Equity Consideration, (b) all Excluded Assets and any Cash proceeds thereof, (including for avoidance of doubt, proceeds received from the Sponsor pursuant to Section 8.3 hereof and the cash portion of the Equity Consideration), (c) any Cash of the Debtor on hand, both as existing as of the Effective Date, and (d) the claims and causes of action and proceeds of the same described as Plan Trust Assets in Section 9.12 of the Plan. |
| 68. | Plan Trust Liabilities | means the Excluded Liabilities. |
| 69. | Plan Trustee | means the person or entity designated as Plan Trustee pursuant to the Plan, or its designee, and any successor appointed pursuant to the Plan. |
| 70. | Post Petition Interest | means unpaid interest accruing on such claims from the Petition Date through the Effective Date at the non-default rate set forth in the contract or other applicable document giving rise to such claims. |
| 71. | Post-Petition Released Parties | means collectively any employee, director, officer, agent, financial advisor, representative, attorney and professional of the Debtor, and all affiliates of the foregoing, serving as such on or after the Petition Date other than the Pre-petition Released Parties. |
| 72. | Pre-petition Released Parties | means the Persons identified on the attached **Schedule A** and all employees, subsidiaries, directors, officers, agents, shareholders, general and limited partners, members, managers, operators, agents, servants, trustees, beneficiaries, heirs, executors, administrators, estates, representatives, attorneys, financial advisors and professionals, and affiliates, predecessors in interest, successors and assigns of the foregoing. |

| | | |
|---|---|---|
| 73. | <u>Priority Claim</u> | means any Claim, other than an Administrative Claim, to the extent entitled to priority under Bankruptcy Code Section 507(a). |
| 74. | <u>Pro Rata</u> | means, except as may otherwise be provided herein, proportionately, so that with respect to any distribution in respect of any Allowed Claim or Equity Interest, the ratio of (a) (i) the amount of property distributed on account of such Allowed Claim or Equity Interest to (ii) the amount of such Allowed Claim or Equity Interest, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims or Equity Interests of the Class or Classes sharing in such distribution to (ii) the amount of all Allowed Claims or Equity Interests in such Class or Classes. |
| 75. | <u>Professional Fee Application</u> | means an application for allowance and payment of a Professional Fee Claim (including any Claims for "substantial contribution" pursuant to Bankruptcy Code Section 503(b)). |
| 76. | <u>Professional Fee Claim</u> | has the meaning set forth in Paragraph 4.2. |
| 77. | <u>Professional Fee Claim Bar Date</u> | has the meaning set forth in Paragraph 4.2. |
| 78. | <u>Professional Person</u> | means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to Bankruptcy Code Sections 327, 328, 329, 330, 331, 503(b) or 1103 in the Case. |
| 79. | <u>Purchaser Escrowed Closing Documents</u> | has the meaning set forth in the Escrow Agreement. |
| 80. | <u>Rejection Damages Bar Date</u> | has the meaning set forth in Paragraph 8.1. |
| 81. | <u>Rejection Damages Claim</u> | has the meaning set forth in Paragraph 8.1. |
| 82. | <u>Released Parties</u> | means, collectively, the Pre-petition Released Parties and the Post-petition Released Parties. |
| 83. | <u>Reorganized Debtor</u> | means the Debtor on and after the Effective Date. |
| 84. | <u>Residual Cash</u> | means any Cash that may be available after payment of all costs and expenses of the Estate, the Plan Trust, and the Plan Trustee, and payment in full, plus interest as may be provided in the Plan, of all Allowed Claims in Classes 1 and 2. |

| 85. | Schedules | means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs to be filed by the Debtor with the Bankruptcy Court, as required by Bankruptcy Code Section 521 and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements may be amended or supplemented by the Debtor from time to time in accordance with Bankruptcy Rule 1009. |
| --- | --- | --- |
| 86. | Secured Claims | means (a) a Claim secured by a lien on any assets of the Debtor, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Case, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against the Debtor that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed. |
| 87. | Securities Act | means the Securities Act of 1933, as amended and the rules and regulations of the Security and Exchange Commission promulgated thereunder. |
| 88. | Seller Escrowed Closing Documents | has the meaning set forth in the Escrow Agreement. |
| 89. | Sponsor | means Best Buy Enterprise Services, Inc. |
| 90. | Subordinated Equity Claims | means any Claims, whether brought or held by a participant, holder, claimant, creditor or Governmental Unit, governed by and as defined in Bankruptcy Code Section 510(b) and applicable case law, including, but not limited to, any Claims for damages arising under or related to (a) stock options issued by the Debtor or (b) any equity interests or debt instruments issued by the Debtor. |

| | | |
|---|---|---|
| 91. | <u>Tax</u> | means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments. |
| 92. | <u>Tax Refund</u> | means the carryback Tax refund that may be received by the Debtor from the Internal Revenue Service for the tax year of 2010 or any other Tax refund. |
| 93. | <u>Unclaimed Property</u> | means all Cash deemed to be "Unclaimed Property" pursuant to Paragraphs 11.2(d), 11.3 and 11.5 of the Plan. |

* The term "Outside Date" used in the Asset Purchase Agreement shall have the same meaning as set forth in this Plan.

<u>Other Terms</u>.  Terms defined in the Bankruptcy Code but not defined above have the same meaning as defined in the Bankruptcy Code.

**EXHIBIT B**

**PLAN TRUST AGREEMENT**

[To be filed with the Bankruptcy Court at least ten (10) days before the Confirmation Hearing.]

**EXHIBIT C**

<u>**ASSET PURCHASE AGREEMENT**</u>

ASSET PURCHASE AGREEMENT

by and between

PARTSEARCH TECHNOLOGIES, INC.

as Seller

and

BEST BUY CO., INC.

as Purchaser


Dated as of March 31, 2011

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ...................................................................1

Section 1.1.    Recitals.................................................................1
Section 1.2.    Definitions.............................................................2
Section 1.3.    Other Terms............................................................2
Section 1.4.    Interpretation.........................................................2
Section 1.5.    Time...................................................................2

**ARTICLE II AGREEMENT OF PURCHASE AN SALE** .......................3

Section 2.1.    Purchase and Sale of Assets............................................3
Section 2.2.    Excluded Assets........................................................4
Section 2.3.    Condition of Conveyance ...............................................5
Section 2.4.    Purchase Price.........................................................5
Section 2.5.    Assumption of Liabilities..............................................5
Section 2.6.    Excluded Liabilities...................................................6
Section 2.7.    Procedures for Assumption of Agreements ...............................7
Section 2.8.    Purchase Price Deposit.................................................8
Section 2.9.    Purchase Price Allocation..............................................9

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER**...........9

Section 3.1.    Corporate Status.......................................................9
Section 3.2.    Power and Authority....................................................9
Section 3.3.    Conflicts Under Constituent Documents or Laws .........................9
Section 3.4.    Consents...............................................................9
Section 3.5.    Included Assets.......................................................10
Section 3.6.    Intellectual Property Rights .........................................10
Section 3.7.    Software and Systems..................................................11
Section 3.8.    Brokers...............................................................11
Section 3.9.    Litigation............................................................12
Section 3.10.   Compliance with Law ..................................................12
Section 3.11.   Financial Statements..................................................12
Section 3.12.   Absence of Certain Changes or Events..................................12
Section 3.13.   Customers and Suppliers...............................................13
Section 3.14.   Permits...............................................................13
Section 3.15.   Contracts.............................................................13
Section 3.16.   Taxes.................................................................13
Section 3.17.   No Misleading Statements..............................................14

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER**.................14

Section 4.1.    Corporate Status......................................................14
Section 4.2.    Validity..............................................................14
Section 4.3.    Consents..............................................................14
Section 4.4.    Broker Fees...........................................................14
Section 4.5.    Resources.............................................................14

Section 4.6.     Investigation ....................................................................................15

**ARTICLE V COVENANTS** .................................................................................**15**

Section 5.1.     Closing Documents .............................................................................15
Section 5.2.     Matters Requiring Notice ...................................................................15
Section 5.3.     Supplement to Disclosure Schedules ..................................................15
Section 5.4.     Access to Information/Confidentiality/Preservation of Books and
                 Records ................................................................................................16
Section 5.5.     Disclaimer of Additional Warranties .................................................16
Section 5.6.     Required Approvals ............................................................................17
Section 5.7.     Publicity .............................................................................................17
Section 5.8.     Preservation of the Business and the Included Assets Pending Closing .........17
Section 5.9.     Transfer of Nondebtor Subsidiary Included Assets ............................18
Section 5.10.    Employee Related Liabilities .............................................................18
Section 5.11.    Unscheduled Contracts ......................................................................19

**ARTICLE VI CONDITIONS TO CLOSING** .......................................................**19**

Section 6.1.     Conditions for Purchaser ...................................................................19
Section 6.2.     Conditions for Seller .........................................................................20

**ARTICLE VII CLOSING** .....................................................................................**21**

Section 7.1.     Closing Arrangements .......................................................................21
Section 7.2.     Seller's Deliveries .............................................................................21
Section 7.3.     Purchaser's Deliveries .......................................................................22
Section 7.4.     Tax Matters .......................................................................................22

**ARTICLE VIII BANKRUPTCY COURT APPROVAL** ......................................**23**

Section 8.1.     Sale Process ......................................................................................23
Section 8.2.     Certain Bankruptcy Undertakings .....................................................23
Section 8.3.     Break-Up Fee .....................................................................................23
Section 8.4.     Alternative Transaction .....................................................................23
Section 8.5.     Notice of Sale ....................................................................................23

**ARTICLE IX TERMINATION OF AGREEMENT** ...........................................**24**

Section 9.1.     Termination .......................................................................................24
Section 9.2.     Purchase Price Deposit ......................................................................24
Section 9.3.     Certain Effects of Termination ..........................................................25
Section 9.4.     Remedies ............................................................................................25
Section 9.5.     Right to Monetary Damages ..............................................................25

**ARTICLE X MISCELLANEOUS** ........................................................................**26**

Section 10.1.    Survival .............................................................................................26
Section 10.2.    Relationship of the Parties ................................................................26
Section 10.3.    Amendment of Agreement .................................................................26
Section 10.4.    Notices ...............................................................................................26
Section 10.5.    Fees and Expenses .............................................................................27
Section 10.6.    Governing Law; Jurisdiction; Service of Process ..............................27

Section 10.7.     WAIVER OF RIGHT TO TRIAL BY JURY ................................................. 28

Section 10.8.     Further Assurances ................................................................................ 28

Section 10.9.     Entire Agreement ................................................................................ 28

Section 10.10.    Waiver .................................................................................................. 28

Section 10.11.    Assignment .......................................................................................... 29

Section 10.12.    Successors and Assigns ........................................................................ 29

Section 10.13.    No Third Party Beneficiaries ............................................................... 29

Section 10.14.    Severability of Provisions .................................................................... 29

Section 10.15.    Counterparts ......................................................................................... 29

Section 10.16.    Specific Performance .......................................................................... 29

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of March 31, 2011 (the "Execution Date"), is by and between Partsearch Technologies, Inc., a Delaware corporation ("Seller"), and Best Buy Co., Inc., a Minnesota corporation, or its designee ("Purchaser"). In this Agreement, Seller and Purchaser are hereinafter collectively referred to as the "Parties."

## RECITALS

A. Seller is engaged in the business of selling parts for electronics, appliances and other items, and offering customer support services for retailers, in each case through the internet or via telephone (the "Business").

B. On January 27, 2011, Seller commenced a case under Chapter 11 of the Bankruptcy Code by filing a voluntary petition for relief ("Seller Chapter 11 Case") with the Bankruptcy Court. Purchaser's purchase of substantially all of Seller's assets will occur pursuant to an order of the Bankruptcy Court authorizing Seller to consummate this Agreement and all transactions required or contemplated hereunder.

C. Upon the terms and subject to the conditions contained in this Agreement, Seller wishes to sell to Purchaser, and Purchaser wishes to purchase and acquire from Seller, all of Seller's right, title and interest in and to certain assets pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

D. Contemporaneously with the execution of this Agreement, Purchaser proposed terms for a plan of liquidation (the "Plan") to be proposed by the Seller and co-sponsored by the Purchaser, which Plan constitutes Purchaser's primary offer for the acquisition of the equity of the reorganized Seller.

E. Simultaneously with the execution of this Agreement, Seller, Purchaser, and the Escrow Holder entered into an Escrow Agreement, a copy of which is attached hereto as Exhibit G ("Escrow Agreement").

## AGREEMENT

In consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1. Recitals The recitals set forth above are incorporated by reference and are expressly made part of this Agreement.

Section 1.2. Definitions The definitions set forth on Schedule 1.2 shall apply to and constitute part of this Agreement, the Schedules and all Exhibits attached hereto.

Section 1.3.    Other Terms   As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable Legal Requirement, will be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, or neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. References to "this Agreement" shall include all Exhibits, Schedules and other agreements, instruments or other documents attached hereto. The words "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. References in this Agreement to Articles, sections, Schedules or Exhibits are to Articles or sections of, Schedules or Exhibits to, this Agreement, except to the extent otherwise specified herein. References to the consent or approval of any Party mean the written consent or approval of such Party, which may be withheld, conditioned or delayed in such Party's sole and absolute discretion, except to the extent otherwise specified herein. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. Any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the provisions of this Agreement and shall not affect the interpretation hereof. Unless otherwise specified herein, payments that are required to be made under this Agreement shall be paid by wire transfer of immediately available funds to an account designated in advance by the Party entitled to receive such payment. All references to "dollars" or "$" or "US$" in this Agreement means U.S. dollars.

Section 1.4.    Interpretation.  The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

Section 1.5.    Time.  Except as expressly set out in this Agreement, the computation of any period of time referred to in this Agreement shall exclude the first day and include the last day of such period. If the time limited for the performance or completion of any matter under this Agreement expires or falls on a day that is not a Business Day, the time so limited shall extend to the next following Business Day. The time limited for performing or completing any matter under this Agreement may be extended or abridged by an agreement in writing by the Parties. All references herein to time are references to prevailing Eastern time, unless otherwise specified herein.

ARTICLE II
AGREEMENT OF PURCHASE AN SALE

Section 2.1.    Purchase and Sale of Assets.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, free and clear of Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), all right, title and interest in, to and under all of the assets, properties, rights and claims of Seller (other than the Excluded Assets), whether real or personal, tangible or intangible, vested or unvested, contingent or otherwise, wherever located, and all goodwill associated therewith (the "Included Assets"), including:

(a)    All Contracts identified on Schedule 2.1(a) (provided that Purchaser may, subject to Section 2.5(c), upon notice to Seller, at any time on or before the Closing Date, add any Contract to Schedule 2.1(a) and/or remove any Contract from Schedule 2.1(a), including all rights and obligations arising out of or relating to any such Contract) to the extent such Contracts may be assumed and assigned under Section 365 of the Bankruptcy Code (such Contracts, subject to such additional or removal, the "Assumed Contracts");

(b)    all Systems and any other Equipment described on Schedule 2.1(b);

(c)    all Software, including the Software described on Schedule 2.1(c);

(d)    all Intellectual Property Rights, including all Domain Names, of Seller, including all Domain Names set forth on Schedule 3.6(i) and any other Intellectual Property described on Schedule 3.6(i) (such Intellectual Property Rights including Software, collectively, "Business IP");

(e)    all Books and Records (provided that Seller may, in its discretion and at its sole expense, retain one copy of the Books and Records, for the sole purpose of the Seller Chapter 11 Case, winding down its operations and/or performing the Seller's obligations under the Operating Lease Agreement);

(f)    all goodwill associated with the Business;

(g)    all supplies, goods, materials, work in progress, properties, rights and other assets used or held for use by Seller in connection with the Business;

(h)    all telephone numbers and fax numbers used in the Business, including those listed on Schedule 2.1(i) to the extent such numbers may be assumed and assigned under Section 365 of the Bankruptcy Code or are otherwise transferrable to Purchaser;

(i)    all unfulfilled sales orders as of the Closing Date (the "Open Sales Orders");

(j)    the Nondebtor Subsidiary Included Assets; and

(k)    all Permits to the extent transferable after giving effect to the Sale Order.

Section 2.2.    Excluded Assets. Nothing herein contained shall be deemed to sell, transfer, assign, convey or deliver the Excluded Assets to Purchaser or any Affiliate of Purchaser, and Seller or an Affiliate thereof, as applicable, shall retain all right, title and interest to, in and under the Excluded Assets and neither Purchaser nor any Affiliate of Purchaser shall have any Liability therefor. "Excluded Assets" shall mean the following assets, properties and rights of Seller:

(a)    any and all rights of Seller under this Agreement;

(b)    all Accounts Receivable;

(c)    all Avoidance Actions of Seller;

(d)    all Deposits;

(e)    all rights to refunds, credits, deposits or prepayments or the equivalent owing to Seller from any taxing authority;

(f)    any and all of Seller's rights, title and interest in any litigation, claims, causes of action whether known or unknown, asserted or unasserted, for any action, conduct, or omissions arising prior to the Closing;

(g)    the Excluded Contracts and any and all rights thereunder;

(h)    the Retained Books and Records; provided, that prior and subsequent to the Closing Date, Purchaser shall have the right to make copies of any portions of the Retained Books and Records to the extent that such portions relate to, are relevant to, or were used prior to the Closing Date in connection with the operation of, the Business or any of the Included Assets;

(i)    any cash or cash equivalents and all bank accounts of Seller (including, for this purpose, all collected funds (including checks), at or prior to 12:01 a.m., prevailing Eastern time on the Closing Date received by Seller (including in a lockbox of Seller);

(j)    all Deposits under this Agreement, any Excluded Contract or for workers' compensation collateral;

(k)    all assets of Seller related to or under any Employee Benefit Plans;

(l)    insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not included within the Included Assets, (B) any item of tangible or intangible property not included within the Included Assets, or (C) any Excluded Liability;

(m)    all claims under Seller's insurance policies, and all proceeds from claims under such insurance policies;

(n)    all Equipment other than the Equipment set forth on Schedule 2.1(b);

(o)     any equity interest held by Seller in any Person;

(p)     the assets, properties and rights set forth on Schedule 2.2(m); and

(q)     any intercompany obligations owing to Seller.

Section 2.3.     Condition of Conveyance.  Without limiting the provisions of this Agreement relating to the Closing, the sale, transfer, assignment, conveyance or delivery of the Included Assets shall be effected (a) by appropriate instruments of transfer, bills of sale, endorsements, assignments and deeds, in recordable form as appropriate and (b) free and clear of any and all Encumbrances other than Permitted Encumbrances and Assumed Liabilities.

Section 2.4.     Purchase Price.  The purchase price for the Included Assets (the "Purchase Price") shall consist of (i) cash in an amount equal to the sum of $6,405,000 (such cash amount, the "Cash Purchase Price") and (ii) assumption of the Assumed Liabilities.

Section 2.5.     Assumption of Liabilities.  On the Closing Date, Purchaser shall assume and agree to pay, perform and discharge when due, the Assumed Liabilities, but only to the extent not paid, performed or discharged by Seller on or prior to the Closing Date. Other than the Assumed Liabilities, Purchaser is not assuming and shall not be liable for any liabilities or obligations of Seller or any Affiliate of Seller.  For purposes of this Agreement, "Assumed Liabilities" shall mean the following Liabilities only (to the extent not paid at or prior to the Closing):

(a)     in addition to the liabilities set forth in Sections 2.5(b) and (c) below, all liabilities and obligations of Seller under the (i) Assumed Contracts and (ii) Permits that constitute Included Assets, in each case, to the extent relating to and arising after the period commencing on or after the Closing Date;

(b)     all liabilities relating to Open Sales Orders transferred to Purchaser;

(c)     cure amounts owing under any of the Assumed Contracts as of the Closing Date to be paid as a condition to Seller's assignment to Purchaser of any Assumed Contract, but subject and limited to the specific amounts expressly as set forth in Schedule 2.1(a) (collectively, such scheduled costs, or other amounts that Purchaser expressly agrees in writing to pay which are not scheduled, the "Cure Costs"); provided however that Purchaser shall have the right to amend Schedule 2.1(a) anytime prior to the Closing Date to include one or more Contracts to the list of Assumed Contracts subject to (i) Purchaser agreeing to pay such amount(s), if any, as agreed to between Purchaser and the non-debtor contract party to cure defaults under section 365(b) of the Bankruptcy Code or (ii) in the event that the Purchaser and such non-debtor contract party cannot agree upon such cure amount, then Purchaser agreeing to pay the cure amount(s), if any, as determined by order of the Bankruptcy Court following a hearing to address the disputed cure claim; providing further however that, in the event that there is a dispute and the Bankruptcy Court determines that the required cure cost is higher than Purchaser otherwise agrees to pay as a cure cost, then such Contract shall be excluded from the list of Assumed Contracts.

(d)     all liabilities and obligations relating to and arising from the Included Assets or the operation of the Business, but only to the extent relating to and arising after the period commencing on or after the Closing Date and the Purchaser's operation of the Business post-Closing;

(e)     all liabilities and obligations for warranty liabilities, repairs, replacements, returns, allowances and rebates with respect to products sold, or services provided, by the Business, but only to the extent relating to and arising from activities occurring after the period commencing on or after the Closing Date and the Purchaser's operation of the Business post-Closing;

(f)     Taxes relating to the Business or the Included Assets to the extent relating to and arising after the period commencing on or after the Closing Date.

Section 2.6.     Excluded Liabilities.  Notwithstanding anything contained in this Agreement to the contrary, neither Purchaser nor any of its Affiliates will assume or agree or undertake to pay, satisfy, discharge or perform in respect of, and will not be deemed by virtue of the execution and delivery of this Agreement or any document delivered at the Closing pursuant to this Agreement, or as a result of the consummation of the transactions contemplated by this Agreement, to have assumed, or to have agreed to pay, satisfy, discharge or perform in respect of, any liability, obligation, indebtedness or Income Taxes of Seller or its Affiliates or of any other Person or in any way relating to the Business, the Included Assets or otherwise (whether primary or secondary, direct or indirect, known or unknown, absolute or contingent, matured or unmatured, or otherwise) other than and limited to the Assumed Liabilities (such liabilities and obligations retained by Seller or any Affiliate of Seller or of any other Person or as otherwise excluded hereunder, including all liabilities and obligations with respect to the Excluded Assets, being referred to herein as the "Excluded Liabilities").  Seller, an Affiliate of Seller or any other Person, as applicable, shall retain and remain solely liable for all of the Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, the term "Excluded Liabilities" includes, without limitation:

(a)     all liabilities or obligations of Seller or any Affiliate owing to any current or former Affiliates, directors, officers, employees, personnel, independent contractors, agents or other representatives of Seller, any Affiliate, or its or their agents or representatives, including claims for salaries, benefits, compensation arising under any agreement and/or applicable Law (including the Work Adjustment and Retraining Notification Act of 1988, as amended ("WARN")) and, without limiting the foregoing, Purchaser and its Affiliates shall not be deemed a successor employer of Seller and its Affiliates under any agreement and/or applicable Law;

(b)     all liabilities or obligations relating to any compensation or benefits of any current or former director, officer, employee, personnel, independent contractor, agent or other representative of  Seller or any Affiliate or arising under any Employee Benefit Plan, including all retirement, severance, deferred compensation, incentive, stock option, vacation, sick leave, bonus, commission, unemployment, partnership or other payments, distributions or benefits payable to or accrued in favor of such Persons on, prior to or after the Closing Date, whether or not pursuant to any Employee Benefit Plan and whether or not such Persons become personnel (including as independent contractors) of Purchaser or an Affiliate of Purchaser;

(c)     all liabilities or obligations relating to any Excluded Asset;

(d)     all liabilities or obligations relating to any claim of any third party, including any customer or supplier, against Seller or any Affiliate or otherwise arising out of the ownership or operation of the Included Assets or the conduct or operation of the Business or the activities of Seller or any Affiliate in connection with the Included Assets or the Business prior to the Closing (other than relating to those liabilities expressly being assumed as Assumed Liabilities hereunder and subject to the limitations provided for in this Agreement);

(e)     all liabilities or obligations relating to any lease of real property;

(f)     all liabilities or obligations of Seller or its stockholders (or members) or any Affiliate for Taxes and all liabilities or obligations for Taxes relating to the Business or the Included Assets prior to Closing;

(g)     all Liabilities relating to or arising out of product liability or similar Claims by Persons with respect to products sold by Seller or any Affiliate prior to the Closing;

(h)     all liabilities and obligations for warranty liabilities, repairs, replacements, returns, allowances and rebates with respect to products sold, or services provided, by the Business, to the extent relating to, or arising from, the period prior to the Closing Date;

(i)     all liabilities or obligations relating to any other assets, operations, products, businesses or activities of Seller or any Affiliate that are not part of the Business, the Included Assets or the Assumed Liabilities;

(j)     all liabilities and obligations relating to the failure of Seller or any Affiliate to comply with any "bulk sales," "bulk transfer" or similar Law;

(k)     all liabilities and obligations for legal or accounting fees and any other expenses incurred by Seller or any Affiliate in connection with this Agreement or consummation of the transactions contemplated herein, including any fees, expenses or other payments incurred or owed by Seller or any Affiliate to any agent, broker, investment banker or other firm or Person retained or employed by Seller or any Affiliate in connection with the transactions contemplated herein; and

(l)     all liabilities or obligations to pay cure costs with respect to Assumed Contracts in excess of the Cure Costs.

Section 2.7.     Procedures for Assumption of Agreements.  Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing and pursuant to section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser the Assumed Contracts, subject to provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code.  Consistent with the Sale Procedures Order, if requested by the Purchaser, Seller will commence and prosecute to conclusion, in expedited proceedings before the Bankruptcy Court, objection(s) to the cure cost(s) claimed by the counterparty to any Contract.

(b)     Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Included Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required under applicable Law. In such event, Seller will use their best efforts to obtain the Necessary Consents, at their cost and expense, with respect to any such Included Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request. To the extent that Seller cannot obtain such Necessary Consent prior to Closing, Purchaser shall have the right, but not the obligation, to designate such Included Asset as an "Excluded Asset" hereunder, with a corresponding reduction in Cash Purchase Price as mutually agreed upon by the Parties, in which event (and only in which event) such Consent shall not be deemed a Necessary Consent for purposes of the condition set forth in Section 6.1(e). Once Consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, Seller shall promptly transfer, assign, convey and deliver such asset to Purchaser at no additional cost, other than remittance of an amount equal to the reduction in Cash Purchase Price applicable to such asset. Except as otherwise expressly provided in this Section 2.7(b), the condition set forth in Section 6.1(e) shall apply to all Necessary Consents.

(c)     At the Closing, Seller shall assume and assign to Purchaser the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Costs in respect of the Assumed Contracts. All Cure Costs as and to the extent provided for herein in respect of Assumed Contracts shall be borne by Purchaser.

(d)     If following the Closing, Seller receives or becomes aware that it holds any asset, property or right which constitutes a Included Asset, then Seller shall transfer such asset, property or right to Purchaser as promptly as practicable for no additional consideration.

(e)     If following the Closing, Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then Purchaser shall transfer such asset, property or right to Seller as promptly as practicable for no additional consideration.

Section 2.8.     Purchase Price Deposit; Escrow.  Seller and Purchaser have on the date hereof entered into the Escrow Agreement, and Purchaser has deposited with the Escrow Holder, by wire transfer of immediately available funds, (a) as an earnest good-faith money deposit and security for the performance of Purchaser's obligations under this Agreement, an amount equal to $300,000 (the "Purchase Price Deposit") and (b) as additional security for the performance of Purchaser's obligations under this Agreement, an amount equal to $2,902,500 (the "Escrow Amount"). The Purchase Price Deposit and the Escrow Amount shall be held by the Escrow Holder in a segregated escrow account in accordance with the terms and conditions of the Escrow Agreement and this Agreement. The parties shall bear equally the fees and costs of the Escrow Holder.

(b)     At the Closing, the Purchase Price Deposit (and interest thereon accrued, if any) and the Escrow Amount shall be credited and applied toward the Cash Purchase Price.

Section 2.9.    <u>Purchase Price Allocation</u>.  The Purchase Price (and all other capitalizable costs) will be allocated for Tax purposes (the "<u>Allocation</u>") among the Included Assets in accordance with IRC Section 1060 as mutually agreed upon by Purchaser and Seller.  Purchaser shall submit a proposed allocation to Seller not more than thirty (30) days after the Closing and such proposed allocation shall be subject to consent from Seller, which consent shall not be unreasonably withheld.  Seller shall have thirty (30) days from notice of such proposed allocation to object thereto.  Any such objection shall be made by notice and shall specify, in reasonable detail, the specific areas of Seller's disagreement with Purchaser's proposed allocation and the reasons therefor.  Any items of Purchaser's proposed allocation that Seller does not timely object to in accordance with the preceding sentence shall be deemed final and shall be binding upon the Parties.  The Parties shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the agreed upon Allocation.  No party hereto shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Allocation unless required to do so by applicable law.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER

Purchaser hereby acknowledges and agrees that, except as otherwise expressly provided herein, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Included Assets.  As of the date hereof and as of March 31, 2011 (the "<u>Bring-Down Date</u>"), Seller represents and warrants to Purchaser as follows:

Section 3.1.    <u>Corporate Status</u>.  Seller is duly organized and validly existing under the laws of its jurisdiction of organization. Seller has all requisite corporate power and authority to own, lease, develop and operate the Included Assets and to carry on its business as now being conducted (subject to the provisions of the Bankruptcy Code).

Section 3.2.    <u>Power and Authority</u>.  Subject, in the case of the obligation to carry out the Transaction, to the entry of the Sale Order, Seller has all requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Subject to the entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transaction have been duly and validly authorized by all requisite corporate action on the part of Seller and no other proceeding on the part of Seller is necessary to authorize this Agreement and to consummate the Transaction.

Section 3.3.    <u>Conflicts Under Constituent Documents or Laws</u>.  Neither the execution and delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated hereby, will conflict with or result in a breach of any of the terms, conditions or provisions of Seller's certificate or articles of incorporation or by-laws, or of any statute or administrative regulation, or of any Order, writ, injunction, judgment or decree of any court or Governmental Authority or of any arbitration award to which Seller is a party or by which Seller is bound, in each case, subject to the effect of applicable bankruptcy law and the Sale Order.

Section 3.4.   Consents.   Except as set forth on Schedule 3.4, the execution, delivery and performance by Seller of this Agreement does not, and the consummation by Seller of the Transaction will not require Seller to make any filing with or give notice to, or obtain any Consent from, any Governmental Authority or other third party, other than the Sale Order.

Section 3.5.   Included Assets.   Except as disclosed in Schedule 3.5, Seller has (or, with respect to the Nondebtor Subsidiary Included Assets, will have on the Bring-Down Date) good, valid and marketable title to the Included Assets, free and clear of all Encumbrances, except for Permitted Encumbrances and those Encumbrances that will be removed, released or otherwise rendered unenforceable at or prior to the Bring Down Date.   Upon the sale of the Included Assets on the Closing Date, Purchaser, or its assignee, pursuant to the Sale Order, shall be the owner thereof and hold good, valid and marketable title thereto, free and clear of all Encumbrances (other than Permitted Encumbrances), to the maximum extent permitted under Sections 105 and 363 of the Bankruptcy Code and other applicable law.   The Included Assets, collectively, constitute all of the assets, property, rights and systems of Seller used or held for use in, necessary for or otherwise relating to the conduct or operation of the Business, and are sufficient for the continued conduct of the Business after the Bring-Down Date in the same manner as the Business has been conducted in the Ordinary Course.

Section 3.6.   Intellectual Property Rights.   Schedule 3.6(i) sets forth a true and complete list and summary description of all registered Patents, applications for registration of Patents, registered Marks, applications for registration of Marks, registration of Copyrights, application for registration of Copyrights and Domain Names owned by Seller (collectively, "Registered IP"), and any other material Intellectual Property Rights owned by Seller (such Registered IP and material Intellectual Property Rights, together with all other Intellectual Property Rights owned by the Seller the "Owned IP").   Where applicable, the following is provided for each item listed on Schedule 3.6(i):  owner's name, registration number, serial number or other identification, the applicable jurisdiction and the registration and/or filing date.   Schedule 3.6(ii) contains a true and complete list of all licenses, sublicenses or agreements or other instruments involving the Intellectual Property Rights of Seller, including (i) licenses by Seller to any Person of any Intellectual Property Rights, and (ii) all licenses by any other Person to Seller of any Intellectual Property Rights (except with respect to generally available "off-the-shelf" software) (each a "License").   Except as set forth in Schedule 3.6(iii), each such License is a valid and binding agreement enforceable in accordance with its terms.   With respect to any License, except as has resulted solely from Seller's commencement of the Bankruptcy Cases, there is no default (or event that with the giving of notice or passage of time could constitute a default) by Seller or, to Seller's Knowledge, the other party thereto.   There are no pending claims or Claims with respect to any License and, to Seller's Knowledge, no such claims or Claims have been threatened or asserted.   Schedule 3.6(i) and Schedule 3.6(ii), taken together, are a true and complete list of all Intellectual Property of Seller, and is all the Business IP, including all Owned IP, and Intellectual Property licensed to Seller by another Person.   Except as set forth on Schedule 3.6(i) or Schedule 3.6(iii):

(a)      all Owned IP is valid, subsisting and enforceable;

(b)      Seller is not violating, nor has Seller violated, any intellectual property or other proprietary information or rights of another Person, and no Claim is pending concerning any

claim or position that Seller has violated any intellectual property or other proprietary information or rights of another Person, nor has to Seller's Knowledge any such Claim or claim been threatened or asserted;

(c)     no Claim is pending concerning the Owned IP, including any Claim concerning a claim or position that the Owned IP has been violated or is invalid, unenforceable, unpatentable, unregisterable, cancelable, not owned or not owned exclusively by Seller, nor has any such Claim or claim been threatened or asserted;

(d)     to Seller's Knowledge, no Person is violating any Owned IP;

(e)     Seller owns or otherwise holds valid rights to use all Business IP;

(f)     Seller has made all filings and payments required to maintain in subsistence all Registered IP, including filings to confirm, record, evidence and effect ownership of and title to the Registered IP in Seller; and

(g)     Seller has taken reasonable measures to secure and protect the secrecy and confidentiality of all Trade Secrets, including data and databases.

Section 3.7.    Software and Systems.

(a)     Except as set forth on Schedule 3.7(a), all Software and Systems developed by or for, or licensed or made available to Seller and Related to the Business substantially conform to all functional, design and performance specifications therefor, and are free from any material programming error (including any virus, Trojan horse, corruptant, back-door, malicious code, defect or bug) which can cause the interruption or cessation of operation, or otherwise materially impairs the Software and Systems from consistently operating substantially in the manner for which they are intended.

(b)     Seller has implemented industry "best practices" to ensure the physical and electronic protection of its Systems, Software, websites and information assets from unauthorized disclosure, use or modification. Other than as set forth in Schedule 3.7(b) since October 9, 2009, there has been no material breach of security involving any Systems, Software, websites or information assets of Seller. Since October 9, 2009, all data which has been collected, stored, maintained or otherwise used by Seller has been collected, stored, maintained and used in accordance with Seller's privacy policies and applicable U.S. and foreign Laws, guidelines and industry standards in all material respects. Seller has not since October 9, 2009 received a notice of material noncompliance with its privacy policies or applicable data protection laws, rules, regulations, guidelines or industry standards. Seller's privacy policy or policies, and the periods such policy or policies have been in effect are set forth in Schedule 3.7(b). Seller's privacy policies are and have, while such websites have been operational, been available on all Seller websites at all times during the periods indicated on Schedule 3.7(b). Seller's privacy practices conform, and since October 9, 2009 have conformed, in all material respects to their privacy policies.

Section 3.8.    Brokers. No person has acted as a broker on behalf of Seller in connection with the consummation of the Transaction, and Seller has not incurred or become liable for any

broker's commission or finder's fee which would or may become payable by Purchaser relating to or in connection with the Transaction, and Seller shall indemnify and hold Purchaser harmless from and against any liability with respect to any and all such commissions and fees.

Section 3.9.  Litigation.  Except as set forth on Schedule 3.9, there is no pending or, to Seller's Knowledge, threatened, action, suit, proceeding, claim, opposition, challenge, charge or investigation before any court or other Governmental Authority affecting any of the Included Assets, Assumed Liabilities or, except as would not reasonably be expected to have a Material Adverse Effect, the Business, or that relates to this Agreement or any other agreement, document or instrument to be executed and delivered by Seller pursuant thereto.  There are no outstanding judgments, writs, injunctions, orders, decrees or settlements that apply, in whole or in part, to the Included Assets, the Assumed Liabilities or the Business, or that restrict the ownership or use of the Included Assets, the Assumed Liabilities or the Business in any way.

Section 3.10.  Compliance with Law.  Except as set forth in Schedule 3.10, Seller is in compliance in all material respects with all Laws, orders and settlements applicable to the conduct or operations of the Business.

Section 3.11.  Financial Statements Seller has previously delivered to Purchaser (i) information regarding revenue and payable amounts of Seller for the month ended November 30, 2010 (the "Financial Information") and (ii) the unaudited balance sheet of Seller as of September 30, 2010 and the unaudited income statement and statement of cash flows of Seller for the period ended September 30, 2010 (the "Interim Financial Statements").  The Interim Financial Statements have been prepared in accordance with GAAP applied on a consistent basis (except, in the case of Interim Financial Statements, for the absence of footnotes) and except as set forth on Schedule 3.11 present fairly in all material respects the financial position, results of operations, cash flows and changes in stockholders equity of Seller as of the dates and for the periods presented therein.

(b)  Seller keeps such books, records and accounts as are necessary or appropriate to run the Business, and all such books, records and accounts are accurate and complete and are maintained in accordance with good business practice and all Laws except where the failure to so maintain or keep such books would not individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.12.  Absence of Certain Changes or Events.  Except for the Seller's Chapter 11 Case and as set forth on Schedule 3.12, since November 11, 2010, (i) Seller has in all material respects operated the Business in the Ordinary Course of Business, (ii) Seller has not taken, or agreed to take, any of the actions set forth in Section 5.8 hereto, (iii) there has not occurred any event or condition that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect on the Business or the Included Assets, (iv) the Business has not suffered the loss of service of any officers, directors, employees, consultants, independent contractors or agents of Sellers who are material, individually or in the aggregate, to the operations or conduct of the Business and (v) there has been no material damage to or loss or theft of any of the Included Assets (whether or not covered by insurance).

Section 3.13. <u>Customers and Suppliers</u>. Except as set forth on Schedule 3.13, since November 11, 2010, there has not been and there exists no actual or, to Seller's Knowledge, threatened termination, cancellation or limitation of, or modification to or change in, the business relationship between (a) Seller, on the one hand, and any customer or customers, on the other hand, whose agreements with Seller are, individually or in the aggregate, material to the Business or the Included Assets, or (b) Seller, on the one hand, and any supplier, on the other hand whose agreements with Seller, are individually or in the aggregate, material to the Business or the Included Assets.

Section 3.14. <u>Permits</u>. Schedule 3.14 sets forth a true and complete list of all permits, licenses, authorizations, approvals, entitlements, accreditations, certifications, franchises, consents, orders and registrations of all Governmental Authorities which are necessary for Seller to own, lease, manage or operate the Business (collectively, the "<u>Permits</u>"). The Permits are valid and in full force and effect, and Seller is in compliance with the terms of the Permits except where a failure for such Permits to be in full force and effect or noncompliance would not individually or in the aggregate reasonably be expected to have a Material Adverse Effect. No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any Permit which is material to the Business.

Section 3.15. <u>Contracts</u>

(a)    Schedule 3.15(a) sets forth a true and complete list of all Contracts of Seller that are material to the Business (the "<u>Material Contracts</u>")

(b)    Seller has delivered to Purchaser a correct and complete copy of each Assumed Contract or in the case of an oral Assumed Contract, a correct and complete summary thereof. To the Knowledge of the Seller, each Assumed Contract is a legal, valid and binding agreement of Seller, enforceable in accordance with its terms subject, as to the enforcement of remedies, to the applicable provisions of bankruptcy law and to equitable principles of general applicability and is in full force and effect, and will, subject and subsequent to the entry of the Sale Order and Seller's assumption of such Assumed Contract in the Seller's Chapter 11 Case, continue to be legal, valid and binding, enforceable and in full force and effect. Except as set forth on Schedule 3.15(b), (x) Seller has performed, in all material respects, the obligations required to be performed by it under such Assumed Contract, (y) Seller is in not in material default or breach of any Assumed Contract, (z) no party to any Assumed Contract has given Seller notice of its intention to cancel, terminate or fail to renew any Assumed Contract, (xx) to Seller's Knowledge, there is no material default by any other party to any Assumed Contract and (yy) Seller has not assigned, delegated or otherwise transferred, or entered into any agreement to so assign, delegate or otherwise transfer, any of its rights or obligations with respect to any Assumed Contract.

Section 3.16. <u>Taxes</u>. Seller has timely filed all Tax Returns that it was required to file and has paid all Tax shown thereon as owing. There are no liens for Taxes (other than for current Taxes not yet due and payable) on any of the Included Assets. Except as set forth on Schedule 3.16, there are no examinations, audits or inquiries pending of any Tax Return of Seller. No deficiency with respect to Taxes relating to the Business and/or the Included Assets

has been proposed, asserted or assessed in writing or otherwise against Seller, and there are no outstanding agreements or waivers extending the statutory period of limitations applicable to any Tax Returns required to be filed with respect to Seller. Seller has not requested any extension of time within which to file any Tax Return, which Tax Return has not yet been filed. Except as set forth on Schedule 3.16, Seller is not bound by any agreement in respect of Taxes.

Section 3.17. <u>No Misleading Statements</u>. The representations and warranties made by Seller in this Agreement, including the Exhibits and Schedules hereto, do not include any untrue statement of a material fact or omit to state any material fact necessary to make the statements herein not misleading.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASER

As of the date hereof and as of the Bring-Down Date, Purchaser represents and warrants to Seller as follows:

Section 4.1. <u>Corporate Status</u>. Purchaser is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

Section 4.2. <u>Validity</u>. Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder (subject, in the case of the obligation to carry out the Transaction, to the entry of the Sale Order). The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transaction have been duly and validly authorized by all requisite corporate action on the part of Purchaser, and no other corporate proceeding on the part of Purchaser is necessary to authorize this Agreement and to consummate the Transaction. This Agreement has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by all parties hereto and thereto other than Purchaser) constitutes (or will constitute) valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms (subject, in the case of the obligation to car out the Transaction, to the entry of the Sale Order).

Section 4.3. <u>Consents</u>. The execution, delivery and performance by Purchaser of this Agreement does not, and the consummation by Purchaser of the Transaction will not require Purchaser to make any filing with or give notice to, or obtain any Consent from, any Governmental Authority, other than the Sale Order.

Section 4.4. <u>Broker Fees</u>. Purchaser has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Transaction that would be payable by Seller.

Section 4.5. <u>Resources</u>. At the Closing, Purchaser will have sufficient funds available to pay the Cash Purchase Price.

Section 4.6.    Investigation.    Purchaser acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Included Assets, that it has made such reviews and inspections of the Included Assets as it deems commercially reasonable, necessary and appropriate, and that in making its decision to enter into this Agreement and consummate the Transaction, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties other than those expressly set forth in this Agreement, upon which it has relied.

ARTICLE V
COVENANTS

Section 5.1.    Closing Documents.    The Parties shall proceed diligently and in good faith to attempt to settle, on or before the Closing Date or such earlier date as may be expressly set forth herein, the contents of all Closing Documents to be executed and delivered by Seller and Purchaser.

Section 5.2.    Matters Requiring Notice.    Seller, on the one hand, and Purchaser, on the other hand, shall:

(i)    promptly notify the other of any written notice or other written communication received by Seller, in the case of Seller, or Purchaser, in the case of Purchaser, from any Person alleging that the Consent of such Person is or may be required in connection with the Transaction;

(ii)    promptly, and in no event later than the Closing, notify the other of any inaccuracy of any representation or warranty of such Party contained in this Agreement at any time that would make such representation or warranty false in any material respect; and

(iii)    promptly, and in no event later than the Closing, notify the other of any breach of any covenant or agreement of such Party contained in this Agreement at any time.

(b)    Notwithstanding anything to the contrary in this Agreement, delivery of any notice pursuant to Section 5.2(a) and any access to or provision of information (including pursuant to Section 5.4) shall not modify any of the representations, warranties, covenants or agreements of the Parties (or rights or remedies with respect thereto) or the conditions to the obligations of the Parties under this Agreement.

Section 5.3.    Supplement to Disclosure Schedules.    From time to time prior to the Bring-Down Date, Seller shall have the right (but not the obligation) to propose to Purchaser any supplement or amendment to the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "Schedule Supplement"), and, upon receipt by Seller of written approval by Purchaser of such Schedule Supplement, each such Schedule Supplement shall be deemed to be incorporated into and to supplement and amend the Disclosure Schedules as of the Bring-Down Date; provided, however, that in the event such event, development or occurrence which is the subject of the Schedule Supplement constitutes or relates to something that has had a Material Adverse Effect, then Purchaser shall have the right to terminate this Agreement pursuant to Section 9.1(e); provided, further, that if Purchaser has the right to, but does not elect to terminate this Agreement within

two (2) Business Days of its receipt of such Schedule Supplement, then Purchaser shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter under any of the conditions set forth in Section 6.1.

Section 5.4.    <u>Access to Information/Confidentiality/Preservation of Books and Records</u>. From the Execution Date until the earlier of (i) termination of this Agreement and (ii) the Closing, Purchaser shall be entitled, through its Representatives (including their legal advisors and accountants), to make such investigation of Seller, the Included Assets and the Assumed Liabilities and such examination of the Books and Records as it reasonably requests and to make extracts and copies of such Books and Records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice in a manner that minimizes disruption to the business, operations and activities of Seller.  Seller shall use their reasonable best efforts to cause their Representatives to cooperate with Purchaser and its Representatives in connection with such investigation and examination.  Notwithstanding anything to the contrary contained herein, Purchaser shall not be entitled to access or examine any information which Seller reasonably determines (i) is protected by attorney-client privilege, work-product or any other similar privilege or doctrine or (ii) the disclosure of which is prohibited pursuant to any Contract or applicable Law.

(b)    From and after the Closing and for so long as the Bankruptcy Case is pending or twelve (12) months after Closing, whichever period is shorter, Purchaser agrees to provide Seller with reasonable access to Books and Records (and allow Seller to make extracts and copies of such Books and Records during such access) solely in connection with the wind down of the Seller Chapter 11 Case or any other proceeding or action relating thereto at Seller's sole cost and expense. Any such access shall be during regular business hours upon reasonable advance notice and in a manner that minimizes disruption to the business, operations and activities of Purchaser, including Purchaser's operation of the Business.  Notwithstanding anything to the contrary contained herein, Seller shall not be entitled to access or examine any information which Purchaser reasonably determines (i) includes trade secrets or other proprietary information, (ii) is protected by attorney-client privilege, work-product or any other similar privilege or doctrine, (iii) the disclosure of which is prohibited pursuant to any Contract or applicable Law, or (iv) includes customer names or pricing information.

Section 5.5.    <u>Disclaimer of Additional Warranties</u>. Purchaser hereby acknowledges and agrees that, except as set forth in Article III, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Included Assets (including, without limitation, income to be derived or expenses to be incurred in connection with the Included Assets, the physical condition of any personal property comprising a part of the Included Assets or which is the subject of any Assumed Contract, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any Lease to be assumed by Purchaser at the Closing or any other real property or improvements comprising a part of the Included Assets, the zoning of any such real property or improvements, the value of the Included Assets (or any portion thereof), the transferability of Included Assets, the terms, amount, validity, collectability or enforceability of any Claim, Assumed Contract, the title to the Included Assets (or any portion thereof), or any other matter or thing relating to the Included Assets or any portion thereof). **Without in any way limiting the foregoing, except as set forth in Article III Seller hereby disclaims any**

**warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Included Assets.** Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Property and all such other matters relating to or affecting the Included Assets as Purchaser deemed commercially reasonable, necessary and appropriate and that in proceeding with its acquisition of the Included Assets, Purchaser is doing so based solely upon such independent inspections and investigations. **Accordingly, except only for the representations and warranties set forth in Article III (which do not survive the Bring-Down Date), Purchaser will accept the Included Assets at the Closing "AS IS, "WHERE IS," and "WITH ALL FAULTS." Without limiting the generality of the immediately foregoing, except for the representations and warranties specifically contained in Article III, Seller hereby expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise, relating to the condition of the assets of Seller; it being the intention of the Parties that the Included Assets are to be accepted by Purchaser in their present condition and state of repair.**

Section 5.6.    <u>Required Approvals</u>

(a)    Prior to the Closing, upon the terms and subject to the conditions of this Agreement, the Parties shall use reasonable best efforts to cooperate and take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any applicable Legal Requirement) to consummate the Closing and the Transaction as promptly as practicable including, but not limited to the preparation and filing of all forms, registrations and notices required pursuant to any applicable Legal Requirement to be filed to consummate the Closing and the Transaction and the taking of such actions as are necessary to obtain any requisite approvals, authorizations, Consents, releases, orders, licenses, Permits, qualifications, exemptions or waivers by any third party or Governmental Authority.

(b)    The Parties shall use reasonable best efforts to take all reasonable steps as may be necessary to obtain an approval from, or to resolve any Legal Proceeding by, any Governmental Authority, whether by judicial or administrative action, challenging this Agreement or the consummation of the Transaction or the performance of obligations hereunder under any antitrust law.

Section 5.7.    <u>Publicity</u>.  Except as required by applicable Legal Requirement, including any Order by the Bankruptcy Court in connection with any filings by Seller in any proceedings before the Bankruptcy Court or in connection with the Auction, Seller shall not (and shall cause its Representatives not to) issue any press release or make any public announcement concerning this Agreement or the Transaction without having (i) provided Purchaser at least two (2) Business Days to review and comment on such release or announcement and (ii) received Purchaser's written consent to issue such press release or make such announcement which consent shall not be unreasonably withheld or delayed.

Section 5.8.    <u>Preservation of the Business and the Included Assets Pending Closing</u>. Subject to the orders of the Bankruptcy Court, Seller agrees that, between the date of this Agreement and the Bring-Down Date, Seller shall operate the Business in the Ordinary Course and Seller shall use its reasonable best efforts to (i) preserve and protect the Included Assets and

the business operations of the Business, (ii) comply in all material respects with all applicable Laws and (iii) preserve its current relationship with the customers, clients, contractors and others having business dealings with respect to the Business. Nothing herein should oblige Seller to pay any claims arising prior to the commencement of the Seller Chapter 11 Case, except as otherwise required by order of the Bankruptcy Court. Without limiting the generality of the foregoing, Seller shall not, without the prior written consent of Purchaser:

(a)     grant a participation or security interest in, mortgage, pledge or otherwise encumber or subject to an Encumbrance any of the Included Assets, other than Encumbrances that arise in the ordinary course of business consistent with past practice and shall be released by virtue of the Sale Order;

(b)     sell, lease or transfer any Included Asset to any Person;

(c)     amend, modify, cancel or waive any of their rights under any Assumed Contract;

(d)     (i) abandon or cancel any of the Business IP, or otherwise take or permit third parties under its control to take any action, or omit to take any action, which could reasonably be expected to have an adverse effect on the validity, enforceability or value of any Business IP or Purchaser's rights therein and thereto after the Closing or (ii) sell or assign its interest in, grant any license under, or enter into any other agreement with respect to any Business IP;

(e)     waive any rights relating to any of the Business, the Included Assets or the Assumed Liabilities; or

(f)     commit to any of the foregoing.

Section 5.9.     Transfer of Nondebtor Subsidiary Included Assets. Prior to the Closing Date, Seller shall (i) cause (A) Partsearch Technologies, Inc. (Canada), a company organized under the laws of the Province of British Columbia, and (B) Partstore, LLC, a Delaware limited liability company (together, the "Nondebtor Subsidiaries"), to sell, transfer, assign, convey and deliver to Seller, free and clear of Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), all right, title and interest in, to and under all of the assets, properties, rights and claims of the Nondebtor Subsidiaries of any nature whatsoever (other than assets that, if owned by Seller, would be Excluded Assets), whether real or personal, tangible or intangible, vested or unvested, contingent or otherwise, wherever located, and all goodwill associated therewith (the "Nondebtor Subsidiary Included Assets") and (ii) provide evidence of such transfers, conveyances, and deliveries to Purchaser prior to the Closing.

Section 5.10.     Employee Related Liabilities

(a)     Seller shall remain obligated after the Closing Date for any obligation or liability of Seller to any personnel of Seller or its Affiliates which arises prior to the Closing Date, including but not limited to all accrued but unpaid vacation leave, sick time and personal days of such personnel and any and all employee compensation or Employee Benefit Plan obligations or otherwise. Purchaser shall not assume any employee compensation and/or Employee Benefit Plan obligations or other terms and conditions of employment for any such personnel or otherwise.

(b)     Seller shall bear sole responsibility for any Liabilities under WARN with respect to the termination of the employment of any personnel.  On and after the date hereof, Seller shall not effect a "plant closing" or "mass layoff" (as those terms are defined by WARN) with respect to the Business without notifying Purchaser in advance and obtaining advance approval from Purchaser, and complying with all provisions of WARN.

Section 5.11.  Unscheduled Contracts.  Prior to the assumption, assignment, and/or rejection of any Contract not listed on Schedule 3.15(a) that relates to the Included Assets or the Business, Seller shall provide Purchaser with five (5) Business Days notice of its intent to so assume, assign, and/or reject such Contract, and Purchaser shall be provided with an opportunity to designate such contract as an "Assumed Contract" hereunder at no additional cost and, if after the Closing Date, Seller shall, at its costs and expense, file a motion to transfer such Contract(s) to Purchaser as if such Contract(s) were included in the schedule of Assumed Contracts prior to the Closing Date.  To the extent reasonably practicable, Purchaser and Seller shall work cooperatively to identify such Contracts prior to the Sale Hearing to allow the request to treat such contract as an Assumed Contract to be addressed at the Sale Hearing, subject to section 2.5(c) of this Agreement.

# ARTICLE VI
# CONDITIONS TO CLOSING

Section 6.1.  Conditions for Purchaser.  The obligation of Purchaser to consummate the Closing is subject to the satisfaction or waiver in writing by Purchaser, at or before the Closing, of each of the following conditions:

(a)     All of the covenants and agreements in Articles II, V, VI, VII and VIII of this Agreement to be complied with or performed by Seller on or before the Closing Date shall have been complied with and performed in all material respects (without giving effect to any limitation as to materiality set forth therein).

(b)     The representations and warranties of Seller shall be true and correct except as would not individually or in the aggregate constitute, or be reasonably likely to result in, a Material Adverse Effect (without giving effect to any limitation as to materiality set forth therein) as of the date of this Agreement and as of the Bring-Down Date as if made on the Bring-Down Date (except for any representation or warranty made as of a specified date prior to or as of the Bring-Down Date, which shall be true and correct in all respects except as would not individually or in the aggregate constitute, or be reasonably likely to result in, a Material Adverse Effect (without giving effect to any limitation as to materiality set forth therein) as of such specified date).

(c)     No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any applicable Legal Requirement (including any Order) which is in effect and has the effect of making the Transaction illegal or otherwise restraining or prohibiting consummation of the Transaction and which is not satisfied or resolved or preempted by the Sale Order.

(d)     The Bankruptcy Court shall have entered the Sale Order.

(e)     All Necessary Consents shall have been obtained in form and substance satisfactory to Purchaser, and copies of all such Consents shall have been delivered by Seller to Purchaser.

(f)     Subject to Section 2.5(c), Seller shall have assumed and assigned to Purchaser the Assumed Contracts for which Purchaser has provided adequate assurance of future performance under such Contracts pursuant to Section 365 of the Bankruptcy Code and the Sale Order.

(g)     During the period commencing on January 27, 2011 and ending on the Bring-Down Date, there shall not have been any theft, damage or destruction of a material portion of the Included Assets.

(h)     During the period commencing on January 27, 2011 and ending on the Bring-Down Date, there shall have been no change that has had a Material Adverse Effect on the Included Assets or the Business each considered as a whole, and Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date, executed on behalf of the Seller, by an authorized executive officer thereof, certifying in such detail as Purchaser may reasonably request that the conditions specified above have been fulfilled.

(i)     The transfer to Seller of the Nondebtor Subsidiary Transferred Assets pursuant to Section 5.8 shall have occurred, and evidence thereof shall have been delivered to Purchaser in form and substance reasonably satisfactory to Purchaser.

(j)     The Closing shall occur no later than the Outside Date.

(k)     The deliveries described in Section 7.2 shall have been made.

(l)     The Escrow Holder shall have released the Seller Escrowed Closing Documents in accordance with the Escrow Agreement.

Section 6.2.     Conditions for Seller.  The obligations of Seller to consummate the Closing are subject to the satisfaction or waiver in writing by Seller, at or before the Closing, of each of the following conditions:

(a)     All of the covenants and agreements in this Agreement to be complied with or performed by Purchaser on or before the Closing Date shall have been complied with and performed in all material respects (without giving effect to any limitation as to materiality set forth therein).

(b)     The representations and warranties of Purchaser set forth in Article IV shall be true and correct in all material respects (without giving effect to any limitation as to materiality set forth therein), in each case, as of the date of this Agreement and as of the Bring-Down Date as if made on the Bring-Down Date (except for any representation or warranty made as of a specified date prior to or as of the Bring-Down Date, which shall be true and correct in all material respects (without giving effect to any limitation as to materiality set forth therein) as of such specified date).

(c)     No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any applicable Legal Requirement (including any Order) which is in effect and has the effect of making the Transaction illegal or otherwise restraining or prohibiting consummation of the Transaction and which is not satisfied or resolved or preempted by the Sale Order.

(d)     The Bankruptcy Court shall have entered Sale Order.

(e)     All requisite clearances or Consents by any Governmental Authority under any antitrust or trade regulation laws shall have been obtained.

(f)     The Closing shall occur no later than the Outside Date.

(g)     The deliveries described in Section 7.3 shall have been made.

(h)     The Escrow Holder shall have released the Purchase Price Deposit, the Escrow Amount and the Purchaser Escrowed Closing Documents in accordance with the Escrow Agreement.

ARTICLE VII
CLOSING

Section 7.1.     Closing Arrangements.  The consummation of the Transaction (the "Closing") shall take place at 10:00 a.m. within two Business Days following the date on which all of the conditions set fort in Article VI have been satisfied or waived (other than any conditions that can only be satisfied as of the Closing, but subject to the satisfaction or waiver of such conditions), but in no event later than the Outside Date (the "Closing Date"), at the offices of Brown Rudnick LLP, at 7 Times Square, New York, NY, or at such other time or place as may be mutually agreed to by the Parties.

Section 7.2.     Seller's Deliveries.

(a)     On or prior to the Bring-Down Date, Seller shall deliver or cause to be delivered the following items and documents to Escrow Holder:

(i)     a certificate, undated, representing and certifying that the conditions set forth in Section 6.1 have been fulfilled, duly executed by Seller;

(ii)     the Bill of Sale, undated, duly executed by Seller;

(iii)     the Assignment of Marks and Names, undated, duly executed by Seller;

(iv)     the Assignment and Assumption Agreement, undated, duly executed by Seller;

(v)     an incumbency and specimen signature certificate, undated, with respect to the officers of Seller executing this Agreement and the other documents to be executed in

connection with the transactions contemplated by this Agreement (collectively with the items described in Section 7.2(a)(i)-(v) the "Seller Escrowed Closing Documents"); and

      (vi)     the Escrow Agreement, duly executed by Seller;

    (b)     On or prior to the Bring-Down Date, Seller shall deliver or cause to be delivered the following items and documents to Purchaser:

      (i)     the Escrow Agreement, duly executed by Seller;

      (ii)     the Operating Lease Agreement, duly executed by Seller.

    (c)     On or prior to the Closing Date, Seller shall deliver or cause to be delivered the following items and documents to Purchaser:

      (i)     copies of resolutions of the boards of directors of Seller, authorizing the execution, delivery and performance hereof by Seller, certified by authorized officers and dated the Closing Date;

      (ii)     a certified copy of the Sale Order;

      (iii)     right to possession of Included Assets including keys, locks, safe combinations, passwords, access codes and otherwise required to obtain immediate control of the Included Assets;

      (iv)     if required by the Escrow Agreement, escrow instructions, instructing disbursement at the Closing of the Purchase Price Deposit and the Escrow Amount, and the insertion of the Closing Date by the Escrow Holder on the Seller Escrowed Documents; and

      (v)     a certificate, dated as of the Closing Date, executed on behalf of the Seller, by an authorized executive officer thereof, describing all facts and circumstances existing as of the Closing Date that result in any of the representations and warranties of Seller set forth in Article III not being materially true and correct as of the Closing Date; provided that Purchaser agrees that the Purchaser shall have no right to terminate this Agreement based on any fact or circumstances described in such certificate.

Section 7.3.    Purchaser's Deliveries

    (a)     On or before the Bring-Down Date, Purchaser shall deliver or cause to be delivered the following items and documents to Escrow Holder:

      (i)     in accordance with the Escrow Agreement, the Purchase Price Deposit and the Escrow Amount, by wire transfer of immediately available funds;

      (ii)     a certificate, undated, representing and certifying that the conditions set forth in Section 6.2 have been fulfilled, duly executed by Purchaser;

      (iii)     the Bill of Sale, undated, duly executed by Purchaser;

(iv)     the Assignment of Marks and Names, undated, duly executed by Purchaser;

(v)     the Assignment and Assumption Agreement, undated, duly executed by Purchaser;

(vi)     an incumbency and specimen signature certificate, undated, with respect to the officers of Purchaser executing this Agreement and the other documents to be executed in connection with the transactions contemplated by this Agreement (collectively with the items described in Section 7.3(a)(ii)-(vi) the "Purchaser Escrowed Closing Documents" and, along with the Seller Escrowed Closing Document, the "Escrowed Closing Documents")); and

(vii)     the Escrow Agreement, duly executed by Purchaser

(b)     On or prior to the Bring-Down Date, Purchaser shall deliver or cause to be delivered the following items and documents to Seller:

(i)     the Escrow Agreement, duly executed by Purchaser;

(ii)     the Operating Lease Agreement, duly executed by Purchaser;

(c)     On or prior to the Closing Date, Purchaser shall deliver or cause to be delivered the following items and documents to Seller:

(i)     the Cash Purchase Price, less the Escrow Amount and the Purchase Price Deposit; and

(ii)     if required by the Escrow Agreement, escrow instructions, instructing disbursement at the Closing of the Purchase Price Deposit and the Escrow Amount, and the insertion of the Closing Date by the Escrow Holder on the Purchaser Escrowed Documents.

Section 7.4.     Tax Matters

(a)     In accordance with Section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument or transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the right, title and interest contemplated by this Agreement, shall be in contemplation of a plan of reorganization to be confirmed in the Seller Chapter 11 Case, and such shall be free and clear of any and all transfer tax, stamp tax or similar taxes (collectively, the "Transfer Taxes"). Such instrument, order and agreement transferring the Included Assets to the Purchaser, shall contain the following endorsement:

"Because this instrument has been authorized pursuant to an order of the United States Bankruptcy Court for the Southern District of New York, in contemplation of a plan of reorganization of the Debtor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(a)."

Notwithstanding the foregoing, in the event any Transfer Tax or similar taxes are payable hereunder to a U.S. Governmental Authority, such Transfer Taxes shall be borne by Seller. Any and all Transfer Taxes payable hereunder to a Canadian Governmental Authority shall be borne by Purchaser.

(b)     Purchaser and Seller shall furnish or cause to be furnished to each other, as promptly as reasonably practicable, such information in their possession and assistance relating to the Included Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, Claim for refund or other filings relating to Tax matters, or in connection with any Tax audit or other Tax proceeding.

ARTICLE VIII
BANKRUPTCY COURT APPROVAL

Section 8.1.     Sale Process.  On or before the Outside Date, Seller shall use its reasonable best efforts to obtain entry by the Bankruptcy Court of the "Sale Order", attached hereto as Exhibit F, authorizing Closing as of the Outside Date.  At all times, the Sale Order shall be in form and substance reasonably acceptable to Purchaser; provided however, that the Sale Order attached hereto as Exhibit F is deemed to be in form and substance acceptable to Purchaser; and provided further, however, that any modifications to the Sale Order, and each proposed modification, be in form and substance acceptable to Purchaser.

Section 8.2.     Certain Bankruptcy Undertakings.  Without limiting the other obligations of the parties hereunder, each of Seller and Purchaser agrees to use reasonable best efforts to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm or obtain Bankruptcy Court approval of the sale of the Included Assets or any other agreement contemplated hereby and to consummate the Transaction.  Purchaser shall provide reasonable adequate assurances as required under the Bankruptcy Code with respect to any Assumed Contracts along with payment of all Cure Costs due thereunder, as and to the extent provided for herein; provided, however, that Purchaser shall not be required to pay any deposits or any additional consideration in connection therewith.  In the event the Sale Order is appealed, Seller and Purchaser shall use their respective reasonable best efforts to defend such appeal.  If an appeal is taken, or a stay pending appeal is requested from the Sale Order or the Sale Procedures Order, then Seller shall promptly notify Purchaser of such appeal or stay request and provide to Purchaser a copy of the relevant notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from order.

Section 8.3.     Break-Up Fee.  [INTENTIONALLY BLANK]

Section 8.4.     Alternative Transaction.  This Agreement is subject to approval by the Bankruptcy Court.  From and after the date of this Agreement, Seller shall not, and shall cause its Affiliates and officers, directors, trustees, employees, agents and representatives not, to directly or indirectly, solicit or initiate any inquiry, offer or proposal from any Person regarding the sale or other disposition of all or any part of the Included Assets.

Section 8.5.    Notice of Sale.  [INTENTIONALLY BLANK]

ARTICLE IX
TERMINATION OF AGREEMENT

Section 9.1.    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written Consent of Seller and Purchaser;

(b)    by Seller or Purchaser, if a Governmental Authority of competent jurisdiction shall have issued an Order or taken any other action, in each case, having the effect of permanently making the Transaction illegal or otherwise permanently restraining or prohibiting consummation of the Transaction;

(c)    by either Party, if the Closing has not occurred on or prior to two (2) Business Days following the Outside Date, provided that the failure of the Closing to occur on or prior to the Outside Date is not a result of such Party's failure to satisfy the conditions to the Closing contained in this Agreement on or before the Outside Date or the failure of the Purchase Price Deposit, the Escrow Amount or Escrowed Closing Documents to be released by the Escrow Holder in accordance with the Escrow Agreement;

(d)    by Seller, in the event of any inaccuracy in any of Purchaser's representations or warranties contained in this Agreement or any breach of any of Purchaser's covenants or agreements contained in this Agreement which, individually or in the aggregate with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth in Section 6.2, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within ten (10) calendar days after written notice thereof;

(e)    by Purchaser, in the event of any inaccuracy in any of Seller's representations or warranties contained in this Agreement or any breach of any of Seller's covenants or agreements contained in this Agreement which, individually or in the aggregate with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth in Section 6.1, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within ten (10) calendar days after written notice thereof; and

(f)    by Seller or Purchaser, if the Chapter 11 Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if any trustee is appointed in the Chapter 11 Case.

Section 9.2.    Purchase Price Deposit. If this Agreement is terminated pursuant to Section 9.1 and Purchaser is not in material breach of this Agreement at the time of termination, then the Purchase Price Deposit and the Escrow Amount shall be returned to Purchaser within two Business Days of such termination.

(b)    If this Agreement is terminated pursuant to Section 9.1 and Purchaser is in material breach of this Agreement at the time of termination, then the Purchase Price Deposit

shall be disbursed to Seller ("Seller Liquidated Damages") and the Escrow Amount shall be returned to Purchaser within two Business Days of such termination.

(c)     Purchaser and Seller hereby acknowledge that the terms of this Agreement pertaining to the Purchase Price Deposit and the Escrow Amount shall survive the termination of this Agreement.

Section 9.3.     Certain Effects of Termination.  In the event of the termination of this Agreement by either Seller or Purchaser as provided in Section 9.1: (a) a Party, if so requested by the other Party, will return promptly every document furnished to it by the requesting Party or its representatives in connection with the Transaction, whether so obtained before or after the execution of this Agreement, and any copies thereof (except for copies of documents publicly available) which may have been made, and will cause its representatives and any representatives of financial institutions and investors and others to whom such documents were furnished promptly to return such documents and any copies thereof any of them may have made; and (b) the Confidentiality Agreement shall remain in effect.

Section 9.4.     Remedies.  Notwithstanding any termination right granted in Section 9.1, in the event of the non-fulfillment of any condition to a Party's closing obligations such Party may elect to do one of the following:

(a)     proceed to close despite the non-fulfillment of any closing condition (to the extent legally permissible), it being understood that consummation of the Closing by such party shall be deemed a waiver of each breach of any representation, warranty or covenant of the other party and of such party's rights and remedies with respect thereto;

(b)     decline to close, terminate this Agreement as permitted by Section 9.1 above, receive the Purchase Price Deposit and Escrow Amount (to the extent set forth in Section 9.2), and thereafter seek monetary damages to the extent permitted in Section 9.5; or

(c)     seek specific performance by the other Party hereto of such other Party's obligations hereunder which it has failed to perform so that Closing may proceed (it being acknowledged and agreed that the non-breaching Party would be damaged irreparably, the remedies available at law to the non-breaching Party would be inadequate, and the performance of such other Party's obligations under this Agreement may be specifically enforced).

Section 9.5.     Right to Monetary Damages. (a)  If this Agreement is terminated pursuant to Section 9.1, neither Party hereto shall have any claim for monetary damages against the other, except for (a) the disposition of the Purchase Price Deposit (as provided for in Section 9.2), and (b) in the event the Purchaser terminates this Agreement as a result of a material breach by Seller hereunder, the payment of $300,000 to Purchaser, which payment by Seller shall constitute liquidated damages to Purchaser ("Purchaser Liquidated Damages", and together with the Seller Liquidated Damages, "Liquidated Damages").  Without limiting the foregoing, if the circumstances giving rise to such termination were caused by the other Party's willful failure to comply with a covenant set forth herein, a termination pursuant to Section 9.1 shall not be deemed or construed as limiting or denying any legal or equitable right or remedy of said Party in addition to a right to Liquidated Damages, and said Party shall also be entitled to recover its

costs and expenses which are incurred in pursuing its rights and remedies (including reasonable attorneys' fees). The Parties acknowledge and agree that actual damages, costs or expenses of any material breach of this Agreement by a Party would be difficult to ascertain and that the Liquidated Damages provided for hereunder is a fair and equitable amount to reimburse the non-breaching Party for damages sustained due to the other Party's material breach of its obligations hereunder and is not a penalty. **NOTWITHSTANDING ANYTHING IN THE AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY BE OBLIGATED TO THE OTHER PARTY OR ANY OTHER PERSON IN CONNECTION WITH ANY BREACH OR TERMINATION OF THIS AGREEMENT FOR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OR LOSSES, INCLUDING LOST PROFITS AND REVENUE.**

(b) If the Closing does not occur on or prior to the Outside Date due to a material breach of this Agreement by the Purchaser, including but not limited to Purchaser's obligation to pay the portion of the Cash Purchaser Price due at Closing pursuant to the terms of this Agreement, or due to a delay of the release by the Escrow Holder of the Purchase Price Deposit, Escrow Amount or any Escrowed Closing Documents, which delay was caused solely by the Purchaser in breach of this Agreement or the Escrow Agreement, in addition to all other remedies to Seller hereunder, Purchaser shall pay to Seller as liquidated damages an amount equal to one percent (1%) of the Cash Purchaser Price for each month (or portion thereof) from the Outside Date through the Closing Date. The Parties acknowledge and agree that actual damages, costs or expenses of any such delay would be difficult to ascertain and that the liquidated damages provided for pursuant to this Section 9.5(b) is a fair and equitable amount to reimburse Seller for damages sustained due to the Purchaser's material breach of its obligations hereunder and is not a penalty.

ARTICLE X
MISCELLANEOUS

Section 10.1. <u>Survival</u>. The representations and warranties of the Parties in this Agreement shall not survive the Closing. Except as otherwise expressly provided in this Agreement, the agreements and covenants of the Parties shall survive the Closing and remain in full force and effect without time limit in accordance with the terms thereof.

Accordingly, for clarification purposes, it is acknowledged, understood and agreed by the parties that Seller shall not have any liability or other obligation following the Closing with respect to any breach by Seller or claimed breach by Seller of (a) any representations or warranties contained in this Agreement or any of the documents or instruments delivered or entered into by Seller in connection with this Agreement or (b) any of Seller's covenants and agreements contained in this Agreement or any of the documents or instruments delivered or entered into by Seller in connection with this Agreement that do not by their terms extend beyond the Closing. Notwithstanding anything expressed or implied herein to the contrary, the parties acknowledge and agree that (1) Purchaser shall be solely responsible for the ownership of the Included Assets from and after the Closing Date, the operation of the Business from and after the Closing Date, and acts or omissions of Purchaser with respect thereto, and (2) Seller shall have no responsibility or obligation with respect to, or arising out of, any of the foregoing.

Section 10.2.  Relationship of the Parties.  Nothing in this Agreement shall be construed so as to make Purchaser or any Affiliate of Purchaser a partner of Seller.

Section 10.3.  Amendment of Agreement.  This Agreement may not be supplemented, modified or amended except by a written agreement executed by each Party.

Section 10.4.  Notices.  Any Notice shall be in writing and shall be deemed to have been duly given or made when personally delivered, sent by facsimile or when mailed by registered or certified mail, postage prepaid, return receipt requested, addressed or directed as follows, or as may be furnished hereafter by notice, in writing, to the other Party on at least three Business Days' prior notice, to the following Parties:

    (a)    If to Purchaser, to:

Best Buy Co., Inc.
7601 Penn Ave S.
Richfield, MN 55423
Attention: Eric Halverson, Esq.
Facsimile:  (952) 430-9775
E-Mail:  Eric.Halverson@bestbuy.com

with a copy (which shall not constitute notice) given in like manner to:

Foley & Lardner LLP
90 Park Avenue
New York, NY 10016
Attention:  Richard J. Bernard, Esq.
Facsimile:  (212) 687-2329
E-Mail:  rbernard@foley.com

    (b)    If to Seller, to:

Partsearch Technologies, Inc.
708 Third Avenue, 5th Floor
New York, NY 10017
Attention: Scott Dicus
Facsimile: (845) 240-8986
E-Mail: sdicus@arguscorp.net

with a copy (which shall not constitute notice) given in like manner to:

Brown Rudnick LLP
One Financial Center
Attention: William R. Baldiga, Esq.
Facsimile: (617) 856-8201
E-Mail: wbaldiga@brownrudnick.com

Any Notice which is delivered or is sent by facsimile shall be deemed to have been validly and effectively given and received on the date it is delivered or sent, unless it is delivered or sent after 5:00 p.m. on any given day or on a day which is not a Business Day, in which case it shall be deemed to have been validly and effectively given and received on the Business Day next following the day it was delivered or sent, provided that, in the case of a Notice sent by facsimile, it shall not be deemed to have been sent unless there has been confirmation of transmission.

Section 10.5. <u>Fees and Expenses</u>. The Parties agree that, except as otherwise expressly provided in this Agreement, each Party shall bear and pay all costs, fees and expenses that it incurs, or which may be incurred on its behalf, in connection with this Agreement and the Transaction; provided, however, that in the event of a dispute regarding either Party's obligation to effect the Closing, including, but not limited to Purchaser's obligation to pay the portion of the Cash Purchase Price due at the Closing, the prevailing party in any such dispute shall be entitled to reimbursement of all reasonable legal costs, fees, and expenses actually incurred by it in connection with such dispute.

Section 10.6. <u>Governing Law; Jurisdiction; Service of Process</u>. This Agreement shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the internal laws of the state of New York, without giving effect to any principles of conflicts of law. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, the Parties agree that if any dispute arises out of or in connection with this agreement or any of the documents executed hereunder or in connection herewith, the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to the Transaction. Such court shall have sole jurisdiction over such matters and the Parties affected thereby and Purchaser and Seller each hereby Consent and submit to such jurisdiction; provided, however, that if the Seller Chapter 11 Case has closed and cannot be reopened, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the district in which the Bankruptcy Court is located and any appellate court thereof, for the resolution of any such Claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and Consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 10.4 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with the provisions of Section 10.4 hereof.

Section 10.7. <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, ACTION OR PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON

CONTRACT, TORT OR OTHERWISE) RELATING TO THIS AGREEMENT OR ANY AGREEMENTS CONTEMPLATED HEREIN OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 10.8. <u>Further Assurances</u>. Subject to the other provisions of this Agreement and to applicable Law, each of the Parties hereto agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be reasonably requested by any other Party in order to carry out the intent and purpose of this Agreement, without additional consideration.

Section 10.9. <u>Entire Agreement</u>. Except as set forth herein, this Agreement, the Operating Lease Agreement, the Escrow Agreement and the Confidentiality Agreement constitute the full and entire agreement between the Parties hereto pertaining to the Transaction and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect thereto made by any Party.

Section 10.10. <u>Waiver</u>. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall any waiver constitute a continuing waiver unless otherwise expressed or provided. All waivers hereunder must be in writing to be effective.

Section 10.11. <u>Assignment</u>. Neither the rights nor the obligations of either Party may be assigned or delegated, whether by operation of Law or otherwise, without the prior written Consent of the other Party, <u>provided</u> that Purchaser may assign all or any portion of its rights and obligations hereunder, including with respect to the Included Assets, to one or more Affiliates of Purchaser. To the extent Purchaser assigns all or any portion of its rights and obligations hereunder to its Affiliates, Purchaser shall guarantee payment of the Cash Purchase Price hereunder.

Section 10.12. <u>Successors and Assigns</u>. This Agreement shall bind and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 10.13. <u>No Third Party Beneficiaries</u>. Nothing in this Agreement is intended to, or shall, confer any third party beneficiary or other rights or remedies upon any Person other than the Parties hereto.

Section 10.14. <u>Severability of Provisions</u>. Any provision of this Agreement which is determined by a court of competent jurisdiction to be invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining provisions of this Agreement or affecting the validity or enforceability of any of the provisions of this Agreement in any other jurisdiction, and if any provision of this Agreement is determined to be so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable, <u>provided</u> in all cases that neither the economic nor legal substance of this Agreement is affected by the operation of this sentence in any manner materially adverse to any Parties. Upon any such determination that any provision of this Agreement is invalid or unenforceable, the Parties shall

negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the Parties.

Section 10.15. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the Execution Date. Any delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 10.16. <u>Specific Performance</u>. Notwithstanding anything else contained herein, the Parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties hereto shall be entitled to specific performance of the terms hereof (without the posting of any bond), in addition to any other remedy at law or equity.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed as of the day and year first above written.

SELLER:

PARTSEARCH TECHNOLOGIES, INC.,
a Delaware corporation

By:
Name: Lawton Bloom
Title: Chief Restructuring Officer


PURCHASER

Best Buy Co., Inc.,
a Minnesota corporation


By:
Name:
Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed as of the day and year first above written.

SELLER:

PARTSEARCH TECHNOLOGIES, INC.,
a Delaware corporation

By:_____
Name: Lawton Bloom
Title: Chief Restructuring Officer

PURCHASER

Best Buy Co., Inc.,
a Minnesota corporation

By:_____
Name: George Sherman
Title: Senior Vice President

ATTACHMENT


EXHIBITS

Exhibit A - Assignment and Assumption Agreement
Exhibit B - Assignment of Marks and Names
Exhibit C - Bill of Sale
Exhibit D - Operating Lease Agreement
Exhibit E - [INTENTIONALLY BLANK]
Exhibit F - Form of Sale Order
Exhibit G – Escrow Agreement


SCHEDULES

Schedule 1.2 - Definitions
Schedule 2.1(a) - Assumed Contracts and Cure Costs
Schedule 2.1(b) - Equipment
Schedule 2.1(c) - Software
Schedule 2.1(i) - Telephone and Fax Numbers
Schedule 2.2(m) - Additional Excluded Assets

DISCLOSURE SCHEDULES

Schedule 3.4 – Consents
Schedule 3.5 – Title to Included Assets
Schedule 3.6(i) – Owned IP
Schedule 3.6(ii) – Licenses
Schedule 3.6(iii) – Status of Intellectual Property Rights
Schedule 3.7 – Systems and Software
Schedule 3.9 – Litigation
Schedule 3.10 – Compliance with Law
Schedule 3.11 – Financial Statements
Schedule 3.12 – Absence of Changes
Schedule 3.13 – Customers and Suppliers
Schedule 3.14 – Permits
Schedule 3.15(a) – Material Contracts
Schedule 3.15(b) – Assumed Contracts
Schedule 3.16 – Taxes

"Accounts Receivable" means any and all accounts receivable, notes receivable, checks, similar instruments and other amounts receivable owed to Seller for products sold or services rendered in the operation of the Business, together with all security or other collateral therefor and any interest for unpaid financing charges accrued thereon, in each case as of March 31, 2011.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlling" and "controlled") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation" has the meaning set forth in Section 2.9.

"Assignment and Assumption Agreement" means an agreement providing for the assignment by Seller of Seller's right, title and interest in and to the Assumed Contracts, and the assumption by Purchaser of the Assumed Liabilities, substantially in the form attached hereto as Exhibit A.

"Assignment of Marks and Names" means an assignment of Marks, including Domain Names, substantially in the form attached hereto as Exhibit B.

"Assumed Contract" has the meaning set forth in Section 2.1(a).

"Assumed Liabilities" has the meaning set forth in Section 2.5.

"Auction" means the sale in which the Included Assets were offered for sale to a bidder or bidders making the highest or best offer, which will was scheduled by the Bankruptcy Court in the Seller Chapter 11 Case.

"Avoidance Actions" means all avoidance Actions or Claims available to Seller under chapter 5 of title 11 of the Bankruptcy Code, including any such Claims and actions arising under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Bill of Sale" means a bill of sale substantially in the form attached hereto as Exhibit C.

"Books and Records" means all documents used by Seller in connection with, or relating to, the Included Assets, the Assumed Liabilities, or the operations of Seller, including all files, data, reports, plans, mailing lists, supplier lists, customer lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), which, for the avoidance of doubt, shall exclude the Retained Books and Records.

"Break-up Fee" has the meaning set forth in Section 8.3.

"Bring-Down Date" has the meaning set forth in the introductory paragraph to Article III.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or obligated to close under applicable Legal Requirement.

"Business IP" has the meaning set forth in Section 2.1(d).

"Cash Purchase Price" has the meaning set forth in Section 2.4(a).

"Claim" means any claim, cause of action, chose in action, right to sue, right of recovery, right of set-off, right of recoupment, right of refund or reimbursement, right under warranty, guaranty or contract (express, implied or otherwise), right to receive a credit (by reason of prepayment, deposit, refund or otherwise), or similar right of any kind and nature, known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable.

"Closing" has the meaning set forth in Section 7.1.

"Closing Date" has the meaning set forth in Section 7.1.

"Closing Documents" means any agreements, instruments and other documents to be delivered at the Closing pursuant to Section 7.2 or Section 7.3, other than the Escrowed Closing Documents.

"Confidentiality Agreement" means that certain Confidentiality Agreement between Purchaser and Seller dated [_____, 2010].

"Consent" means any consent, approval, concession, grant, waiver, grant, exemption, license, entitlement, suitability determination, franchise, development right, certificate, variance, registration, permit, order or other authorization of or notice of any Person.

"Contract" means any contract, agreement, understanding, or other arrangement (whether oral or written) affecting or related to the Business or any of the Purchased Assets, real or personal, entered into by Seller or by which Seller is bound or by which any property of Seller is

subject to an Encumbrance or under which Seller has any rights or obligations entered into by Seller, but excluding any Lease.

"Copyrights" has the meaning set forth in the definition of Intellectual Property Rights on this Schedule 1.2.

"Cure Costs" has the meaning set forth in Section 2.5(b).

"Deposit" means any security, vendor, utility, or other similar deposits by Seller and any prepaid expenses, advances, advance payments or prepayments made by Seller.

"Disclosure Schedules" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"Domain Names" means Internet domain names held or used by Seller.

"Employee Benefit Plans" means each employee or director benefit plan, arrangement or agreement, whether or not written, including without limitation any employee welfare benefit plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), any employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) and any bonus, incentive, deferred compensation, vacation, stock purchase, stock option, severance, employment, change of control or fringe benefit plan, program or agreement that is or has been sponsored, maintained or contributed to by Seller or by any trade or business, whether or not incorporated, all of which together with Seller would be deemed a "single employer" within the meaning of Section 4001 of ERISA.

"Encumbrances" means all mortgages, pledges, charges, liens, debentures, trust deeds, Claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements, rights of first refusal or similar interests or instruments charging, or creating a security interest in the Included Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) of any and every kind, nature and description affecting title to the Included Assets or any part thereof or interest therein.

"Equipment" means all tangible personal property, including desks, chairs, tables, cabinets, cubicles, furniture, fixtures, furnishings, work equipment, machinery, motor vehicles, spare pars, tools, computers, servers, network and Internet- and information technology systems-related equipment, computer hardware, photocopiers, telephone lines, facsimile machines and other business equipment and devices (including data processing hardware and related telecommunications equipment, media, and tools), advertising, marketing and promotional materials and all other printed or written materials used in connection with the Business, tools, racking, molds, forms, dies and tooling and miscellaneous items, miscellaneous office furnishings and supplies, maintenance equipment, signs, signage, and other tangible personal property, other than any tangible personal property subject to a Personal Property Lease unless such Personal Property Lease is an Assumed Contract.

"ERISA" has the meaning set forth in the definition of "Employee Benefit Plans" on this Schedule 1.2.

"Escrow Holder" means Brown Rudnick LLP, in its capacity as escrow agent under the Escrow Agreement.

"Escrow Agreement" has the meaning set forth in the recitals to this Agreement.

"Escrow Amount" has the meaning set forth in Section 2.8(a).

"Escrowed Closing Documents" has the meaning set forth in Section 7.3(a)(vi).

"Excluded Contracts" means any Contract to which Seller is a party which is not an Assumed Contract, including any Real Property Leases to which Seller is a party.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.6.

"Execution Date" has the meaning set forth in the preamble.

"Final Order" means, with respect to any Order or other action of a Governmental Authority, an Order or other action (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired and (c) as to which no stay is in effect. In the case of the Sale Order, a Final Order shall also consist of an order and to which an appeal, notice of appeal or motion for rehearing or new trial has been file and as to which no stay is in effect but as to which Purchaser, in its sole and absolute discretion elects to proceed with Closing.

"Financial Information" has the meaning set forth in Section 3.11(a).

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any domestic, foreign, federal, state, provincial or local authority, legislative body, court, government, regulatory agency, self-regulatory organization (including any securities exchange), commission, board, arbitral or other tribunal, or any political or other subdivision, department or branch of any of the foregoing.

"Income Tax" means any Taxes measured by or imposed on net income.

"Income Tax Return" means any Tax Return relating to Income Taxes.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lenders under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services; (e) all indebtedness secured by any Encumbrance on property owned or acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not the obligations secured thereby have been assumed; (f) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (g) all contingent obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (f) above.

"Intellectual Property Rights" means forms of technology and intellectual property including any or all of the following as they exist in any jurisdictions:

(i) inventions (whether or not patentable), discoveries, improvements, business methods, and processes, including patents, patent applications, and other patent rights (including any divisions, continuations, continuations-in-part, renewals, substitutions or reissues thereof, whether or not patents are issued on any such applications and whether or not any such applications are amended modified, withdrawn or refiled) ("Patents");

(ii) words, names, symbols, designs and other designations to identify or distinguish a business, good, group, product, or service, including trademarks, service marks, trade dress, trade names, brand names, Domain Names, designs or logos or corporate names (including, in each case, the goodwill associated therewith), whether registered or unregistered, and all registrations and applications for registration thereof ("Marks");

(iii) published and unpublished works of authorship (whether or not registered or registrable) including audiovisual works, websites and web pages, collective works, data and databases, documentation, compilations, literary works, sound recordings, derivative works, moral rights, including copyrights, including all renewals and extensions thereof, copyright registrations and applications for registration thereof, and non-registered copyrights ("Copyrights");

(iv) information that is not generally known or otherwise readily ascertainable through proper means, including trade secrets, confidential business information and other proprietary information including, without limitation, customer information, telephone and facsimile numbers, listings in telephone books and directories (in any media), blue prints, drawings, designs, research and development information, technical information, specifications, operating and maintenance manuals, methods, engineering drawings, know-how, data, databases and other collections of data, mask works, industrial designs and other proprietary rights (whether or not patentable or subject to copyright, mask work, or trade secret protection) ("Trade Secrets");

(v) Software;

(vi) all licenses, sublicenses, and other agreements or permissions related to the property described in clauses (i) to (v) of this definition; and

(vii) claims, demands and causes of action of any kind with respect to, and any other rights relating to the enforcement of, any of the foregoing, including any past, present or future infringement, misappropriation or other violation of any of them.

"Interim Financial Statements" has the meaning set forth in Section 3.11(a).

"IRC" means the Internal Revenue Code of 1986, as amended.

"Knowledge" means the knowledge of Lawton Bloom, Scott Dicus or Peter Sullivan after reasonable inquiry.

"Law" means all statutes, laws (including common law), regulations, rules, ordinances, codes and other requirements of any Governmental Authority, including any Orders.

"Lease" means any lease, sublease, license or similar contract (whether oral or written) or affecting or related to the Business or any of the Included Assets, real or personal, entered into by Seller or by which Seller is bound or by which any property of Seller is subject to an Encumbrance or under which Seller has any rights or obligations, including all options to renew, purchase, expand or lease (including any leasehold improvements to any facilities or appurtenances to such improvements (including, without limitation, buildings, structures, storage areas, driveways, walkways and parking areas), rights of first refusal, first negotiation and first offer), all credit for the prepaid rent associated therewith, and all Deposits made in connection with such Leases.

"Legal Proceeding" means any action, complaint, suit, litigation, arbitration, mediation, appeal, petition, inquiry, hearing, order, decree, legal proceeding, investigation or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any arbitral or other tribunal or any Governmental Authority.

"Legal Requirement" means federal, state, local, municipal, foreign, international, multinational or other constitution, law, statute, ordinance, principle of common law, code, regulation, or treaty.

"Liability" means any debt, liability, commitment or other obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or not yet due) and including all costs, fees and expenses relating thereto.

"License" has the meaning set forth in Section 3.6.

"Liquidated Damages" has the meaning set forth in Section 9.5.

"Marks" has the meaning set forth in the definition of Intellectual Property Rights on this Schedule 1.2.

"Material Adverse Effect" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate, (i) has been or would be reasonably likely to be material and adverse to the assets, liabilities, properties, Business, financial condition or capitalization of the Included Assets, the Assumed Liabilities; provided, however, that none of the following shall be taken into account in determining whether there has been or would be, a Material Adverse Effect under this subclause (i): (A) changes in general economic or financial market conditions, (B) the outbreak or escalation of hostilities, the declaration of war, the occurrence of any calamity or natural disaster, or acts of terrorism, (C) changes in any Law or GAAP or interpretation thereof after the Execution Date, (D) any event as to which Purchaser has provided its express prior written consent hereunder, (E) any announcement of this Agreement and the Transaction, (F) changes, occurrences or developments in or materially related to the general industry or industries (or portions thereof) in which Seller or the Business operate, or (G) the identity of, or any action taken by, Purchaser or any of its Affiliates or representatives.

"Material Contracts" has the meaning set forth in Section 3.15(a).

"Necessary Consent "has the meaning set forth in Section 2.7(b).

"Nondebtor Subsidiaries" has the meaning set forth in Section 5.9.

"Nondebtor Subsidiaries Included Assets" has the meaning set forth in Section 5.9.

"Notice" means any notice, request, Consent, acceptance, waiver or other communication required or permitted to be given pursuant to this Agreement.

"Operating Lease Agreement" means an operating lease agreement substantially in the form attached hereto as Exhibit D.

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination, decision, verdict, ruling, subpoena, or award entered by or with any Governmental Authority (whether temporary, preliminary or permanent).

"Ordinary Course of Business" or "Ordinary Course" means the ordinary and usual course of normal day to day operations of the Business consistent with practices since November 11, 2011.

"Outside Date" means September 30, 2011, which outside date may be extended to October 31, 2011 at the election of Purchaser upon the payment to Seller of an amount equal to fifty thousand dollars ($50,000).

"Owned IP" has the meaning set forth in Section 3.6.

"Party" or "Parties" has the meaning set forth in the preamble.

"Patents" has the meaning set forth in the definition of Intellectual Property Rights on this Schedule 1.2.

"Permits" has the meaning set forth in Section 3.14.

"Permitted Encumbrances" means, solely with respect to Included Assets: (a) statutory Encumbrances for current Property Taxes, assessments and other charges by Governmental Authorities that are not yet due and payable; (b) mechanics', materialmen's, warehouseman's and similar Encumbrances that relate to Assumed Liabilities; and (c) zoning, building codes and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over real property.

"Person" means an individual, partnership, limited liability company, corporation, trust, joint venture, association, joint stock company, unincorporated organization, Governmental Authority or other entity, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual.

"Personal Property Lease" means any Lease of tangible personal property.

"Property Tax" means all real property and personal property taxes and assessments on the Included Assets.

"Purchase Price" has the meaning set forth in Section 2.4.

"Purchase Price Deposit" has the meaning set forth in Section 2.8(a).

"Purchaser Escrowed Closing Documents" has the meaning set forth in Section 7.3(a)(vi).

"Included Assets" has the meaning set forth in Section 2.1, excluding, for the avoidance of doubt, the Excluded Assets.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Liquidated Damages" has the meaning set forth in Section 9.5.

"Real Property Lease" means any Lease of Real Property.

"Registered IP" has the meaning set forth in Section 3.6.

"Related to the Business" means required for, arising out of, or used in connection with the Business as conducted by Seller before the Closing Date.

"Representative" means, with respect to a particular Person, any director, officer, manager, partner, member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Retained Books and Records" means (A) any documents (including books and records) that Seller is prohibited (or reasonably believe to be prohibited) by applicable Legal Requirement to sell and transfer, (B) corporate seals, minute books, charter documents, corporate stock record

books, original tax and financial records and such other books and records as pertain to the organization, existence, actions or share capitalization of Seller, (C) any books and records or information related exclusively to any of the Excluded Assets, or Excluded Liabilities.

"Sale Order" has the meaning set forth in Section 8.1.

"Sale Procedures Order" has the meaning set forth in Section 8.1.

"Schedule Supplement" has the meaning set forth in Section 5.3.

"Seller Chapter 11 Case" has the meaning set forth in the recitals.

"Seller" has the meaning set forth in the preamble.

"Seller Escrowed Closing Documents" has the meaning set forth in Section 7.2(a)(v).

"Seller Liquidated Damages" has the meaning set forth in Section 9.2.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, and (d) all documentation, including user manuals and training documentation, relating to any of the foregoing, in each case developed by or for, or licensed or made available to, Seller and Related to the Business.

"Systems" means all servers, systems, sites, circuits, networks and other computer assets and computer equipment owned, licensed or used by Seller and related to the Business. Physical assets located in Seller's New York City and Kingston, NY offices shall not be considered "Systems" for the purposes of this Agreement.

"Tax" or "Taxes" means any federal, state, local or foreign net income, gross income, gross receipts, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, unemployment, payroll, withholding, alternative or add on minimum, ad valorem, value added, transfer, stamp, or environmental tax, escheat payments or any other tax, custom, duty, impost, levy, governmental fee or other like assessment or charge (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto).

"Tax Return" or "Tax Returns" means all returns, declarations of estimated tax payments, reports, estimates, information returns and statements, including any related or supporting information with respect to any of the foregoing, filed or required to be filed with any taxing authority.

"Trade Secrets" has the meaning set forth in the definition of Intellectual Property Rights on this Schedule 1.2.

"Transaction" means the transactions contemplated herein to be consummated at the Closing, including the purchase and sale of the Included Assets and the assumption of the Assumed Liabilities provided for in this Agreement.

"Transfer Taxes" has the meaning set forth in Section 7.4(a).

"WARN" has the meaning set forth in Section 2.6(a).

## <u>SCHEDULE A</u>

### <u>Pre-petition released parties</u>

Argus Management Corporation
Lawton W. Bloom
Peter Sullivan
Scott Dicus
Brown Rudnick LLP

## SCHEDULE B.1

## PLAN TRUST ASSUMED CONTRACTS AND EXECUTORY LEASES

Engagement letter between the Debtor and Rosen Seymour with respect to the 401k Audit

Retrievex  - Physical Document/Records storage

Amazon Web Services - hosting of the electronic records

## SCHEDULE B.2

## REORGANIZED DEBTOR ASSUMED CONTRACTS AND EXECUTORY LEASES

VeriSign Managed PKI for SSL Services Agreement, dated June 21, 2011, by and between Debtor and Symantec Ltd.

# 1846843