**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED AND SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1125(a).[1]**

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PARTSEARCH TECHNOLOGIES, INC.,[2] | ) Case No. 11-10282 (MG) |
| | ) |
| Debtor | ) |
| | ) |

## SECOND MODIFIED DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Dated: August 24, 2011

BROWN RUDNICK LLP
William R. Baldiga, Esq.
Nina E. Andersson, Esq.
Sunni P. Beville, Esq.
7 Times Square
New York, NY 10036
Telephone:    (212) 209-4800
Facsimile:    (212) 209-4801

---

[1]  Legend to be removed upon entry by the Clerk of the Bankruptcy Court of an order of the Bankruptcy Court approving this Disclosure Statement.

[2]  The last four digits of the Debtor's taxpayer identification number are: 5335.  Partsearch Technologies, Inc. is a Delaware corporation qualified to do business in the State of New York.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

I. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS .................................... 1

II. EXPLANATION OF CHAPTER 11 ...................................................................................... 3

    A. Overview of Chapter 11 ............................................................................................. 3
    B. Chapter 11 Plan .......................................................................................................... 4
    C. Confirmation of a Chapter 11 Plan ............................................................................ 4

III. OVERVIEW OF THE PLAN ............................................................................................... 5

    A. Summary of the Terms of the Plan ............................................................................. 5
    B. Summary of Distributions Under the Plan ................................................................. 7
    C. Exculpation Provisions ............................................................................................. 11

IV. GENERAL INFORMATION ............................................................................................. 11

    A. History and Overview of the Debtor's Business ...................................................... 11
    B. Debtor's Pre-petition Corporate and Capital Structure ........................................... 12
        i. Corporate Structure ...................................................................................... 12
        ii. Pre-Petition Liabilities ................................................................................. 12
    C. Events Leading to the Commencement of the Case Under Chapter 11 .................... 13
        i. The Debtor's Historical Relationship With Best Buy ................................... 13
        ii. Post-Termination Efforts to Save the Company ........................................... 14
        iii. Prior Internal Investigation; Potential Indemnity Claims; and Insurance Coverage
                 ...................................................................................................................... 14

V. THE CHAPTER 11 CASE .................................................................................................. 15

    A. Commencement of the Chapter 11 Case .................................................................. 15
    B. Continuance of Administrative Operations After the Petition Date ......................... 15
        i. "First-Day" Motions .................................................................................... 16
            1. Consolidated List of Creditors .................................................... 16
            2. Retention of Certain Professionals and Appointment of Officers ............. 16
            3. Interim Compensation .................................................................. 16
            4. Cash Management ........................................................................ 17
            5. Employee Benefits ....................................................................... 17
        ii. Other Retentions by the Debtor ................................................................... 17
    C. Appointment of the Creditors' Committee ............................................................... 17
    D. Matters Relating to Unexpired Leases and Executory Contracts ............................. 18
        i. Motion to Reject Park Avenue Lease ........................................................... 18
        ii. Motion to Reject Service Contracts and Office Equipment Leases ............... 18
        iii. Motion to Reject Temporary Office Space Lease ......................................... 18
        iv. Motion to Reject Kingston Lease ................................................................. 19
    E. Schedules, Bar Dates and Claims Objections ........................................................... 19

VI. SALE OF 100% OF THE EQUITY OF THE REORGANIZED DEBTOR AND
        CONTINGENT SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS ... 19

A. Marketing Process ........................................................................................... 20
B. Auction and Successful Bid ............................................................................. 20

## VII. WARN ACT LITIGATION ...................................................................... 22

## VIII. THE CHAPTER 11 PLAN ...................................................................... 22

A. Classification and Treatment of Claims and Equity Interests ........................ 22
   i. Administrative Claims and Priority Claims ............................................ 23
      1. Administrative Claims ..................................................................... 23
      2. Statutory Fees ................................................................................. 24
      3. Priority Claims ................................................................................ 24
   ii. Debtor Claims and Equity Interests ....................................................... 24
B. Classes Entitled to Vote ................................................................................... 26
C. Nonconsensual Confirmation ........................................................................... 26
D. Executory Contracts ......................................................................................... 26
   i. Rejection and Assumption of Contracts .................................................. 26
   ii. Cure ......................................................................................................... 27
   iii. Best Buy Payable .................................................................................... 27
E. Means for Execution and Implementation of the Plan and Equity Sale ......... 28
   i. Operations between the Confirmation Date and the Effective Date ........ 28
   ii. Other General Corporate Matters ............................................................ 28
   iii. Continued Corporate Existence of the Debtor ......................................... 28
   iv. Re-vesting of Assets ................................................................................ 29
   v. Management ............................................................................................. 29
   vi. Board of Directors ................................................................................... 29
   vii. Officers .................................................................................................... 29
   viii. Cancellation of Debtor Equity Interests .................................................. 29
   ix. Plan Trust ................................................................................................ 30
   x. Transfers to the Plan Trust ...................................................................... 30
   xi. Avoidance Action and other Recoveries ................................................. 30
   xii. Liquidation of Assets ............................................................................... 30
   xiii. Asset Purchase Agreement ...................................................................... 31
F. Plan Trustee ...................................................................................................... 31
   i. Authority of the Plan Trustee .................................................................. 31
   ii. Compensation of Plan Trustee ................................................................. 31
   iii. Authorization, Empowerment, Rights and Duties of Plan Trustee ......... 31
   iv. Participation by the Plan Trustee ............................................................. 33
   v. Investments of Cash Pending Distributions ............................................ 33
   vi. Limitation of Liability of the Plan Trustee .............................................. 33
   vii. Certain Records ....................................................................................... 34
   viii. Termination of the Plan Trust and Plan Trustee ...................................... 34
G. Plan Distribution Provisions ............................................................................ 34
   i. Distributions to Plan Trustee ................................................................... 34
   ii. Distributions ............................................................................................ 34
   iii. Rounding of Payments ............................................................................. 35
   iv. Compliance with Tax Requirements ........................................................ 35

|  |  | v. | Undeliverable Distributions, Voided Checks and Distribution of Unclaimed Property | 35 |
|  |  | vi. | Setoff | 36 |
|  | H. | | Procedures for Resolving Objections to Claims | 36 |
|  |  | i. | Objections to Claims | 36 |
|  |  | ii. | Treatment of Disputed Claims | 37 |
|  |  | iii. | Administrative Claims | 37 |
|  |  | iv. | Professional Fee Claims | 37 |
|  |  | v. | Subordinated Claims | 37 |
|  |  | vi. | Estimation of Claims | 37 |
|  | I. | | Effects of Plan Confirmation | 38 |
|  |  | i. | Binding Effect of Confirmation | 38 |
|  |  | ii. | Good Faith | 38 |
|  |  | iii. | Injunction | 38 |
|  |  | iv. | Releases by the Debtor and the Reorganized Debtor | 38 |
|  |  | v. | Releases by Sponsor | 39 |
|  |  | vi. | Exculpation and Limitation of Liabilities | 40 |
|  |  | vii. | No Releases from Plan Obligations | 41 |
|  | J. | | Conditions to Confirmation and Effectiveness | 41 |
|  |  | i. | Conditions Precedent to Plan Confirmation | 41 |
|  |  | ii. | Conditions Precedent to the Occurrence of the Effective Date | 41 |
|  |  | iii. | Waiver and/or Modification of Conditions | 43 |
|  | K. | | Retention of Jurisdiction | 43 |
|  | L. | | Modification or Withdrawal of Plan | 45 |
|  |  | i. | Modification of Plan | 45 |
|  |  | ii. | Withdrawal of Plan | 45 |
|  | M. | | Other Material Provisions of the Plan | 45 |
|  |  | i. | Governing Law | 45 |
|  |  | ii. | Successors and Assigns | 46 |
|  |  | iii. | Severability of Plan Provisions | 46 |
|  |  | iv. | No Waiver | 46 |
|  |  | v. | Payment of Post-Petition Interest and Attorneys' Fees | 46 |
|  |  | vi. | Creditors' Committee | 46 |
|  |  | vii. | Post-Effective Date Fees and Expenses | 46 |
|  |  | viii. | Final Decree and Case Closure | 47 |
|  |  | ix. | Exemption from Certain Transfer Taxes | 47 |
|  |  | x. | Inconsistencies | 47 |
|  |  | xi. | Post-Effective Date Effect of Evidences of Claims or Equity Interests | 47 |
|  |  | xii. | Other Documents and Actions | 47 |

**IX. RISK FACTORS** ............................................................................................................ 48

| A. | General Considerations | 48 |
| B. | Certain Bankruptcy Considerations and Conditions to Plan Effectiveness | 48 |
| C. | Claims Estimations | 49 |

**X. CONFIRMATION AND CONSUMMATION PROCEDURES** ................................ 49

| A. | Overview | 49 |

B.   Confirmation of the Plan ................................................................................. 51
     i.   Elements of Bankruptcy Code Section 1129 ..................................... 51
     ii.   Acceptance ........................................................................................ 52
     iii.   Best Interests Test............................................................................. 52
     iv.   Feasibility ......................................................................................... 54
C.   Cramdown ......................................................................................................... 54
     i.   No Unfair Discrimination ................................................................. 54
     ii.   Fair and Equitable Test ..................................................................... 54
D.   Effect of Confirmation ...................................................................................... 55

XI. INCOME TAX CONSIDERATIONS.................................................................... 55

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..... 55

A.   Liquidation Under Chapter 7 of the Bankruptcy Code .................................... 55
B.   Alternative Plans .............................................................................................. 56

XIII. CONCLUSION.................................................................................................... 57

## **TABLE OF EXHIBITS**

| Exhibit | Name |
| --- | --- |
| A | Debtor's Plan of Reorganization |
| B | Disclosure Statement Order |
| C | Glossary of Defined Terms |
| D | Best Buy Asset Purchase Agreement |
| E | Liquidation Analysis |

# INTRODUCTION

THE BANKRUPTCY COURT HAS NOT YET APPROVED THE DISCLOSURE STATEMENT RELATING TO THE FIRST MODIFIED PLAN OF REORGANIZATION FOR PARTSEARCH TECHNOLOGIES, INC. (THE "<u>DEBTOR</u>" OR THE "<u>COMPANY</u>") UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED AUGUST 16, 2011 (THE "PLAN"). THE DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS **EXHIBIT A**. CLASS 2a – GENERAL UNSECURED CLAIMS, CLASS 2b – BEST BUY CLAIM, CLASS 3 – EQUITY INTERESTS AND SUBORDINATED EQUITY CLAIMS ARE IMPAIRED UNDER THE PLAN AND THUS ARE ENTITLED TO VOTE ON THE PLAN. ACCORDINGLY, THE DEBTOR IS SOLICITING ACCEPTANCES OF THE PLAN FROM HOLDERS OF CLAIMS IN CLASS 2a – GENERAL UNSECURED CLAIMS, CLASS 2b – BEST BUY CLAIM AND CLASS 3 – EQUITY INTERESTS AND SUBORDINATED EQUITY CLAIMS.

THE DEBTOR AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF, AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF, ALL CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS AND BALLOTS SHALL BE CONTAINED IN THE DISCLOSURE STATEMENT ORDER TO BE ATTACHED HERETO AS **EXHIBIT B**. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS WILL CONTAIN APPLICABLE VOTING INSTRUCTIONS. **THE VOTING INSTRUCTIONS WILL SPECIFY THE VOTING DEADLINE BY WHICH THE BALLOT MUST BE COMPLETED AND RECEIVED BY THE SOLICITATION AGENT.**

**All capitalized terms used in the Disclosure Statement and not defined herein shall have the meanings ascribed thereto in the Plan (see Exhibit A to the Plan, Glossary of Defined Terms). For ease of reference, all defined terms used in the Disclosure Statement are listed on <u>Exhibit C</u> attached hereto. Unless otherwise stated, all references herein to "Exhibits" are references to exhibits to this Disclosure Statement.**

## I. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan or as an equityholder whose Equity Interest is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan. See "Confirmation and Consummation Procedures."

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

The Debtor will make a motion for a disclosure statement hearing and for an order pursuant to Bankruptcy Code Section 1125, finding that the Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims and Equity Interests of the Debtor to make an informed judgment with respect to the acceptance or rejection of the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation

of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Bankruptcy Code Section 1125. Except for the Debtor and certain of the professionals it has retained, no Person has been authorized to use or promulgate any information concerning the Debtor, its business or the Plan other than the information contained in this Disclosure Statement and, if given or made, such information may not be relied upon as having been authorized by the Debtor. **You should not rely on any information relating to the Debtor, its business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.**

After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and return the same to the address as set forth on the ballot, in the enclosed, postage prepaid, return envelope so that it will be actually received by The Garden City Group, Inc. (the "<u>Solicitation Agent</u>"), no later than the Voting Deadline. All votes to accept or reject the Plan must be cast by using the appropriate ballot. Votes which are cast in any other manner will not be counted. All ballots must be actually received by the Solicitation Agent at a time specified in the Disclosure Statement Order. **For detailed voting instructions and the name, address and phone number of the Person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as <u>Exhibit B</u>.**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You will be bound by the Plan if it is accepted by the requisite holders of Claims and Equity Interests and confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan or if you are the holder of an unimpaired Claim. See "Confirmation and Consummation Procedures."

**IN LIGHT OF THE BENEFITS TO BE ATTAINED UNDER THE PLAN, THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS URGE ALL HOLDERS OF IMPAIRED CLAIMS AND EQUITY INTERESTS TO VOTE TO ACCEPT THE PLAN AND RETURN THE BALLOT PRIOR TO THE VOTING DEADLINE.**

## II.  <u>EXPLANATION OF CHAPTER 11</u>

A.  <u>Overview of Chapter 11</u>

On January 25, 2011, certain unsecured creditors filed an involuntary petition under chapter 7 of the Bankruptcy Code against the Debtor. On January 27, 2011, the Debtor filed its own voluntary petition for relief under chapter 11 of the Bankruptcy Code, and on February 2, 2011, the Court entered an order consolidating the Debtor's chapter 7 and chapter 11 cases and converting the chapter 7 case to a chapter 11 case for all purposes (the "<u>Case</u>" or the "<u>Chapter 11 Case</u>"). The "<u>Petition Date</u>" for the Debtor's bankruptcy case is deemed January 25, 2011, and the date an order of relief was entered with respect to the Debtor's bankruptcy case is deemed January 27, 2011.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor-in-possession as of the date the petition is filed. Bankruptcy

Code Sections 1101, 1107 and 1108 provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee. In this Case, the Debtor remains in possession of its property and continues to operate its business as a debtor-in-possession. See "The Chapter 11 Case – Continuation of Administrative Operations After the Petition Date."

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Bankruptcy Code Section 362 provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect pre-petition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate. Unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"), and the debtor will have 180 days to solicit acceptance of such plan (the "Solicitation Period"). However, Bankruptcy Code Section 1121(d) permits the bankruptcy court to extend or reduce the Filing Period and Solicitation Period upon a showing of "cause." The Filing Period and Solicitation Period may not be extended beyond 18 months and 20 months, respectively, from the Petition Date. In this Case, the Filing Period has expired.

B.    Chapter 11 Plan

A plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equityholders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, Bankruptcy Code Section 1125 requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtor to satisfy the requirements of Bankruptcy Code Section 1125 in connection with the Debtor's solicitation of votes on the Plan.**

C.    Confirmation of a Chapter 11 Plan

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of Bankruptcy Code Section 1129(a) have been satisfied. See "Confirmation and

4

Consummation Procedures — Confirmation of the Plan." **The Debtor believes that the Plan satisfies all the applicable requirements of Bankruptcy Code Section 1129(a).**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan. See "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. See "Confirmation and Consummation Procedures." Accordingly, acceptances of a plan will generally be solicited only from those Persons who hold claims or equity interests in an impaired class. **Class 2a – General Unsecured Claims, Class 2b – Best Buy Claim, and Class 3 – Equity Interests and Subordinated Equity Claims are impaired under the Plan and thus are entitled to vote on the Plan. Class 1 – Secured Claims is unimpaired under the Plan and is therefore deemed to have accepted the Plan.**

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. See "Confirmation and Consummation Procedures — Cramdown." **The Plan has been structured so that it will satisfy the foregoing requirements for the Debtor as to any rejecting class of Claims or Equity Interests, and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims or Equity Interests.**

## III.  OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in the Debtor.

A.    Summary of the Terms of the Plan

The Plan is built around the following key elements:

- On the Effective Date, the Reorganized Debtor will issue to Best Buy 100% of its New Common Shares as follows: (i) twenty-five (25) New Common Shares in exchange for Cash in the amount of $1,321,355; and (ii) seventy-five (75) New Common Shares in exchange for and satisfaction of $8,850,000 of the Best Buy Claim. Title to the Included Assets and the Assumed Liabilities shall vest in the Reorganized Debtor.

- Plan distributions will be made as follows:

- All Allowed Administrative Claims will be paid in full, unless the Debtor and any holders of such claims agree to other, no more favorable treatment.

- All Allowed Priority Claims will be paid in full, subject to any applicable cap under Bankruptcy Code Section 507(a).

- All Allowed Secured Claims (Class 1), to the extent any such claims are Allowed, will be unimpaired, as set forth in Section 6.1 of the Plan.

- After all Allowed Administrative Claims and Allowed Priority Claims have been satisfied in full and all Allowed Class 1 Claims have been satisfied in full in accordance with Section 6.1 of the Plan, all Allowed General Unsecured Claims (Class 2a) and the Best Buy Claim (Class 2b) will receive Cash on a Pro Rata basis to the holders on account of their Allowed General Unsecured Claims and the Allowed Best Buy Claim until such Claims are satisfied in full; and, thereafter, on a Pro Rata basis to the holders on account of accrued interest at a rate of 3.25% per annum on their Allowed General Unsecured Claims and the Allowed Best Buy Claim.

- All Equity Interests and Allowed Subordinated Equity Claims of the Debtor will be extinguished. To the extent there is sufficient Residual Cash remaining for a distribution after all of the above-referenced distributions have been made in full, holders of Equity Interests or Allowed Subordinated Equity Claims will be entitled to receive on account of their Equity Interests or Subordinated Equity Claims, a distribution of Residual Cash on a Pro Rata basis on the next available Plan Distribution Date..

- On the Effective Date, Best Buy will pay $5,083,645 in cash ($3,202,500 of which Best Buy has already deposited in escrow) to the Debtor in full satisfaction of all prepetition amounts payable by Best Buy to the Debtor. (This amount is in addition to the Cash portion of the Equity Consideration). In addition, on the Effective Date, all Plan Trust Assets (including the Equity Consideration, all Excluded Assets and any cash proceeds thereof, any cash of the Debtor on hand, both as existing as of the Effective Date, and certain claims and causes of action and proceeds of the same) and Plan Trust Liabilities shall be transferred to the Plan Trust and the Plan Trustee shall be authorized to liquidate the Plan Trust Assets and shall make distributions pursuant to the Plan.

- The Plan Trust will be governed by the Plan Trust Agreement. The Plan Trust Agreement will provide for the creation of a Plan Trust Oversight Committee consisting of no fewer than three (3) members to oversee the actions of the Plan Trustee, and in certain circumstances set forth in the Plan Trust Agreement, to provide the requisite approval of certain actions to be taken by the Plan Trustee. The form of Plan Trust Agreement and the identity of the Plan Trustee and the

members of the Plan Trust Oversight Committee will be filed on the docket for the Chapter 11 Case no later than 14 days prior to the Voting Deadline and will be subject to approval by the Court at the Confirmation Hearing.

- The Plan is co-sponsored by Best Buy Enterprise Services Inc. (the "Sponsor"), and along with Best Buy Co., Inc. and their respective affiliates "Best Buy") as contemplated by Best Buy's winning bid, as described in more detail in Section VI.

- If the Plan is not confirmed and consummated by October 7, 2011, then Best Buy will pay $1,667 per day to the Estate until the occurrence of the Effective Date. To the extent the Plan is not confirmed and consummated by November 4, 2011, or such later date as mutually agreed to by the Debtor and Best Buy, substantially all of the Debtor's assets will be sold to Best Buy pursuant to the Best Buy Asset Purchase Agreement (as defined in Section VI) for a purchase price of $6,405,000 pursuant to the Sale Order.

B.    Summary of Distributions Under the Plan

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit A**. In addition, for a more detailed description of the terms and provisions of the Plan, see "The Chapter 11 Plan," below.

The following chart summarizes the estimated Plan distributions to each class on the Plan Distribution Date (unless otherwise provided):

### Administrative and Priority Claims[3]

| Claim Description | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|
| Administrative Claims | Each Allowed Administrative Claim shall, at the option of the Debtor on or prior to the Effective Date and the Plan Trustee after the Effective Date, receive (i) on the Plan Distribution Date, the amount of such Allowed Claim in Cash, (ii) with respect to Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtor, payment when and as such Administrative Claims become due and owing by their ordinary course terms or (iii) such other treatment as may be agreed upon in writing by the Debtor on or prior to the Effective Date, and | 100% |

---

[3] As provided by Bankruptcy Code Section 1123(a)(1), Administrative Claims and Priority Claims shall not be classified under the Plan. Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of Bankruptcy Code Sections 1123, 1124, 1125, 1126 or 1129.

| Claim Description | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|
| | the Plan Trustee after the Effective Date, as the case may be, and the holder of such Claim; provided, however, that such treatment shall not provide to the holder of such Claim a return having a present value as of the Effective Date in excess of such Allowed Administrative Claim. If a portion of an Administrative Claim is disputed, the undisputed portion of such Administrative Claim shall be timely paid as provided above. | |
| Statutory Fees | The Debtor, or the Plan Trustee, as the case may be, shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of business and in accordance with the Plan Trust Agreement, until the entry of a Final Decree, dismissal of the Chapter 11 Case, or conversion of the Case to Chapter 7 as provided in Section 17.11 of the Plan. | 100% |
| Priority Claims | Each Person holding an Allowed Priority Claim shall be paid in Cash in full (subject to any applicable cap under Bankruptcy Code Section 507(a)) on the Plan Distribution Date. | 100% |

**Classified Claims and Equity Interests**

| Class | Impaired / Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|
| Class 1 - Secured Claims | No / No | Each Allowed Secured Claim shall be unimpaired under the Plan and, at the sole option of the Plan Trustee, shall receive the following treatment: (i) shall receive on the Plan Distribution Date on account of such Allowed Secured Claim a Cash payment in an amount equal to the amount of the Allowed Secured Claim as of the Effective Date with Post-Petition Interest from the Petition Date through the Effective Date; | 100% |

| Class | Impaired / Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|
| | | (ii) except as to Included Assets, shall retain its liens securing such Allowed Secured Claim and receive on account of such Allowed Secured Claim deferred cash payments having a present value on the Effective Date equal to the amount of such Allowed Secured Claim with Post-Petition Interest from the Petition Date through the Effective Date; (iii) shall realize the "indubitable equivalent" of such Allowed Secured Claim; (iv) the property securing the Allowed Secured Claim (that is not an Assumed Liability) shall be sold or vested in the Reorganized Debtor (as the case may be) free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on such proceeds as provided in clauses (ii), (iii) or (vi) of this subparagraph; (v) if such Allowed Secured Claim is subject to a valid right of recoupment or setoff, such Claim shall be setoff to the extent of the amount subject to setoff in accordance with sections 506(a) and 553 of the Bankruptcy Code; or (vi) shall receive such other treatment as may be agreed upon in writing by the holder of such Claim and the Plan Trustee; provided that such agreed upon treatment may not provide the holder of such Claim with a return having a present value as of the Effective Date that is greater than the amount of such Allowed Secured Claim. | |
| Class 2a (General Unsecured Claims) and Class 2b (Best Buy Claim) | Yes / Yes | Each holder of an Allowed General Unsecured Claim and the Best Buy Claim shall be entitled to receive, in full and final satisfaction of its Allowed General Unsecured Claim and the Best Buy Claim, after all Allowed Administrative Claims and Allowed Priority Claims have been satisfied in full and all Allowed Class 1 | Class 2a: 50 – 60%[4]<br><br>Class 2b: 50 – 60%[5] |

---

[4] See the Liquidation Analysis set forth as <u>Exhibit E</u> hereto.
[5] See the Liquidation Analysis set forth as <u>Exhibit E</u> hereto.

| Class | Impaired / Entitled to Vote | Treatment Under the Plan | Estimated Percentage Recovery |
|---|---|---|---|
| | | Claims have been satisfied in full in accordance with Section 6.1 hereof, Cash on a Pro Rata basis to the holders on account of their Allowed General Unsecured Claims and the Allowed Best Buy Claim until such Claims are satisfied in full; and, thereafter on a Pro Rata basis to the holders on account of accrued interest at a rate of 3.25% per annum on their Allowed General Unsecured Claims and the Allowed Best Buy Claim. | |
| Class 3 Equity Interests and Allowed Subordinated Equity Claims | Yes / Yes | On the Effective Date, all Equity Interests of the Debtor shall be extinguished, and any certificates and all other documents representing such Equity Interests shall be cancelled and of no force and effect; provided, however, that such Equity Interests shall be given effect for the sole purpose of calculating the amount of distribution, if any, to be received by holders of Equity Interests hereunder. Each holder of an Equity Interest or Allowed Subordinated Equity Claim shall be entitled to receive on account of their respective Equity Interests and/or Allowed Subordinated Equity Claims, any distribution of Residual Cash on a Pro Rata basis on the next available Plan Distribution Date if there is sufficient Residual Cash for such a distribution. For the avoidance of doubt, distributions pursuant to this subparagraph shall only be made after all costs and expenses of the Estate, the Plan Trust and the Plan Trustee, including the satisfaction in full of all Allowed Administrative Claims, Allowed Priority Claims, and all Allowed Claims in Classes 1, 2(a) and 2(b), including interest thereon, in accordance with the terms of the Plan and the Plan Trust Agreement. | 0% |

C.    Exculpation Provisions

The exculpation provisions of the Plan with respect to the Debtor, as described in Section VIII.I.vi. below, are limited to those actions taken and persons serving with the Debtor from and after November 1, 2010.  On and after November 1, 2010, the Debtor's operations ceased and the Debtor retained Argus Management Corporation and Brown Rudnick to prepare for a possible chapter 11 filing or other type of wind-down or restructuring.  (A decision was subsequently made to resume business operations on a very limited basis in the hopes of effecting a sale of the business as a going concern.).

Prior to November 1, 2010, allegations of intentional overbilling of the Debtor's customers and other financial improprieties arose.  Such allegations will be thoroughly investigated by the Plan Trustee and if it is determined that there was wrongdoing on the part of any person, including perhaps any one or more of the then serving officers or directors of the Debtor, a cause of action may be pursued by the Plan Trustee.  Accordingly, the exculpation provision has been narrowly tailored to exclude actions taken prior to November 1, 2010 so that the Plan Trust is able to pursue such potential causes of action, if appropriate, while providing exculpation for actions taken by individuals working with the Debtor on and after November 1, 2010 without affecting the possibility of claims being brought on account of the actions taken by the Debtor prior to such date.  Specifically, those individuals and entities who are the beneficiaries of the exculpation provision are Argus Management Corporation, Lawton W. Bloom, Peter Sullivan, Scott Dicus (all with Argus) and the law firm of Brown Rudnick LLP. In addition, Michael Dering, Robert McMullan, Derek Jones, Howard Morgan, James W. Shubauer, II and Ron Totaro are beneficiaries of the exculpation provision for actions taken as a officers and directors on and after November 1, 2010, but not for anything occurring prior to such date.  Former officers and directors not listed herein are not beneficiaries of the exculpation provision.

## IV.  **GENERAL INFORMATION**

A.    History and Overview of the Debtor's Business

The Debtor is a Delaware corporation qualified to do business in the State of New York.  On the Petition Date, the Debtor maintained its company headquarters in New York, New York and had an office in Kingston, New York where its finance and customer service departments were located.

The Debtor, established in 2000, began as a one stop shop for parts for electronics, appliances and other items, offering repair technicians and consumers a single place to find obscure parts and commonly lost items such as batteries.  More specifically, the Debtor supplied parts for products in many categories, including consumer electronics, appliances, computers, wireless products and outdoor power equipment.  The Debtor offered both replacement parts for popular consumer items, such as AC adapters, chargers, batteries and various cords and cables, as well as service parts for larger items, including circuit boards and regulators for refrigerators and laundry equipment.  The Debtor supplied parts for various well-known brands including Sony, Whirlpool, Samsung, Yamaha, RCA, General Electric and Maytag.

The Debtor's business model allowed it to provide such replacement parts to its customers without having to hold inventory, which was instead held by the Debtor's suppliers. The Debtor also contracted with major retailers such as Best Buy Co., Inc. (together with Best Buy Enterprise Services, Inc. and their respective affiliates, "Best Buy") to offer customer support services. As parts-related customer service calls came into such retailers, they were routed to the Debtor's call center.

In addition to its relationship with Best Buy, the Debtor operated multiple other co-branded websites with various retailers and its own business-to-customer website, www.Partstore.com (the "Website"). The Website eventually became the industry's largest online source for a variety of replacement parts. The Website was used by various types of customers including individual consumers, retailers, commercial accounts, and service/repair companies.

B.    Debtor's Pre-petition Corporate and Capital Structure

    i.    Corporate Structure

The Debtor is a Delaware corporation qualified to do business in the State of New York. On the Petition Date, there were approximately 70 holders of the Debtor's stock.

    ii.    Pre-Petition Liabilities

The Debtor has no secured or funded debt. As described in Section V.E hereof, the general deadline for filing proofs for claims arising prior to the Petition Date (except proofs of claim filed by governmental units) was April 11, 2011 at 5:00 p.m. prevailing Eastern time, (the "General Bar Date"), subject to exceptions for certain types of claims. Based on the claims filed to date, and the Debtor's books and records, the Debtor estimates its liabilities to be comprised of the following: (i) certain unsecured liabilities totaling approximately $11.1 million arising from a certain Services Agreement dated as of July 24, 2009 by and between the Debtor and Best Buy (the "Best Buy Claim"); and (ii) certain unsecured accounts payable and other unsecured accrued liabilities relating primarily to vendor claims totaling approximately $8.2 million (the "Vendor Claims").

Additionally, as of the Petition Date, the Debtor had certain potential liability arising under a class action lawsuit originally filed on November 24, 2010 in the District Court for the Southern District of New York, Civil Action No. 1:10-cv-08903-VM, which was dismissed after the Petition Date and refiled as an adversary proceeding (Adv. Pro. No. 11-01445) on or around February 7, 2011, alleging a violation of the Worker Adjustment and Retraining Notification Act and the New York State Workers Adjustment and Retraining Notification Act (referred to collectively as the "WARN Act"), and seeking an unliquidated amount of damages (the "WARN Act Lawsuit", and such alleged damages, the "WARN Act Claims", and together with the Best Buy Claim and the Vendor Claims, the "Unsecured Claims"). As described more fully in Section VII hereof, the Debtor filed a motion to settle and resolve the WARN Act Lawsuit and the WARN Act Claims. Pursuant to the settlement, as approved by the Bankruptcy Court on June 20, 2011, the Debtor is required to pay $183,000 to the WARN Act claimants and their

attorneys, in exchange for a dismissal of the WARN Act Lawsuit with prejudice, and a full release of the WARN Act Claims.

C.    Events Leading to the Commencement of the Case Under Chapter 11

    i.    The Debtor's Historical Relationship With Best Buy

Best Buy, formerly the Debtor's largest customer, became a customer in 2001 and an equity investor on October 26, 2001 (ultimately owning a total of less than seven (7) percent of the Debtor's common stock). Historically, Best Buy represented approximately fifty (50) percent of the Debtor's annual revenue. The Debtor supported Best Buy's customers by operating a customer service call center and providing replacement parts to Best Buy customers through Best Buy's extended warranty program. The Debtor also operated a co-branded website with Best Buy.

In or about mid-August 2010, the Debtor identified discrepancies in its invoicing of Best Buy. The Debtor's Board of Directors immediately retained a leading law firm, Wilson, Sonsini, Goodrich & Rosati ("WSGR"), to conduct an investigation into the discrepancies. By early September 2010, the Debtor determined that it likely had over-invoiced Best Buy over a period of years by millions of dollars.

On September 9, 2010, the Debtor's Chief Executive Officer, Ronald Totaro, and Chief Financial Officer, Robert McMullan, met with Best Buy to inform it of the discovery of the invoicing issues and to discuss a plan to remedy the problem and repay any historic overcharges. During the meeting, Mr. Totaro informed Best Buy that the Debtor intended to rectify the problem, repay any amounts owed and take any necessary steps to maintain the relationship, including cooperating with an audit by Best Buy of the Debtor's invoicing activities.

Following the September 9 meeting, Best Buy initiated its audit, and the Debtor worked cooperatively with Best Buy to provide it with access to the Debtor's books and records relating to the invoicing issues. During this time, Best Buy continued its business with the Debtor at levels consistent with the parties' nine year business relationship. In addition, the Debtor and Best Buy continued discussions concerning pricing for 2010 and 2011.

By September 27, 2010, the Debtor had corrected the inaccuracies in its invoicing process and sent Best Buy a revised invoice for unpaid services and parts. Historically, the Debtor invoiced Best Buy weekly, which Best Buy paid on thirty-day terms. Based upon its ongoing discussions with Best Buy and historical practice, the Debtor expected the revised invoices to be paid in due course.

On October 22, 2010, during a meeting between the Debtor and Best Buy to discuss a settlement of the amounts due to Best Buy relating to the invoicing issues, Best Buy advised the Debtor that it did not intend to pay the Debtor's outstanding invoices or any future invoices until its audit was complete. On the evening of October 29, 2010, without advance notice to the Debtor, Best Buy effectively terminated its relationship with the Debtor by, among other things, re-directing calls to the customer service call center, disabling the links to the Website and ceasing to place orders with the Debtor.

ii.    Post-Termination Efforts to Save the Company

Immediately upon learning of Best Buy's termination of its relationship with the Debtor, the Debtor's management and Board members began around-the-clock discussions regarding the future of the business. On November 1, 2010, the Debtor hired Brown Rudnick LLP ("Brown Rudnick") as crisis management counsel. On that same day, the Debtor's Board met and concluded that the business was not viable without Best Buy as a customer. Immediately following the meeting, a Board member unsuccessfully attempted to re-engage with Best Buy.

On November 1, 2010, the Debtor's employees were informed that Best Buy had terminated its relationship with the Debtor, and each employee received a notice under the WARN Act. The following day, the Debtor determined that Best Buy was not going to re-engage the Company on negotiations regarding its termination. As a result, the Debtor was forced to lay off all but ten employees and cease operations. All employees were paid through November 15, 2010.

On November 3, 2010, the Debtor hired Argus Management Corporation ("Argus") to provide interim management and advisory services. Since then, the Debtor has recommenced limited operations, including its website, in order to preserve the going concern value of its remaining assets and operations for a sale. (This sale, which was approved by the Bankruptcy Court on March 28, 2011 is described further in Section VI). In addition, the Debtor rehired certain employees who were previously laid off to work in these limited operations.

To preserve capital, in December of 2010, the Debtor abandoned its company headquarters located at 360 Park Avenue South, 15th Floor, New York, NY 10003 (the "Park Avenue Premises"). On December 6, 2010, the Debtor entered into an Office Services Agreement to lease less expensive, temporary office space located at 708 Third Avenue, 3rd Floor, New York, NY 10017 (the "Temporary Office Space").

iii.    Prior Internal Investigation; Potential Indemnity Claims; and Insurance Coverage

After discovery of the invoicing issues discussed above, Wilson Sonsini Goodrich and Rosati, a leading law firm ("WSG&R"), was retained to conduct an investigation as to the invoicing issues, operational responsibility for the same and the Debtor's rights against and obligations to Best Buy given the investigation results. No written report of the WSG&R investigation was issued. However, materials generated in connection with that investigation were shared with the Debtor's board of directors (the "Board") and have since been shared with the Debtor and the Creditors' Committee, but such materials and the results of the investigation remain confidential and so have not been made generally available to the public. The Plan Trustee will have access to those materials and the materials that have already been provided to the Creditors' Committee, and may decide to also conduct further investigation into matters which may or may not have been covered by the WSG&R investigation. The Plan Trustee may also decide to possibly commence litigation actions in an effort to obtain recoveries for the Plan Trust related to such (or other) issues (any such litigation actions, "Litigation Efforts"). Certain former and present members of the Board ("Indemnity Claimants"), believe any such Litigation Efforts may result in a delay of distributions to be made under the Plan.

The Indemnity Claimants have asserted claims in unliquidated amounts for reimbursement of any costs or other amounts that they may incur in connection with any Litigation Efforts ("Indemnity Claims"). The amount and validity of those Indemnity Claims have not been decided. The Debtor carries a policy of "D&O Insurance" that may provide coverage for any such Indemnity Claims (as well as direct coverage for certain types of other claims that may be asserted by the Debtor and/or other insureds, including perhaps by the Indemnity Claimants). That policy, issued by Twin City Fire Insurance Co. (a unit of The Hartford Insurance Company), is in the aggregate amount of $3,000,000 (inclusive of funded defense costs), subject to deductible (self-insurance) amounts that vary in amount by nature of the claim made up to an aggregate of $40,000 (the "Policy Limits"). Depending on the nature and extent of any Litigation Efforts, the amount of the Indemnity Claims may exceed the Policy Limits. The Bankruptcy Court may direct, or the Plan Trustee may choose, to establish reserves on account of the potential Indemnity Claims pending their allowance or disallowance, and the amount so reserved would be withheld from amounts otherwise available for distribution under the Plan.

## V. **THE CHAPTER 11 CASE**

A.    Commencement of the Chapter 11 Case

On January 25, 2011, certain unsecured creditors filed an involuntary petition under chapter 7 of the Bankruptcy Code against the Debtor. On January 27, 2011, the Debtor filed its own voluntary petition for relief under chapter 11 of the Bankruptcy Code, and on February 2, 2011, the Court entered an order consolidating the Debtor's chapter 7 and chapter 11 cases and converting the chapter 7 case to a chapter 11 case for all purposes. The "Petition Date" for the Debtor's bankruptcy case is deemed January 25, 2011, and the date an order of relief was entered with respect to the Debtor's bankruptcy case is deemed January 27, 2011.

B.    Continuance of Administrative Operations After the Petition Date

The Debtor has continued its administrative operations and managed its assets as a debtor-in-possession after the Petition Date. After commencement of this Chapter 11 Case, the Debtor proceeded to efficiently and effectively administer the Debtor's Estate under the protection of the Bankruptcy Code.

One of the Debtor's main goals throughout the Chapter 11 Case has been pursuing a sale of substantially all of its business and assets and otherwise pursuing an orderly wind-down and liquidation of its remaining assets in order to realize maximum value for stakeholders. The Debtor has done so in consultation with the Office of the United States Trustee, the Creditors' Committee and other parties-in-interest. As described in Section VI, on March 28, 2011, the Bankruptcy Court entered an order approving the contingent sale of substantially all of the Debtor's assets to Best Buy if the Plan as attached hereto cannot be confirmed and consummated by November 4, 2011. If the Plan is not confirmed and consummated by October 7, 2011, then Best Buy will pay the Estate $1,667 per day until the earlier of (i) the Effective Date or (ii) November 4, 2011.

The Debtor has sought and will continue to seek the Bankruptcy Court's approval for all transactions outside the ordinary course of business.

i.        "First-Day" Motions

On January 27, 2011, the Debtor filed several motions seeking typical "first-day" relief, in order to facilitate the Debtor's transition into the chapter 11 process and permit the Debtor to continue its remaining operations with as little disruption as possible under the circumstances. Such "first-day" motions included the following:

1.        *Consolidated List of Creditors*

The Debtor filed a motion seeking approval to file (i) a consolidated list of creditors and (ii) a consolidated list of the Debtor's twenty (20) largest creditors, as well as permission to complete all mailings of notices.  By order entered on February 3, 2011, the Bankruptcy Court granted the relief requested in this motion.

2.        *Retention of Certain Professionals and Appointment of Officers*

The Debtor filed motions seeking authority to retain and employ certain professionals to represent and assist it in connection with the Chapter 11 Case, including a motion to employ Brown Rudnick, as counsel for the Debtor (the "Brown Rudnick Retention Motion"), a motion to employ Garden City Group, Inc., as claims and noticing agent and a motion to employ Garden City Group, Inc., as administrative agent (together, the "GCG Retention Motions"). Additionally, the Debtor filed a motion to employ Argus to provide restructuring services and to appoint Lawton W. Bloom as Chief Restructuring Officer of the Debtor and Peter Sullivan and Scott Dicus, each as an Assistant Restructuring Officer of the Debtor (the "Argus Retention Motion").

By order entered on February 3, 2011, the Bankruptcy Court granted the relief requested in the GCG Retention Motions in substantially the manner requested in such motions.  By order entered on February 25, 2011, the Bankruptcy Court granted the relief requested in the Brown Rudnick Retention Motion and the Argus Retention Motion in substantially the manner requested in such motions.

3.        *Interim Compensation*

In an effort to enable all parties to monitor the costs of administration, enable the maintenance of a more level cash flow availability and implement efficient cash management, the Debtor has developed procedures for interim compensation and reimbursement of expenses of the professionals and members of any official committee appointed in the Chapter 11 Case. On the Petition Date, the Debtor sought and received an order establishing certain procedures with which all Professionals would be required to comply in seeking compensation and reimbursement.

4. *Cash Management*

As of the Chapter 11 Petition Date, the Debtor had in place certain bank accounts supporting its remaining business and administrative operations (the "Cash Management System"). The Debtor filed a motion for an order (i) authorizing the Debtor to continue to use its existing bank accounts, Cash Management System and business forms, and open new debtor-in-possession accounts, and (ii) authorizing and directing the Debtor's banks to accept and hold the Debtor's funds in accordance with pre-petition practices. By order entered on February 1, 2011, the Bankruptcy Court granted the relief requested in this motion in substantially the manner requested on an interim basis, and on February 25, 2011, the Bankruptcy Court granted the relief requested in this motion in substantially the manner requested on an final basis.

5. *Employee Benefits*

The Debtor filed a motion for authority to (i) contribute to a pre-petition employee health plan and continue such plan, (ii) pay certain employee obligations and maintain and continue an employee severance plan, (iii) pay workers' compensation obligations and other insurance premiums, and (iv) pay the salary of the Debtor's sole remaining Board member. By order entered on February 1, 2011, the Bankruptcy Court granted the relief requested in this motion in substantially the manner requested on an interim basis, and on February 25, 2011, the Bankruptcy Court granted the relief requested in this motion in substantially the manner requested on an final basis.

ii. Other Retentions by the Debtor

On May 5, 2011, the Bankruptcy Court entered an order approving the Debtor's motion for authorization to employ and retain BDO USA, LLP and BDO Canada LLP (together, "BDO") as a tax services provider for the Debtor. On May 27, 2011, the Bankruptcy Court entered an order approving the Debtor's motion for authorization to employ and retain Rosen Seymour Shapss Martin & Company LLP ("RSSM") as a 401(k) Plan auditor for the Debtor.[6]

C. Appointment of the Creditors' Committee

Section 1102 of the Bankruptcy Code provides that as soon as practicable after the commencement of a chapter 11 case, the United States Trustee shall appoint an official committee of unsecured creditors. On February 8, 2011, the U.S. Trustee appointed the following members to form the Official Committee of Unsecured Creditors (the "Creditors' Committee"): Best Buy Co., Inc., Herman Electronics, Fox International, BTI Corporation and Tech City 22, 23 & 24, LLC.[7]

The Creditors' Committee retained Halperin Battaglia Raicht, LLP as its counsel and CBIZ MHM, LLC as its financial advisor, which retentions the Bankruptcy Court approved on February 22, 2011.

---

[6] As set forth below, the Bankruptcy Court also approved the Creditors' Committee's retention of counsel and a financial advisor.

[7] As of the date hereof, the remaining members of the Creditors' Committee are Best Buy Co., Inc. and Tech City 22, 23 & 24, LLC.

D.     Matters Relating to Unexpired Leases and Executory Contracts

Bankruptcy Code Section 365 grants the debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is assumed, the rights of the debtor party to such agreement continue as property of the debtor's estate.  A subsequent breach of an assumed lease or executory contract creates an administrative claim in favor of the non-debtor counterparty, entitling it to an administrative claim for pre-petition obligations as well as post-petition obligations arising as a result of the breach.  If an executory contract or unexpired lease is rejected, the non-debtor counterparty to the agreement may file a claim for damages incurred by reason of the rejection, which is treated as a pre-petition claim.  In the case of rejection of leases of real property, such damage claims are subject to certain claim amount limitations imposed by the Bankruptcy Code.  For a description of the special bar date established on account of such claims, see "The Chapter 11 Case — Schedules, Bar Dates, Claims Objections," below.

Generally, debtors have until the confirmation date of a chapter 11 plan to assume executory contracts and unexpired leases to which they are a party.  An exception to the foregoing is set forth in Bankruptcy Code Section 365(d)(4), which provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee (i) within 120 days after the petition date, (ii) within a 90-day additional period as the bankruptcy court, for cause, fixes, or (iii) within such additional time as the bankruptcy court, for cause, fixes with the consent of the landlord of the leased premises, then such lease is deemed rejected.

i.     Motion to Reject Park Avenue Lease

On January 27, 2011, the Debtor filed a motion to reject the non-residential, unexpired real estate lease for the Park Avenue Premises.  In December of 2010, the Debtor informed the landlord that it was abandoning the Park Avenue Premises, and on or before January 14, 2011, the Debtor removed its final item of property from the Park Avenue Premises.  By order entered on February 25, 2011, the Bankruptcy Court granted the Debtor's motion to reject this lease.

ii.     Motion to Reject Service Contracts and Office Equipment Leases

On March 30, 2011, the Debtor filed a motion to reject a total of seven executory contracts.  These contracts included two equipment leases with General Electric Capital Corporation, two equipment leases with Pitney Bowes, and three service contracts relating to fiber optic lines with Verizon Select Services Inc.  By order entered on June 10, 2011, the Bankruptcy Court granted the Debtor's motion to reject these executory contracts.

iii.     Motion to Reject Temporary Office Space Lease

On April 29, 2011, the Debtor filed a motion to reject the non-residential real estate lease for the Temporary Office Space.  On or around April 28, 2011, the Debtor abandoned and surrendered the Temporary Office Space.  By order entered on May 27, 2011, the Bankruptcy Court granted the Debtor's motion to reject this lease.

iv.     Motion to Reject Kingston Lease

On May 23, 2011, the Debtor filed a motion to reject the non-residential, unexpired real estate lease for its office location at Buildings 22-23-24, 100-698 Enterprise Drive (204 Enterprise Drive), Kingston, New York 12401, where its finance and customer service departments were located (the "Kingston Premises"). On May 18, 2011, the Debtor informed the landlord that it was abandoning the Kingston Premises. The Debtor abandoned the Kingston Premises on or before May 31, 2011. An order approving this motion was approved by the Bankruptcy Court at a hearing on June 20, 2011 and an order approving the motion was entered on June 21, 2011.

E.     Schedules, Bar Dates and Claims Objections

The Debtor filed its Schedules within fourteen (14) days of the Petition Date – on February 8, 2011 – as provided in Bankruptcy Rule 1007.

On March 2, 2011, the Bankruptcy Court entered an order (the "Bar Date Order") setting forth the following deadlines relating to the filing of proofs of claim: (i) for claims arising prior to the Petition Date (except proofs of claim filed by governmental units), April 11, 2011 at 5:00 p.m. prevailing Eastern time, (the "General Bar Date"); (ii) for proofs of claim filed by governmental units, July 26, 2011 (the "Government Bar Date"); (iii) for claims arising from the rejection of an executory contract or unexpired lease, the later of (a) the General Bar Date or (b) such date as the Bankruptcy Court may set forth in the applicable order authorizing such rejection (the "Rejection Damages Bar Date").

The deadlines set forth in the Bar Date Order do not apply to various types of claims, including previously filed claims, certain claims listed on the Debtor's Schedules that are not listed as "disputed," "contingent" or "unliquidated", previously allowed claims, claims that have been paid in full, claims subject to a separate deadline set forth by the Bankruptcy Court, claims by affiliates of the Debtor, claims allowable under Section 503(b) or Section 507(a)(2) of the Bankruptcy Code as an expense of administration (except claims under section 503(b)(9), which are subject to the Bar Date Order), and certain claims for interests based on equity securities.

Notwithstanding anything to the contrary in the Plan or this Disclosure Statement, the filing of proofs of claim, including, but not limited to, timing and manner, shall be governed by the Bar Date Order as entered by the Bankruptcy Court.

## VI.     SALE OF 100% OF THE EQUITY OF THE REORGANIZED DEBTOR AND CONTINGENT SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS

Section 363(b) of the Bankruptcy Code permits a debtor to sell property of the estate, other than in the ordinary course of the debtor's business. A debtor that seeks to sell property of the estate outside the ordinary course of its business must demonstrate that such a sale represents the exercise of sound business judgment, and a bankruptcy court must use its discretion in determining whether to approve such a sale under Section 363(b) of the Bankruptcy Code.

On January 27, 2011, the Debtor filed a motion (i) for an order authorizing and approving auction and sale procedures in connection with the sale of substantially all of the Debtor's assets

and granting related relief, and (ii) for an order authorizing and approving the sale of substantially all of the Debtor's assets free and clear of liens, and granting related relief (the "Sale Motion").

On February 14, 2011, the Bankruptcy Court entered an order authorizing and approving auction and sale procedures in connection with the sale of substantially all of the Debtor's assets and granting related relief (the "Sale Procedures Order"). Pursuant to the Sale Procedures Order, the Debtor held an auction for substantially all of its assets (as defined in the Sale Motion, the "Sale") on March 22, 2011. As further described below, Best Buy was the winning bidder at the auction with its offer to purchase all of the equity of the Reorganized Debtor. On February 28, 2011, the Court entered an order authorizing and approving the sale to Best Buy (the "Sale Order").

A.    Marketing Process

Following the termination of the Best Buy relationship prior to the Petition Date, the Debtor commenced discussions with several parties relating to a potential sale of substantially all of its assets. In order to preserve the rapidly diminishing value of its business and prevent the attrition of certain key employees, the Debtor attempted to secure a favorable purchase offer as quickly as possible under the circumstances. On behalf of the Debtor, Argus reached out to numerous parties prior to the bankruptcy filing to determine their interest in pursuing a purchase of the Debtor's assets.

Prior to the Petition Date, ELDIS, Inc. ("ELDIS") demonstrated the most interest in acquiring the Debtor's operating assets and ultimately provided the highest valued indication of interest. Ultimately, ELDIS agreed to become the Stalking Horse Bidder (as defined in the Sale Motion), and the Debtor entered into the Asset Purchase Agreement, dated January 27, 2011, between the Debtor, as seller, and ELDIS, as purchaser (the "Stalking Horse APA"), for the purchase of substantially all of the Debtor's assets (the "Assets"). The consummation of the Stalking Horse APA was subject to, inter alia, the results of an auction for the Assets (the "Auction").

Argus continued actively marketing the Debtor's assets and working with potential counter-bidders after entering into the Stalking Horse APA, including placing advertisements, press releases and directly contacting various parties that had expressed interest in bidding on the Debtor's assets. As a result of these communications, the Debtor had conversations with numerous interested parties and executed confidentiality agreements with four additional parties. Three parties (including Best Buy) conducted onsite due diligence of the Debtor's assets post-petition.

B.    Auction and Successful Bid

Pursuant to the Sale Procedures Order, the Auction occurred on March 22, 2011. Best Buy and ELDIS attended and participated in the Auction. The final and winning bid was Best Buy's offer of $6,405,000. As a part of Best Buy's winning bid, Best Buy and the Debtor agreed to co-sponsor the Plan, pursuant to which Best Buy (or its designee) will acquire 100% of the equity of the reorganized Debtor as described in more detail herein. Best Buy and the Debtor

also entered into a contingent Asset Purchase Agreement [attached hereto as **Exhibit D**] (the "Asset Purchase Agreement"). If the Plan is confirmed and goes effective on or before November 4, 2011, Best Buy will acquire 100% of the equity of the Reorganized Debtor and the Asset Purchase Agreement will terminate and be of no further force and effect. Best Buy will pay $1,321,355 in Cash and deem $8,850,000 of the Best Buy Claim satisfied in exchange for the equity of the Reorganized Debtor. In addition, Best Buy will pay $5,083,645 in cash ($3,202,500 of which Best Buy has already deposited in escrow) to the Debtor in full satisfaction of all prepetition amounts payable by Best Buy to the Debtor. Pursuant to the bid, the Plan is required to be at least as beneficial to the creditors of the Debtor's estate and other parties in interest in the Debtor's chapter 11 case as would be the consummation of the Asset Purchase Agreement followed by a distribution of the Debtor's assets pursuant to confirmation of a simple liquidating plan using the priority scheme applicable to chapter 7 cases.

If the Plan is not confirmed and consummated by October 7, 2011, then Best Buy will pay $1,667 to the Estate until the earlier of: (i) the Effective Date; or (ii) November 4, 2011. If the Plan is not confirmed and does not become effective by November 4, 2011, Best Buy will, pursuant to the terms of the Asset Purchase Agreement, purchase substantially all assets of the Debtor's business.[8] Best Buy will pay $6,405,000 in cash for the assets purchased pursuant to the Asset Purchase Agreement. As required by Best Buy's winning bid as approved by the Sale Order, Best Buy and the Debtor have submitted all the documents required to consummate the transactions contemplated by the Asset Purchase Agreement into escrow. Such documents will be released if the transactions contemplated by the Asset Purchase Agreement are consummated. In addition, on March 31, 2011, Best Buy posted a cash deposit of $3,202,500, equal to 50% of its bid price, which deposit will be set off against the payments required to be made by Best Buy under the Plan, or if the Plan does not go effective, the Asset Purchase Agreement.

As part of Best Buy's winning bid, the Debtor and Best Buy entered into an operating lease (the "Best Buy Operating Lease") whereby Best Buy assumed the operation, maintenance, complete control, risk of loss, injury and cost of the Debtor's business for an initial term beginning on March 31, 2011 and ending on November 4, 2011, as such term may be extended pursuant to the terms of the Best Buy Operating Lease. Pursuant to the Best Buy Operating Lease, the Debtor permitted Best Buy to use certain of the Debtor's non-residential real property, including the Kingston Premises, certain space used to house the Debtor's telecommunications equipment, and provided that the Debtor's employees would provide certain services to Best Buy as the operator the Debtor's business, including telecommunications services, internet services, electricity, water and heating, ventilating and air conditioning.

Pursuant to the Best Buy Operating Lease, Best Buy agreed to pay certain fees set forth in the Best Buy Operating Lease, as well as a $175,000 administrative fee, which would be refunded on a pro rata basis if the closing of the Sale or the confirmation of a plan in this Chapter 11 Case occurs before November 4, 2011. In addition, if the Plan is not confirmed and consummated by October 7, 2011, Best Buy will pay the Debtor an additional fee of $1,667 per day until the earlier of: (i) the Effective Date, or (ii) November 4, 2011.

---

[8] Such assets are defined in Section 2.1 of the Asset Purchase Agreement and include the Debtor's intellectual property assets and certain physical assets, but exclude certain assets set forth in Section 2.2 of the Asset Purchase Agreement, which consist primarily of cash, accounts receivable, prepaid expenses and certain excluded contracts.

## VII.  WARN ACT LITIGATION

As a result of the Debtor's November 2 layoff, the New York State Department of Labor engaged in discussions with the Debtor relating to the layoff and the Debtor's compliance with the WARN Act.  Through repeated correspondence with the New York State Department of Labor, including a letter dated January 7, 2011 from Brown Rudnick with a supporting affidavit from Mr. Totaro, the Debtor provided information demonstrating that it satisfied the unforeseeable business exception under the WARN Act due to the fact that the November 2, 2010 layoffs "were caused by the unexpected and sudden loss of Partsearch's single largest customer, Best Buy."

Nonetheless, on November 24, 2010, Craig Wenzel (the "Plaintiff"), on behalf of himself and all others similarly situated, filed the WARN Act Lawsuit in the United States District Court for the Southern District of New York (the "District Court").  On February 7, 2011, the Plaintiff filed a complaint in the Bankruptcy Court, Adversary Proceeding No. 11-01445, and on February 9, 2011, dismissed the action in the District Court, effectively transferring the WARN Act Lawsuit to the Bankruptcy Court.  On March 25, 2011, the Bankruptcy Court granted the Creditors' Committee's motion to intervene as a defendant in the WARN Act Lawsuit.

Following consensual discovery and extensive negotiations, the parties negotiated a settlement that, subject to approval by the Bankruptcy Court, would resolve all issues relating to the WARN Act Settlement (the "WARN Act Settlement").  The WARN Act Settlement, which was approved by the Bankruptcy Court on June 20, 2011, requires the Debtor to pay a total of $183,000 in full satisfaction of the WARN Act Claims, to be divided as follows: (1) $2,500 to Mr. Wenzel; (2) $135,375 to be divided among members of the "class"; and (3) $45,125 to counsel to the Plaintiff and the class.

## VIII.  THE CHAPTER 11 PLAN

As a result of the chapter 11 process and through the Plan, the Debtor expects that creditors will obtain a substantially greater recovery from the Estate than the recovery that would be available if the Debtor's remaining assets had been liquidated under chapter 7 of the Bankruptcy Code.  The Plan is annexed hereto as **Exhibit A** and forms part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

The Plan will be funded from the Equity Consideration, the Debtor's Cash on hand as of the Effective Date and the Excluded Assets.

A.    Classification and Treatment of Claims and Equity Interests

For the purposes of organization, voting and all confirmation matters, except as otherwise provided herein, the Plan classifies all Claims against and all Equity Interests in the Debtor as set forth below.

i. <u>Administrative Claims and Priority Claims</u>

As provided by Bankruptcy Code Section 1123(a)(1), Administrative Claims and Priority Claims shall not be classified under the Plan. Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of Bankruptcy Code Sections 1123, 1124, 1125, 1126 or 1129.

1. *Administrative Claims*

All Administrative Claims shall be treated as follows:

(a) <u>Time for Filing Administrative Claims</u>

The holder of an Administrative Claim, other than (i) a Professional Fee Claim, (ii) a liability incurred and payable in the ordinary course of business by the Debtor (and not past due or a liability of the Sponsor pursuant to the Operating Lease Agreement), (iii) an Administrative Claim that has been Allowed on or before the Effective Date or (iv) an Administrative Claim asserted under section 503(b)(9) of the Bankruptcy Code (the last being governed by the Bar Date Order), must file with the Bankruptcy Court and serve on the Debtor, the Plan Trustee and the Office of the United States Trustee, notice of such Administrative Claim within forty (40) days after service of the Notice of Confirmation (the "<u>Administrative Bar Date</u>"). Such notice of Administrative Claim must include at a minimum (A) the name of the holder of the Claim, (B) the amount of the Claim and (C) the basis of the Claim. **Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred and discharged—without further order of the Court.** Objections to any filed request for payment of an alleged Administrative Claim must be filed and served on the claimant and the Debtor on or before the Effective Date and the Plan Trustee after the Effective Date within ninety (90) days of the Administrative Bar Date. The deadline for filing objections to Administrative Claims may be extended by the Court, for cause.

(b) <u>Time for Filing Professional Fee Claims</u>

Each Professional Person who holds or asserts a claim for services rendered to the Estate before the Effective Date (a "<u>Professional Fee Claim</u>") must file with the Bankruptcy Court and serve on the Debtor and the Office of the United States Trustee a Professional Fee Application within thirty (30) days after service of the Notice of Confirmation (the "<u>Professional Fee Claim Bar Date</u>"), which Professional Fee Claim shall include an estimate of fees and expenses for the period from the Confirmation Date through the Effective Date. **The failure to timely file and serve such Professional Fee Application shall result in the Professional Fee Claim being forever barred and discharged.** Objections to any Professional Fee Claim must be filed and served on the claimant, the Debtor, the Plan Trustee and the Office of the United States Trustee within fifteen (15) days of the filing of the Professional Fee Claim, whereupon the Bankruptcy Court shall schedule a hearing thereon.

(c) <u>Allowance of Administrative Claims and Professional Fee Claims</u>

An Administrative Claim with respect to which notice has been properly filed and served pursuant to Paragraph 4.2(a) of the Plan shall become an Allowed Administrative Claim if no

objection is filed in accordance with Paragraph 4.2(a) of the Plan or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within the ninety (90) day period as described in Paragraph 4.2(a) of the Plan (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order. A Professional Fee Claim in respect of which a Professional Fee Application has been properly filed and served pursuant to Paragraph 4.2(b) of the Plan shall become an Allowed Administrative Claim when, as and if approved by the Bankruptcy Court.

(d)     Payment of Allowed Administrative Claims

Each Allowed Administrative Claim shall, at the option of the Debtor on or prior to the Effective Date and the Plan Trustee after the Effective Date, receive (i) on the Plan Distribution Date, the amount of such Allowed Claim in Cash from the Estate or the Plan Trust Assets (as the case may be), (ii) with respect to Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtor, payment when and as such Administrative Claims become due and owing by their ordinary course terms or (iii) such other treatment as may be agreed upon in writing by the Debtor on or prior to the Effective Date, and the Plan Trustee after the Effective Date, and the holder of such Claim; provided, however, that such treatment shall not provide to the holder of such Claim a return having a present value as of the Effective Date in excess of such Allowed Administrative Claim. If a portion of an Administrative Claim is disputed, the undisputed portion of such Administrative Claim shall be timely paid as provided above.

2.     *Statutory Fees*

The Debtor, or the Plan Trustee, as the case may be, shall pay all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of business, until the entry of a Final Decree, dismissal of the Chapter 11 Case, or conversion of the Case to Chapter 7 as provided in Section 17.11 of the Plan.

3.     *Priority Claims*

All Priority Claims shall be treated as follows: each Person holding an Allowed Priority Claim shall be paid in Cash in full (subject to any applicable cap under Bankruptcy Code Section 507(a)) on the Plan Distribution Date.

ii.     Debtor Claims and Equity Interests

Claims that are required to be classified under Bankruptcy Code Section 1123(a)(1) and Equity Interests are divided under the Plan into the following classes for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to Bankruptcy Code Sections 1122 and 1123(a)(1):

| Class | Designation | Impairment | Whether Entitled to Vote |
| --- | --- | --- | --- |
| Class 1 | Secured Claims | Unimpaired | No |

| Class | Designation | Impairment | Whether Entitled to Vote |
|-------|-------------|------------|--------------------------|
| Class 2a | General Unsecured Claims | Impaired | Yes |
| Class 2b | Best Buy Claim | Impaired | Yes |
| Class 3 | Equity Interests and Subordinated Equity Claims | Impaired | Yes |

Class 2a and Class 2b shall be deemed separate Classes for all purposes.

     (a)    <u>Class 1 (Secured Claims)</u>

Each Allowed Secured Claim shall be unimpaired under the Plan and, at the sole option of the Plan Trustee, shall receive the following treatment: (i) shall receive on the Plan Distribution Date on account of such Allowed Secured Claim a Cash payment in an amount equal to the amount of the Allowed Secured Claim as of the Effective Date with Post-Petition Interest from the Petition Date through the Effective Date; (ii) except as to Included Assets, shall retain its liens securing such Allowed Secured Claim and receive on account of such Allowed Secured Claim deferred cash payments having a present value on the Effective Date equal to the amount of such Allowed Secured Claim with Post-Petition Interest from the Petition Date through the Effective Date; (iii) shall realize the "indubitable equivalent" of such Allowed Secured Claim; (iv) the property securing the Allowed Secured Claim (that is not an Assumed Liability) shall be sold or vested in the Reorganized Debtor (as the case may be) free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on such proceeds as provided in clauses (ii), (iii) or (vi) of this subparagraph; (v) if such Allowed Secured Claim is subject to a valid right of recoupment or setoff, such Claim shall be setoff to the extent of the amount subject to setoff in accordance with sections 506(a) and 553 of the Bankruptcy Code; or (vi) shall receive such other treatment as may be agreed upon in writing by the holder of such Claim and the Plan Trustee; provided that such agreed upon treatment may not provide the holder of such Claim with a return having a present value as of the Effective Date that is greater than the amount of such Allowed Secured Claim.

     (b)    <u>Class 2a (General Unsecured Claims) and Class 2b (Best Buy Claim)</u>

On the Plan Distribution Date, each holder of an Allowed General Unsecured Claim and the Best Buy Claim shall be entitled to receive, in full and final satisfaction of its Allowed General Unsecured Claim and the Best Buy Claim, after all Allowed Administrative Claims and Allowed Priority Claims have been satisfied in full and all Allowed Class 1 Claims have been satisfied in full in accordance with Section 6.1 of the Plan, Cash on a Pro Rata basis to the holders on account of their Allowed General Unsecured Claims and the Allowed Best Buy Claim until such Claims are satisfied in full; and, thereafter on a Pro Rata basis to the holders on account of accrued interest at a rate of 3.25% per annum on their Allowed General Unsecured Claims and the Allowed Best Buy Claim.

     (c)    <u>Class 3 (Equity Interest and Allowed Subordinated Equity Claims)</u>

On the Effective Date, all Equity Interests of the Debtor shall be extinguished, and any certificates and all other documents representing such Equity Interests shall be cancelled and of no force and effect; provided, however, that such Equity Interests shall be given effect for the sole purpose of calculating the amount of distribution, if any, to be received by holders of Equity Interests hereunder. Each holder of an Equity Interest or Allowed Subordinated Equity Claim shall be entitled to receive on account of their respective Equity Interests and/or Allowed Subordinated Equity Claims, any distribution of Residual Cash on a Pro Rata basis on the next available Plan Distribution Date. For the avoidance of doubt, distributions pursuant to this subparagraph shall only be made after all costs and expenses of the Estate, the Plan Trust and the Plan Trustee, including the satisfaction in full of all Allowed Administrative Claims, Allowed Priority Claims, and all Allowed Claims in Classes 1, 2(a) and 2(b), including interest thereon, in accordance with the terms of the Plan and the Plan Trust Agreement.

B.    Classes Entitled to Vote

Classes 2a, 2b and 3 shall be entitled to vote to accept or reject the Plan. Class 1, which is unimpaired, is, by operation of law, deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

C.    Nonconsensual Confirmation

To the extent that the Plan cannot be confirmed on a consensual basis, the Debtor reserves the right to seek to effect a non-consensual confirmation pursuant to the provisions of Bankruptcy Code Section 1129. Specifically, the Debtor reserves the right to seek confirmation of the Plan pursuant to Bankruptcy Code Section 1129(b) if all of the applicable requirements of Bankruptcy Code Section 1129(a) have been met other than Bankruptcy Code Section 1129(a)(8).

D.    Executory Contracts

i.    Rejection and Assumption of Contracts

On the Effective Date, all executory contracts and unexpired leases, regardless of whether entered into before or after the Petition Date, will be deemed rejected by the Debtor unless such contracts or leases were either (a) expressly assumed by the Debtor prior to the Confirmation Date, (b) are the subject of a pending motion to assume by the Debtor, as of the Confirmation Date or (c) are assumed pursuant to the Plan including those listed on Schedule B.1 assumed by the Plan Trust and Schedule B.2 assumed by the Reorganized Debtor, as such schedules may be amended no later than 21 days prior to the date of the Confirmation Hearing. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, with rejection effective as of the Confirmation Date.

Any Claim for damages arising from rejection of any executory contract or unexpired lease pursuant to entry of an order (which may be the Confirmation Order) authorizing the rejection of the applicable executory contract or unexpired lease (each, a "Rejection Damages Claim") shall be forever barred unless a proof of claim therefor in proper form is filed with the Bankruptcy Court within the later of: (i) the applicable Claims Bar Date or Government Bar Date or (ii) thirty (30) days after the Bankruptcy Court's entry of the Confirmation Order or other

order approving the rejection of the applicable executory contract or unexpired lease (the later of these dates, the "Rejection Damages Bar Date"). All such Claims shall constitute Class 2a Claims. Objections to any rejection damages claim must be filed and served on the claimant and the Plan Trustee within ninety (90) days of the Rejection Damages Bar Date. The deadline for filing objections to rejection damages claims may be extended by the Court, for cause.

ii.    Cure

At the election of the Debtor, any monetary defaults under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease, provided that any cure costs for executory contracts or unexpired leases to be assumed by the Debtor under this Plan at the direction of the Sponsor (including those listed on Schedule B.2) shall be paid by the Sponsor in accordance with the provisions set forth in (a) or (b) of this sentence.

In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. Any subsequently filed "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" will set forth the Debtor's cure obligations for each agreement which a cure obligation must be satisfied as a condition to the assumption or assumption and assignment of such agreement. Any non-Debtor counterparty to an agreement listed on any subsequently filed "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtor, Sponsor and any committee, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by no later than three (3) days prior to the commencement of the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on any subsequently filed "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption or assumption and assignment of the relevant agreement as proposed by the Debtor.

iii.    Best Buy Payable

On the Effective Date, in exchange for the allowance of the Best Buy Claim, and in full satisfaction of all prepetition amounts payable by Best Buy to the Debtor under the Best Buy Services Agreement, Sponsor shall pay by release of the Escrowed Funds and the balance in Cash to the Debtor the aggregate amount of $5,083,645.

E.    Means for Execution and Implementation of the Plan and Equity Sale

At the Plan Closing on the Effective Date, the Reorganized Debtor shall issue to the Sponsor one hundred percent (100%) of one hundred (100) New Common Shares in exchange for the Equity Consideration ("Equity Sale"), consisting of Cash in the amount of $1,321,355 for twenty-five (25) New Common Shares and satisfaction of $8,850,000 of the Best Buy Claim in exchange for seventy-five (75) New Common Shares.

As of the Effective Date, the reservation for issuance, as applicable, and the issuance by Reorganized Debtor of one hundred (100) New Common Shares is hereby authorized without further act or action under applicable law, regulation, order or rule. The Confirmation Order shall provide that the issuance of the New Common Shares issuable shall be exempt from the registration requirements of the Securities Act in accordance with section 1145 of the Bankruptcy Code or, to the extent section 1145 does not apply Section 4(2) of the Securities Act.

i.    Operations between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate its business as Debtor in Possession, subject to the Bankruptcy Code, the Bankruptcy Rules, the Operating Lease Agreement and all orders of the Bankruptcy Court that are then in full force and effect. All actions taken by the Debtor during the period from the Confirmation Date through the Effective Date shall be, and shall be taken in a manner, consistent in all material respects with the Confirmation Order, this Plan and the Operating Lease Agreement. Best Buy Co., Inc. shall continue to be liable for the payment of expenses pursuant to the Operating Lease Agreement through the Effective Date, and costs and expenses incurred by the Debtor prior to the Effective Date for which Best Buy Co., Inc. is obligated to reimburse the Debtor pursuant to the Operating Lease Agreement and payable on or after the Effective Date shall be paid by Best Buy to the Plan Trustee.

ii.    Other General Corporate Matters

On or after the Effective Date, the Reorganized Debtor will be authorized to take such action as is necessary under the laws of the State of Delaware, federal law and other applicable law to effect the terms and provisions of this Plan, including, without limitation, the filing of an amended certificate of incorporation and/or other amended organizational documents. Without limiting the foregoing, the issuance of the New Common Shares, the election and the appointment of directors and officers, and any other matter involving the corporate structure of the Reorganized Debtor shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to section 303 and other applicable provisions of the Delaware General Corporation Law, without any requirement of further action by the stockholders or directors of the Debtor or the Reorganized Debtor.

iii.    Continued Corporate Existence of the Debtor

The Debtor shall continue to exist after the Effective Date as the Reorganized Debtor as a separate entity, with all the powers available to such legal entity. On or after the Effective Date, the Reorganized Debtor may, within its sole and exclusive discretion, take such action as

permitted by applicable law and their constituent documents, as it determines may be reasonable and appropriate.

### iv. Re-vesting of Assets

Upon the occurrence of the Effective Date, title to all of the Included Assets, including all of the Debtor's federal income tax attributes, and Assumed Liabilities (and only the Assumed Liabilities) shall vest in the Reorganized Debtor free and clear of all liens, Claims, Causes of Action, interests, security interests and other encumbrances and without further order of the Bankruptcy Court other than the Assumed Liabilities (such vesting, the "Plan Closing"). On and after the occurrence of the Effective Date, the Reorganized Debtor may operate its business and may use, acquire and dispose its assets free of any restrictions of the Bankruptcy Code, subject to the terms of this Plan and Confirmation Order. From and after the Effective Date, (a) the Reorganized Debtor shall have no obligation to pay, satisfy or perform any Excluded Liabilities, and (b) the Plan Trust shall be solely liable for all of the Excluded Liabilities.

### v. Management

Except as set forth in Section 9.7 of the Plan, upon the occurrence of the Effective Date, the management and operation of the Reorganized Debtor shall be the general responsibility of the Reorganized Debtor's board of directors, which may appoint new management personnel. The Confirmation Order shall ratify and approve all actions taken by the Reorganized Debtor from the Petition Date through the Effective Date.

### vi. Board of Directors

Upon the Effective Date, all of the Debtor's officers and directors in office immediately prior to the Effective Date shall be deemed to have resigned from their positions with the Debtor (without the necessity of any further action or writing or Bankruptcy Court order) and shall have no further responsibilities, duties and obligations arising after the Effective Date.

On the Effective Date, the board of directors of Reorganized Debtor shall consist of one member, who shall be Todd Hartman.

### vii. Officers

Subject to any applicable employment agreements and applicable law, from and after the Effective Date, the officers of the Reorganized Debtor shall be selected and appointed by its board of directors.

### viii. Cancellation of Debtor Equity Interests

On the Effective Date: (i) the Debtor's Equity Interests and any note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor related to the Debtor's Equity Interests shall be canceled and terminated; and (ii) the obligations of the Debtor under any agreements, indentures or certificates of designation governing the Debtor Equity Interests and any note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor related to the

Debtor Equity Interests shall be cancelled and terminated; provided, that the provisions of clause (ii) of this paragraph shall not affect the discharge of the Debtor's liabilities under the Bankruptcy Code and the Confirmation Order or result in any expense or liability to the Reorganized Debtor and provided further that such cancellation and discharge shall not impair the rights of any person to receive distributions under the Plan.

ix.      <u>Plan Trust</u>

On the Effective Date, a newly-formed Delaware trust with no prior assets or liabilities shall be created to hold the Plan Trust Assets and Plan Trust Liabilities and make distributions pursuant to Paragraph 11.2 of the Plan and liquidate any business related to the Plan Trust Assets and Plan Trust Liabilities (the "<u>Plan Trust</u>"). The Plan Trustee shall be designated by the Creditors' Committee (after consultation with the Debtor and the Sponsor) and appointed as the Plan Trustee and shall serve as the trustee of the Plan Trust with the rights and duties set forth in Article X of the Plan and otherwise herein. For the avoidance of doubt, the Plan Trustee, on the Effective Date, shall have the sole authority to administer the Plan Trust Assets and Plan Trust Liabilities.

x.      <u>Transfers to the Plan Trust</u>

On the Effective Date, the Debtor and the Estate shall transfer, shall be deemed to have irrevocably transferred and assigned, without any further action by the Debtor, the Estate or any other party to the Plan Trust all of the Plan Trust Assets (but subject to all rights, defenses and setoffs of any defendant) and all of the Plan Trust Liabilities.

xi.      <u>Avoidance Action and other Recoveries</u>

The Plan Trustee shall be granted the right under the Plan to pursue all Estate causes of action arising under chapter 5 of the Bankruptcy Code, which are expressly preserved and survive confirmation of the Plan (the "<u>Avoidance Claims</u>"); provided, however, that preference actions under section 547 of the Bankruptcy Code against holders of General Unsecured Claims who are not insiders of the Debtor and were not insiders of the Debtor in the two years prior to the Petition Date shall be waived upon the Effective Date. Additionally, the Plan Trustee shall be authorized to pursue on behalf of the Estate all Commercial Tort Claims and other claims and causes of action belonging to the Estate.

Any recoveries in actions brought pursuant to the authority granted by this Paragraph (net of reasonable costs and professional fees incurred by the Plan Trustee and the Plan Trustee's professionals in discharge of their duties) shall become Plan Trust Assets and shall be distributed to holders of Allowed Class 1, 2a and 2b Claims and Allowed Class 3 Equity Interests pursuant to the terms of this Plan.

xii.      <u>Liquidation of Assets</u>

The Plan Trustee shall be authorized to liquidate the Plan Trust Assets and shall make distributions of such Cash proceeds as provided in Paragraphs 4.2, 4.3, 6.1, 6.2, 6.3 and 9.12 of the Plan respectively.

xiii.     Asset Purchase Agreement

On the Effective Date, (a) the Asset Purchase Agreement shall be deemed terminated pursuant to Section 9.1(a) thereof and (b) Section 9.2 of the Asset Purchase Agreement shall be deemed to be amended by deleting it in its entirety and replacing it with "[Reserved]".

F.     Plan Trustee

i.     Authority of the Plan Trustee

The Plan Trustee shall have the authority set forth in the Plan until all Avoidance Claims and other actions have been resolved and all distributions required to be made to holders of Allowed Claims (including recoveries on account of the Avoidance Claims and other actions) have been made in accordance with the Plan.  The Plan Trustee may retain counsel and/or other professionals as may be reasonably necessary to carry out its obligations under the Plan and shall be authorized to reimburse counsel and any such other professionals for such professionals' reasonable fees and expenses in accordance with the provisions of Paragraph 11.2 of the Plan and the Bankruptcy Code.  The Debtor shall not have any liability for any such fees and expenses.

The Plan Trustee is expressly given discretion to decide which actions to bring and which actions not to bring in relation to the Avoidance Claims, the Commercial Tort Claims and other claims and causes of action.  The Plan Trustee is expressly granted the power to settle any such actions, either before or after suit is brought.  Furthermore, the Plan Trustee is expressly authorized to liquidate the Plan Trust Assets in a reasonable manner.

ii.     Compensation of Plan Trustee

The Plan Trustee shall be entitled to compensation from the proceeds of the Plan Trust Assets in accordance with Paragraph 11.2(a) of the Plan on account of its service pursuant to the terms of the Plan Trust Agreement approved by the Bankruptcy Court, provided however, that nothing herein shall preclude the  Plan Trustee from engaging counsel and any such other professionals as may be reasonably necessary to carry out its obligations under the Plan.

iii.     Authorization, Empowerment, Rights and Duties of Plan Trustee

(a)     The Plan Trustee shall be authorized and empowered to preserve, protect and maximize the value of the Plan Trust causes of action, as promptly and efficiently as is reasonably possible, and distribute all income and proceeds therefrom in accordance with the terms of the Plan.

(b)     The Plan Trustee may engage such attorneys, accountants and other professionals as are reasonably required to effectively and efficiently perform his responsibilities under the Plan and shall pay the reasonable fees, charges and expenses of such attorneys, accountants and other professionals who provide services after the Effective Date as an expense in accordance with Paragraph 11.2(a) of the Plan.  The Plan Trustee may retain professionals who were retained by the Debtor or the Creditors' Committee during the Case.

(c)     The Plan Trustee shall have the right and duty to examine all rights of action, including, without limitation, the Avoidance Claims, Commercial Tort Claims and other claims and causes of action of the Estate and to commence an action, litigate to final judgment, settle, withdraw or otherwise resolve such rights of action.

(d)     The Plan Trustee shall have the right and duty to examine all Claims, not previously allowed as of the Effective Date, and file, litigate to final judgment, seek to estimate or subordinate, settle, withdraw or otherwise resolve objections to such Claims in accordance with the Plan Trust Agreement.

(e)     Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the  Plan Trustee shall have authority to settle (i) all Avoidance Claims, Commercial Tort Claims and other claims and causes of action on behalf of the Estate and (ii) all Claims, not previously allowed as of the Effective Date, without further review or approval of the Bankruptcy Court as set forth in the Plan Trust Agreement.

(f)     The Plan Trustee shall make distributions under the Plan as often as in the Plan Trustee's discretion and judgment there is an amount of funds sufficient to make a meaningful distribution to holders of Allowed Claims, and, if sufficient Residual Cash remains after payment in full plus interest to holders of the Allowed Claims as provided in the Plan, to holders of Allowed Class 3 Equity Interests.  In making such determinations, the Plan Trustee shall exclude from distributions amounts of Cash necessary to meet other obligations of the Plan Trust and/or the Plan Trustee, held for withholding Taxes or other charges, or otherwise needed to pay the present or future expenses, debts, charges, liabilities and obligations of the Plan Trust and/or the Plan Trustee in accordance with the terms of the Plan.

(g)     The Plan Trustee may resign by giving written notice of his resignation to the Bankruptcy Court, the Office of the United States Trustee and all parties who filed notices of appearance and requests for service of pleadings in this Case.  Unless the Bankruptcy Court (on motion of any party) orders otherwise, (i) such resignation shall become effective on the date on which a successor Plan Trustee is appointed pursuant to the terms of the Plan Trust Agreement and (ii) the Plan Trustee shall be entitled to compensation up to the date on which the Plan Trustee's resignation becomes effective.

(h)     The Plan Trustee shall retain and may enforce any and all claims, causes of action and rights of the Debtor or the Estate, including, without limitation, Avoidance Claims and Commercial Tort Claims.

(i)     The Plan Trustee shall be authorized to take any and all necessary actions to comply with the requirements of any taxing authorities, including in connection with its duties pursuant to Paragraph 11.4 of the Plan, including, but not limited to, (i) compile, draft and file any necessary local, state and federal Tax returns on behalf of the Debtor and the Plan Trust and (ii) obtain any necessary tax identification numbers.  Any claimant that does not provide a tax identification number to the Plan Trustee timely upon receipt of a request for such number shall not be entitled to any distribution on account of its claims and such claims shall be disallowed.

### iv. Participation by the Plan Trustee

The Plan Trustee shall have the right to participate in any (i) hearings on proposed modifications or amendments to the Plan, notwithstanding the provisions of Bankruptcy Code Section 1127, (ii) actions to enforce or interpret the Plan, and (iii) proceedings regarding Disputed Claims.

### v. Investments of Cash Pending Distributions

Any Cash recovered by the Plan Trustee in satisfying its obligations hereunder shall be invested as the Plan Trustee determines is reasonable.

### vi. Limitation of Liability of the Plan Trustee

The Plan Trustee and its counsel are hereby exculpated by holders of Claims from any and all claims, causes of action and other assertions of liability (including breach of fiduciary duty) arising out of the discharge by the Plan Trustee of the powers and duties conferred upon him, her or it by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the gross negligence, willful misconduct or fraud of the Plan Trustee or its counsel. No current holder of a Claim, or representative thereof, or other party in interest shall have or pursue any claim or cause of action against the Plan Trustee or its counsel for making payments or distributions in accordance with the Plan.

The Plan Trustee and any supplemental Plan Trustee and its members, agents, representatives, employees and professionals shall not be liable to the Debtor, Sponsor, creditors or any other entity or party in interest for any error of judgment made in good faith, but only for gross negligence, willful misconduct or fraud. The Plan Trustee shall not be liable for any action taken or omitted in good faith and believed by it to be authorized within the discretion or rights or powers conferred upon it by the Plan. The Plan Trustee makes no representation as to the value or condition of the Debtor's assets or any part thereof, or as to the security afforded by the Plan, or as to the validity, execution (except its own execution), enforceability, legality or sufficiency of the Plan and the Plan Trustee shall incur no liability or responsibility with respect to such matters. In performing its duties under the Plan, the Plan Trustee may retain and consult with counsel selected by it and shall have no liability for any action taken upon the advice of such counsel. None of the provisions of the Plan shall require or be construed as requiring the Plan Trustee to expend or risk its own funds or otherwise incur or expose it to personal financial liability in the performance of any of its duties under the Plan or in the exercise of any of its rights and powers. The Plan Trustee may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper Person. The Plan Trustee shall, pursuant to the terms of the Plan Trust Agreement, be indemnified and receive reimbursement from the Estate and the Plan Trust against and from any and all loss, liability or damage, including payment of attorneys' fees and other costs of defending itself, which it may incur or sustain, other than as a result of gross negligence, willful misconduct or fraud in the exercise and performance of its duties hereunder and under the Plan.

vii.    Certain Records

A complete copy of book and records for the period January 1, 2000 through the Effective Date, which may be in electronic format, which the Debtor has in its possession, shall be provided to the Plan Trustee on the Effective Date. Upon written request to the Estate and/or the Reorganized Debtor, as applicable, which requests shall be reasonable in scope and related to the duties of the Plan Trustee, the Plan Trustee shall (at no material cost or expense to the Estate and/or the Reorganized Debtor, as the case may be), also be afforded reasonable access (with no obligation on the part of the Estate or the Reorganized Debtor to advance photocopying or other costs related to the Plan Trustee's efforts) to such other pre-Effective Date records of the Debtor as the Plan Trustee shall deem necessary to fulfill its obligations.

viii.    Termination of the Plan Trust and Plan Trustee

Upon substantial completion of its functions as designated herein, but no later than five (5) years from the Effective Date, which date may be extended as provided in the Plan Trust Agreement, the Plan Trustee shall be discharged and the Plan Trust shall be terminated.

G.    Plan Distribution Provisions

i.    Distributions to Plan Trustee

On the Effective Date, the Debtor shall transfer the Plan Trust Assets and Plan Trust Liabilities. to the Plan Trust, and effective as of the Effective Date, the Plan Trust Assets and the Plan Trust Liabilities are hereby transferred and assigned, to the Plan Trust.

ii.    Distributions

(a)    Debtor and Plan Trustee

Prior to the Effective Date, the Debtor shall be solely responsible for making all of the distributions under the Plan including distributions to holders of Allowed Administrative Claims. From and after the Effective Date, the Reorganized Debtor shall be solely responsible for discharging all Assumed Liabilities and the Plan Trustee shall be solely responsible for making all other distributions under the Plan including distributions to (i) holders of Allowed Administrative Claims; (ii) holders of Allowed Priority Claims; (iii) holders of Allowed Class 1, 2a and 2b Claims, and holders of Allowed Class 3 Equity Interests, if any, according to the terms of the Plan and (iv) required to be made on the Plan Distribution Date.

All costs and expenses in connection with distributions made by the Plan Trustee, including, without limitation, the fees and expenses of the Plan Trustee and its professionals, shall be borne solely out of proceeds of the Plan Trust Assets.

(b)    Dates of Distributions

Unless otherwise provided, all distributions required to be made in the Plan shall be made on the Plan Distribution Date. Any distribution required to be made on the Effective Date shall be deemed to be made on such date if made as soon as practicable after such date and, in any

event, within thirty (30) days after such date. The Plan Trustee or the Debtor, as applicable, shall make distributions in accordance with the Plan and the Plan Trust Agreement as often as in their respective discretion and judgment, the Plan Trust or the Debtor, as applicable, have sufficient funds to make a meaningful distribution. The Plan Trustee or the Debtor, as applicable, shall exclude from distributions amounts of Cash necessary to meet other obligations of the Plan Trust and/or the Plan Trustee and the Debtor, as applicable, held for withholding Taxes or other charges, or otherwise needed to pay the present or future expenses, debts, charges, liabilities and obligations of the Plan Trust and/or the Plan Trustee and the Debtor, as applicable, in accordance with the terms of the Plan and the Plan Trust Agreement.

(c)    <u>Manner of Payment</u>

At the option of the Plan Trustee and the Debtor, as applicable, with respect to the distributions to be made by it, distributions may be made in Cash, by wire transfer or by a check drawn on a domestic bank.

(d)    <u>Minimum Distributions</u>

Notwithstanding anything to the contrary herein, the Plan Trustee and the Debtor, as applicable, shall not be obligated to make any distribution to the holder of an Allowed Claim or Equity Interest in the aggregate amount of $10.00 or less. To the extent Cash remains undistributed as a result of Paragraph 11.2(d) of the Plan, such Cash shall be treated as "Unclaimed Property" under Paragraph 11.5(d) of the Plan.

iii.    <u>Rounding of Payments</u>

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under Paragraph 11.5(d) of the Plan.

iv.    <u>Compliance with Tax Requirements</u>

The Plan Trustee and the Debtor shall comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

v.    <u>Undeliverable Distributions, Voided Checks and Distribution of Unclaimed Property</u>

(a)    If any distribution by the Plan Trustee or the Debtor to the holder of an Allowed Claim or Equity Interest is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies the Plan Trustee or Debtor, as applicable, in writing, in accordance with Paragraph 17.4 of the Plan, of such holder's then-current address, at which time all missed distributions shall, subject to Paragraph 11.5(d) of the Plan, be made as soon as is practicable to such holder, without interest.

(b)     Checks issued by or on behalf of the Plan Trustee or the Debtor in respect of Allowed Claims or Equity Interests shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Requests for re-issuance of any check shall be made in accordance with the notice provisions of Paragraph 17.4 of the Plan by the holder of the Allowed Claim or Equity Interest to whom such check was originally issued.  No further distributions to such holder shall be made unless and until the holder notifies the Plan Trustee or the Debtor, as applicable, in writing of such holder's claim for the voided check, at which time and as soon as is practicable, subject to Paragraph 11.5(d) of the Plan, a check shall be re-issued to such holder, without interest.

(c)     Notwithstanding anything to the contrary herein, nothing contained in the Plan shall require the Plan Trustee or the Debtor to attempt to locate the holder of an Allowed Claim or Equity Interest which is the subject of an undeliverable distribution or voided check.

(d)     All claims for undeliverable distributions or voided checks shall be made on or before one hundred and fifty (150) days after the date such undeliverable distribution or check was initially made or issued, respectively.  After such dates, all such distributions shall be deemed Unclaimed Property under Bankruptcy Code Section 347(b).  The holder of any Claim or Equity Interest for which an undeliverable distribution or voided check has been deemed Unclaimed Property shall not be entitled to any other or further distribution under the Plan on account of such Claim or Equity Interest.  The Unclaimed Property and accrued interest or dividends earned thereon shall become the property of, and shall be released to, the Plan Trustee for distribution in accordance with the Plan and the Plan Trust Agreement.

vi.     Setoff

The Plan Trustee and the Debtor, as applicable, may, but are not required to, set off against any Claim and the distribution to be made pursuant to the Plan in respect of such Claim, any claims of any nature which the Estate may have against the holder of such Claim.  Neither the failure by the Plan Trustee or the Estate to affect such a setoff nor the allowance of any Claim shall constitute a waiver or a release of any claim which the Estate may have against the holder of a Claim.

H.     Procedures for Resolving Objections to Claims

i.     Objections to Claims

Prior to the Effective Date, the Debtor shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, the Plan Trustee shall be solely responsible for pursuing any objection to the allowance of any and all Claims.

Unless another date is established by the Bankruptcy Court or this Plan, any objection to a Claim shall be filed with the Bankruptcy Court and served on the Person holding such Claim within ninety (90) days of the Effective Date ("Claims Objection Bar Date").  The Plan Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of such dates if cause exists for such an extension.

ii.     Treatment of Disputed Claims

(a)     No Distribution Pending Allowance

If any portion of a Claim is a Disputed Claim, no payment or distribution provided for under the Plan shall be made on account of the portion of such Claim that is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim, but the payment or distribution provided for under the Plan shall be made on account of the portion of such Claim that is an Allowed Claim.

(b)     Distribution After Allowance

As soon as practicable after the date on which a Disputed Claim becomes an Allowed Claim and, in any event, within three months after such date, the Plan Trustee shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if such Claim had been an Allowed Claim on the Effective Date.

(c)     Reserves for Disputed Claims

In the event that Disputed Claims are pending, the Plan Trustee shall establish reasonable reserves for such Disputed Claims, and the aggregate property to be distributed to holders of Allowed Claims on any Plan Distribution Date shall be adjusted to reflect such reserves.  No amounts shall be reserved for Claims filed more than forty-five (45) days after the Effective Date, and such Claims shall be deemed disallowed without any action by the Debtor or the Plan Trustee or further order of the Bankruptcy Court.

iii.    Administrative Claims

The resolution of Administrative Claims shall be governed by Paragraph 4.2 of the Plan.

iv.     Professional Fee Claims

The resolution of Professional Fee Claims shall be governed by Paragraph 4.2 of the Plan.

v.      Subordinated Claims

Either the Debtor prior to the Effective Date or the Plan Trustee from and after the Effective Date shall commence appropriate proceedings in the Bankruptcy Court with respect to any Claims it believes should be subordinated pursuant to Bankruptcy Code Section 510(b) or otherwise.

vi.     Estimation of Claims

Prior to the Effective Date, the Debtor, and from and after the Effective Date, the Plan Trustee may, at any time, request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Plan Trustee, as applicable, has previously objected to such Claim or whether the Bankruptcy Court has ruled on

any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

I.      Effects of Plan Confirmation

i.      Binding Effect of Confirmation

Confirmation will bind the Debtor, all holders of Claims or Equity Interests and all other parties in interest to the provisions of the Plan whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not the holder of such Claim or Equity Interest has accepted the Plan.

ii.     Good Faith

Confirmation of the Plan shall constitute a finding that: (i) this Plan has been proposed by the Debtor and the Sponsor in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all Persons' solicitations of acceptances or rejections of this Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

iii.    Injunction

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold or may hold a debt, Claim or Equity Interest discharged pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such discharged debt, Claim or Equity Interest: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, the Reorganized Debtor, their successors or their respective property; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Reorganized Debtor, their successor or its respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the Reorganized Debtor, their successors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due to the Debtor, the Reorganized Debtor, their successors or their respective property; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

iv.     Releases by the Debtor and the Reorganized Debtor

**As of the Effective Date, for good and valuable consideration, *the Debtor (in its individual capacity and as Debtor in Possession), the Estate, the Reorganized Debtor, and its***

*subsidiaries, directors, officers, shareholders, general and limited partners, members, managers, operators, agents, servants, employees, trustees, beneficiaries, heirs, executors, administrators, representatives, attorneys, and the affiliates, predecessors in interest, successors and assigns of the foregoing,* **release and forever waive and discharge all Claims, actions, complaints, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, guarantees. variances, trespasses, damages, judgment decrees, extents. executions, claims, demands and losses of any kind, and nature whatsoever whether known or unknown, asserted or unasserted, accrued or unaccrued, absolute or contingent. in law or in equity, (other than the right to enforce the obligations under the Plan and the contacts, instruments, releases and other agreements and documents delivered thereunder), whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place (i) on or prior to the Effective Date (with respect to the Pre-petition Released Parties and the Best Buy Released Parties) and (ii) on or after the Petition Date and prior to the Effective Date (with respect to the Post-petition Released Parties and the Best Buy Released Parties); and in any way relating to the Debtor (in its individual capacities and as Debtor in Possession), the Reorganized Debtor, the Estate and the Plan Trustee, the Chapter 11 Case, this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtor, the Estate or the Reorganized Debtor against any of the Released Parties or Best Buy Released Parties** <u>**provided**</u>**, however, that nothing in this Section shall be construed to release any party or entity from (x) fraud, willful misconduct or gross negligence as determined by a Final Order, or (y) any objections by the Debtor, the Reorganized Debtor or Plan Trustee to Claims or Equity Interests filed by such party or entity against the Debtor and/or its Estate or (z) any of its obligations or liabilities under this Plan. For avoidance of doubt, nothing contained in this Section or the Plan generally is or shall be deemed a release of any Post-petition Released Parties from any claims relating to or arising from actions or failures to act prior to the Petition Date.**

      v.    <u>Releases by Sponsor</u>

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Sponsor shall be presumed conclusively absolutely, unconditionally and irrevocably to have released and forever waived and discharged any cause of action and any and all Claims, actions, complaints, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, guarantees, variances, trespasses, damages, judgment decrees, extents, executions, claims, demands and losses of any kind, and nature whatsoever whether known or unknown, asserted or unasserted, accrued or unaccrued, absolute or contingent in law or in equity, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place (i) on or after the Petition Date (with respect to the Post-petition Released Parties) and (ii) on or prior to the Effective Date (with respect to the Pre-petition Released Parties, the Debtor, the Estate, the Reorganized Debtor and the Plan Trustee) and in any way relating to the Chapter 11 Case,**

this Plan, the Disclosure Statement, the Debtor, the Debtor's restructuring or the purchase, sale or rescission of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Case or any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan against any of the Released Parties, the Debtor, the Estate, the Reorganized Debtor and the Plan Trustee; provided, however, that nothing in this Section shall be construed to release any party from fraud, willful misconduct or gross negligence as determined by a Final Order.

vi.    Exculpation and Limitation of Liabilities

To the maximum extent permitted by law, neither the Debtor (in its individual capacity or as Debtor-in-Possession), the Reorganized Debtor, the Estate, the Plan Trustee, the Sponsor nor any of their respective subsidiaries, shareholders, present or former (provided that with respect to the Debtor, the exculpation pertains solely to persons serving and actions taken on or after November 1, 2010) employees, officers, directors, agents, members, representatives or the professionals employed or retained by any of them, whether or not by Bankruptcy Court order (each, an "Exculpated Person"), shall have or incur liability to any Person for any act taken or omission made in good faith in connection with or related to the wind-down or reorganization of the Debtor's business, the Asset Purchase Agreement and the transactions contemplated thereunder and any interim arrangements between the Debtor and the Sponsor as of November 1, 2010,  the preparation for and formulation of the Plan, the Disclosure Statement or a contract, instrument, release or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan or the consummation and implementation of the Plan and the transactions contemplated therein as well as with respect to Argus Management Corporation and its employees and officers any actions taken in the scope of their crisis management of the Debtor as of November 1, 2010.  Each Exculpated Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan.   Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in this Paragraph is necessary to, inter alia, facilitate confirmation and to minimize potential claims arising after the Effective Date.   The Confirmation Order's approval of the Plan also constitutes a res judicata determination of the matters included in the exculpation provisions of the Plan.

For avoidance of doubt, nothing in this Section shall be construed to release or exculpate any party or entity from (i) fraud, willful misconduct or gross negligence as determined by a Final Order, (ii) any objection by the Debtor, the Reorganized Debtor or the Plan Trustee to Claims or Equity Interests filed by or on behalf of such party against the Debtor and/or its estate, or (iii) any obligations under this Plan.  Moreover, nothing contained in this Section or the Plan generally is or shall be deemed a release or exculpation of any of the Debtor's present or former officers or directors for any act or omission prior to November 1, 2010.   Further, nothing in this Section or the Plan shall

**limit the liability of the professionals of the Debtor to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).**

       vii.      No Releases from Plan Obligations

Nothing contained in Article 13 of the Plan shall release any party from its obligations under this Plan.

**J.**      Conditions to Confirmation and Effectiveness

       i.      Conditions Precedent to Plan Confirmation

The following are conditions precedent to confirmation of the Plan:

       (a)      The Clerk of the Bankruptcy Court shall have entered on the docket of the Chapter 11 Case an order or orders (i) approving the Disclosure Statement and, (ii) authorizing the solicitation of votes with respect to the Plan;

       (b)      The proposed Confirmation Order shall be in form and substance acceptable to the Debtor, the Creditors' Committee and the Sponsor;

       (c)      The proposed Confirmation Order shall include determinations that all of the settlements and compromises contained in the Plan meet the applicable standards under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation; and

       (d)      The transfer to the Debtor of the Nondebtor Subsidiary Included Assets pursuant to Section 5.8 of the Asset Purchase Agreement shall have occurred, and evidence thereof shall have been delivered to Sponsor in terms and substance reasonably satisfactory to the Sponsor.

       ii.      Conditions Precedent to the Occurrence of the Effective Date.

It shall be a condition precedent to the occurrence of the Effective Date of the Plan that:

       (a)      the Confirmation Order shall have been entered;

       (b)      no stay of the Confirmation Order shall be in effect; and

       (c)      the Debtor shall have complied with or performed in all material respects (without giving effect to any limitation as to materiality set forth therein) all of the covenants and agreements in Sections 5.2, 5.4, 5.7, 5.8, and 5.9 of the Asset Purchase Agreement with which the Debtor is obligated to comply or that the Debtor is obligated to perform, in each case, pursuant to the Asset Purchase Agreement; provided, however, that purposes of this Paragraph, any references to the terms "Closing" or "Closing Date" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Plan Closing and the Effective Date, respectively;

(d)     the representations and warranties of the Debtor in the Asset Purchase Agreement shall be true and correct except as would not individually or in the aggregate constitute, or be reasonably likely to result in, a Material Adverse Effect (without giving effect to any limitation as to materiality set forth therein) as of the date of the Asset Purchase Agreement and as of the Bring-Down Date as if made on the Bring-Down Date (except for any representation or warranty made as of a specified date prior to or as of the Bring-Down Date, which shall be true and correct in all respects except as would not individually or in the aggregate constitute, or be reasonably likely to result in, a Material Adverse Effect (without giving effect to any limitation as to materiality set forth therein) as of such specified date) provided, however, that purposes of this Paragraph, (i) any references to the terms "Closing" or "Closing Date" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Plan Closing and the Effective Date, respectively and (ii) any references to the term "Sale Order" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Confirmation Order;

(e)     Best Buy Co., Inc. shall have complied with or performed in all material respects (without giving effect to any limitation as to materiality set forth therein) all of the covenants and agreements in the Asset Purchase Agreement to be complied with or performed by Best Buy Co., Inc. on or before the Effective Date; provided, however, that purposes of this subparagraph, any references to the terms "Closing" or "Closing Date" in the covenants and agreements in the Asset Purchase Agreement referred to above shall be deemed to refer to the Plan Closing and the Effective Date, respectively;

(f)     the representations and warranties of Best Buy Co., Inc. set forth in Article IV of the Asset Purchase Agreement shall be true and correct in all material respects (without giving effect to any limitation as to materiality set forth therein), in each case, as of the date of the Asset Purchase Agreement and as of the Bring-Down Date as if made on the Bring-Down Date (except for any representation or warranty made as of a specified date prior to or as of the Bring-Down Date, which shall be true and correct in all material respects (without giving effect to any limitation as to materiality set forth therein) as of such specified date) provided, however, that purposes of this Paragraph, (i) any references to the terms "Closing" or "Closing Date" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Plan Closing and the Effective Date, respectively and (ii) any references to the term "Sale Order" in the sections of the Asset Purchase Agreement referred to above shall be deemed to refer to the Confirmation Order;

(g)     the Debtor shall have delivered or cause to be delivered to the Sponsor the following items and documents:

(i)     a certificate, dated the Effective Date, representing and certifying that the conditions set forth in Paragraph 14.2(c) and (d) of the Plan have been fulfilled, duly executed by the Debtor;

(ii)     right to possession of the Included Assets including keys, locks, safe combinations, passwords, access codes and otherwise required to obtain immediate control of the Included Assets;

(iii)     escrow instructions, instructing (A) disbursement on the Effective Date of the Escrowed Funds to a bank account of the Debtor or the Plan Trust, as the case may be, designated in writing by the Debtor or the Plan Trust, as the case may be, to the Sponsor, and (B) delivery of the Purchaser Escrowed Closing Documents to the Sponsor, and the Seller Escrowed Closing Documents to the Debtor; and

(iv)     a certificate, dated as of the Effective Date, executed on behalf of the Debtor, by an authorized executive officer thereof, describing all facts and circumstances existing as of the Effective Date that result in any of the representations and warranties of the Debtor set forth in Article III of the Asset Purchase Agreement not being materially true and correct as of the Effective Date; provided, however, that for the avoidance of doubt, the existence of any fact or circumstance described in such certificate shall not be a condition to the occurrence of the Effective Date;

(h)     the Sponsor shall have delivered or cause to be delivered to the Debtor the following items and documents:

(i)     a certificate, dated the Effective Date, representing and certifying that the conditions set forth in Paragraph 14.2(e) and (f) of the Plan have been fulfilled, duly executed by the Sponsor;

(ii)     escrow instructions, instructing (A) disbursement on the Effective Date of the Escrowed Funds to a bank account of the Debtor or the Plan Trust, as the case may be, designated in writing by the Debtor the Plan Trust to the Sponsor, as the case may be, and (B) delivery of the Purchaser Escrowed Closing Documents to the Sponsor, and the Seller Escrowed Closing Documents to the Debtor; and

(iii)     the cash portion of the Equity Consideration and Cash payments payable pursuant to Paragraph 8.3 of the Plan.

(i)     all other agreements and instruments contemplated by, or to be entered into pursuant to, the Plan, shall have been duly and validly executed and delivered to the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

iii.     Waiver and/or Modification of Conditions

Each of the conditions precedent specified in Paragraphs 14.1 and 14.2 of the Plan may only be waived and/or modified by the Debtor and (a) with respect to conditions precedent specified in Paragraphs 14.1 and 14.2(a), (b), (c), (d), (g) and (i) of the Plan, with the written consent of the Sponsor prior to the Outside Date; and (b) with respect to conditions precedent specified in Paragraphs 14.1 and 14.2(a), (b), (e), (f), (h) and (i) of the Plan,  the written consent of the Creditors' Committee at any time.

K.     Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case and any of the proceedings arising from or relating to, the Case pursuant to Bankruptcy Code Section 1142 and 28 U.S.C. §

1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out. Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)     to hear and determine any and all objections to the allowance, or requests for estimation, of Claims or the establishment of reserves pending the resolution of Disputed Claims;

(b)     to consider and act on the compromise and settlement of any Claim against, or cause of action on behalf of, the Debtor or the Estate;

(c)     to hear and determine any motions pending on the Effective Date to reject any executory contract or unexpired lease and to determine the allowance of any Claim resulting therefrom;

(d)     to enter such orders as may be necessary or appropriate in connection with the recovery of the Debtor's assets wherever located;

(e)     to hear and determine any and all applications for allowance of compensation and reimbursement of expenses;

(f)     to hear and determine any and all controversies, suits and disputes arising under or in connection with the interpretation, implementation or enforcement of the Plan and any of the documents intended to implement the provisions of the Plan or any other matters to be resolved by the Bankruptcy Court under the terms of the Plan;

(g)     to hear and determine any motions or contested matters involving Taxes, Tax refunds, Tax attributes and Tax benefits and similar and related matters with respect to the Debtor arising prior to the Effective Date or relating to the administration of the Case, including, without limitation, matters involving federal, state and local Taxes in accordance with Bankruptcy Code Sections 346, 505 and 1146;

(h)     to hear and determine any and all applications, adversary proceedings and contested matters pending on the Effective Date or that may be commenced thereafter as provided in the Plan;

(i)     to effectuate distributions under and performance of the provisions of the Plan;

(j)     to hear and determine any applications to modify any provision of the Plan to the full extent permitted by the Bankruptcy Code;

(k)     to correct any defect, cure any omission or reconcile any inconsistency in the Plan, the exhibits to the Plan and annexes thereto or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan;

(l)     to determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(m)     to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with the Case or the Plan;

(n)     to enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(o)     to determine any other matter not inconsistent with the Bankruptcy Code or the Plan; and

(p)     to resolve any disputes regarding fees and expenses of professionals employed by the  Plan Trustee.

L.     Modification or Withdrawal of Plan

i.     Modification of Plan

At any time prior to confirmation of the Plan, the Debtor may supplement, amend or modify the Plan after providing at least three (3) Business Days written notice to the Sponsor and the Creditors' Committee, provided, however, that any Plan Modification Amendment shall require the prior written consent of the Sponsor and the Creditors' Committee.

After confirmation of the Plan, the Debtor or the Plan Trustee may apply to the Bankruptcy Court, pursuant to Bankruptcy Code Section 1127, to modify the Plan.  After confirmation of the Plan, the Debtor or Plan Trustee may apply to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.  The Plan may not be altered, amended or modified without the written consent of the Debtor or Plan Trustee.

ii.     Withdrawal of Plan

The Debtor reserves the right, which right shall be subject to the Sponsor's consent prior to the Outside Date, to revoke and withdraw the Plan at any time before the Confirmation Date.

M.     Other Material Provisions of the Plan

i.     Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware.

ii.     Successors and Assigns

The rights, duties and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity; provided, however, that the Plan Trustee is not and shall not be deemed a successor to the Debtor, but shall have the rights and duties enumerated in this Plan.

iii.    Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtor, and prior to the Outside Date to the extent affecting the Sponsor or its interests, the Sponsor, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

iv.     No Waiver

The failure of the Debtor to object to any Claim for purposes of voting shall not be deemed a waiver of the Debtor's or  Plan Trustee's right to object to or examine such Claim, in whole or in part.

v.      Payment of Post-Petition Interest and Attorneys' Fees

Unless otherwise expressly provided in the Plan or allowed by Final Order of the Bankruptcy Court, the Debtor or the Plan Trustee shall not be required to pay to any holder of a Claim any interest accruing on or after the Petition Date or any attorneys' fees with respect to such Claim.

vi.     Creditors' Committee

The Creditors' Committee shall terminate on the Effective Date, provided however, that to the extent final applications for payment of professional fees and reimbursement of expenses are heard by the Bankruptcy Court after the Effective Date, the Creditors' Committee shall remain in existence for the limited purpose of reviewing and if necessary responding to such applications.

vii.    Post-Effective Date Fees and Expenses

From and after the Effective Date, the Estate and/or the Plan Trustee shall, without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of the Professional Persons thereafter incurred by the Estate and/or the Plan Trustee related to the implementation and consummation of the Plan to the extent that such fees and expenses accrue after the Effective Date (i.e., fees and expenses that are not Administrative Claims – payment of

Administrative Claims being dealt with elsewhere in the Plan). Such fees and expenses shall be paid within fifteen (15) days of the client's receipt of the applicable invoice, absent objection by the client.

       viii.   <u>Final Decree and Case Closure</u>

The Case shall remain open until the earlier of (a) the date on which all actions authorized under the Plan that are brought by the Plan Trustee are resolved and (b) the date on which the Plan Trustee determines that no actions will be brought by the Plan Trustee. In accordance with Bankruptcy Code Section 1129(a)(12) and 28 U.S.C. § 1930, all quarterly fees payable to the Office of the United States Trustee, including any interest due pursuant to 37 U.S.C. § 3717, shall be paid in full on or before their respective due dates and shall continue to be assessed and paid until such time as a final decree closing, converting or dismissing this Case is entered by the Bankruptcy Court. The Debtor and the Estate shall be liable for payment of such quarterly fees during the period through and including the Effective Date and the initial distribution made pursuant to the Plan, including the distributions to the Plan Trustee, and the Plan Trustee shall be liable for all other quarterly fees payable to the Office of the United States Trustee thereafter until the Case is closed, converted or dismissed. The Debtor or the Plan Trustee shall promptly file an application for a final decree with the Court to close the Case, upon notice to each other and the United States Trustee.

       ix.   <u>Exemption from Certain Transfer Taxes</u>

Pursuant to Bankruptcy Code Section 1146(c), any transfers made pursuant to the Plan, including any transfers from the Debtor, the Estate and/or the Plan Trustee to any other Person or entity, shall not be subject to any document recording Tax, stamp Tax, conveyance fee, intangibles or similar Tax, mortgage Tax, stamp act, real estate transfer Tax, mortgage recording Tax or other similar Tax or governmental assessment.

       x.   <u>Inconsistencies</u>

In the event the terms or provisions of the Plan are inconsistent with the terms and provisions of the exhibits to the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

       xi.   <u>Post-Effective Date Effect of Evidences of Claims or Equity Interests</u>

Except as otherwise expressly provided in the Plan, notes, bonds, stock certificates and other evidences of Claims against or Equity Interests in the Debtor shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

       xii.   <u>Other Documents and Actions</u>

The Debtor, Plan Trustee and other appropriate Persons may execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

# IX.  RISK FACTORS

The holder of a Claim against or Equity Interest in the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan.

A.  General Considerations

The formulation of a plan is a principal purpose of a chapter 11 case.  The Plan sets forth the means for satisfying the Claims against and Equity Interests in the Debtor.  The sale of the equity of the reorganized Debtor and a wind-down of the Debtor's remaining administrative operations and liquidation of the Excluded Assets under the proposed Plan avoids the potentially adverse impact of a protracted and costly liquidation under chapter 7 of the Bankruptcy Code.

B.  Certain Bankruptcy Considerations and Conditions to Plan Effectiveness

Pursuant to Best Buy's winning bid, the Plan is required to be at least as beneficial to the creditors of the Debtor's estate and other parties in interest in the Debtor's chapter 11 case as would be the consummation of the Asset Purchase Agreement followed by a distribution of the Debtor's assets pursuant to confirmation of a simple liquidating plan using the priority scheme applicable to chapter 7 cases.  However, if the Plan is not confirmed and consummated, but the transactions contemplated by the Asset Purchase Agreement are consummated, there cannot be any assurance that the subsequent distribution of assets would be on terms as favorable to the holders of impaired Claims or Equity Interests as the terms of the Plan for several reasons, including because the development and process for confirming any alternative plan ( or the conversion on this Case to a liquidation case under chapter 7 of the bankruptcy Code) would require the further material expenditure for professional fees and related costs and likely delay the date on which funds could be distributed to creditors.

Also, the effectiveness of the Plan require that certain conditions be met, as described in Section VIII.J(ii) of the Disclosure Statement.  The consummation of the transactions contemplated by the Asset Purchase Agreement are subject to similar conditions precedent. Accordingly, if these conditions are not met and neither the Plan nor the transactions contemplated by the Asset Purchase Agreement can be consummated, there can be no assurance that the subsequent distribution of assets would be on terms as favorable to the holders of impaired Claims or Equity Interests as the terms of the Plan.

In addition, if a protracted liquidation were to occur (either following a consummation of the transactions contemplated by the Asset Purchase Agreement or without such consummation), there is a substantial risk that holders of Claims and Equity Interests would receive less than they will receive under the Plan.

For all of these reasons, the Debtor believes that confirmation of this Plan is likely to provide the most certain, quickest and largest distributions to creditors as compared to any other alternative resolution to these proceedings.

C.     <u>Claims Estimations</u>

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

Similarly, there can be no assurance that the estimated percentage of recovery for each class of Claims and Equity Interests set forth herein are correct, and the actual recovery amount for each class of Claims and Equity Interests may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions relating to, among other things, costs, recoveries by the Plan Trust and the claims resolution process. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual recovery amount may vary from those estimated herein.

## X.   **CONFIRMATION AND CONSUMMATION PROCEDURES**

A.     <u>Overview</u>

A plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. Before soliciting acceptances of the proposed plan, Bankruptcy Code Section 1125 requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtor to satisfy the requirements of Bankruptcy Code Section 1125 in connection with the Debtor's solicitation of votes on the Plan.**

If all classes of claims and equity interests accept a plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of Bankruptcy Code Section 1129(a) have been satisfied. Bankruptcy Code Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization. **The Debtor believes that the Plan satisfies all the applicable requirements of Bankruptcy Code Section 1129(a), including, in particular, the best interests of creditors' test and the feasibility requirement.**

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan. Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class. Similarly, a class of equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those Persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan. Except for Class 1 – Secured Claims, which are unimpaired, the other classes of Claims and Equity Interests are impaired under the Plan and are entitled to vote on the Plan.

The bankruptcy court also may confirm a plan even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under Bankruptcy Code Section 1129(b), a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claim.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests, and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims or Equity Interests.

B.   Confirmation of the Plan

    i.   Elements of Bankruptcy Code Section 1129

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under Bankruptcy Code Section 1129 are satisfied.

Such conditions include the following:

(a)   The Plan complies with the applicable provisions of the Bankruptcy Code.

(b)   The Debtor has complied with the applicable provisions of the Bankruptcy Code.

(c)   The Plan has been proposed in good faith and not by any means proscribed by law.

(d)   Any payment made or promised by the Debtor or by an entity issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court; and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(e)   The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor or a successor to the Debtor under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

(f)   With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the applicable consummation date under the Plan, that is not less than the amount that such entity would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code.  In the event that the Debtor does not move to confirm the Plan non-consensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

(g)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full on the applicable consummation date and that Tax Claims will be paid in full, in cash, on the applicable consummation date or as soon as practicable thereafter; however, the Debtor shall have the right to make deferred cash payments on account of such Tax Claims over a period not exceeding six (6) years after the date of assessment of such Claims, having a value, as of the applicable consummation date, equal to the allowed amount of such Claims.

(h)     At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

(i)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

(j)     All fees payable under Bankruptcy Code Section 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Debtor believes that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that they have complied or will have complied with all of the provisions of the Bankruptcy Code and that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.**

ii.     <u>Acceptance</u>

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims.  Each class of Equity Interests will have accepted the Plan if the Plan is accepted with reference to a class of Equity Interests, by at least two-thirds in amount of the Allowed Equity Interests of each class of Equity Interests.

iii.     <u>Best Interests Test</u>

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtor was liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtor in a chapter 7 liquidation case.  The proceeds that would be available for satisfaction of Claims against and Equity Interests in the Debtor would consist of the proceeds generated by the sale of the assets pursuant to the Asset Purchase Agreement and the cash held by the Debtor at the time of the commencement of the liquidation case.  Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the termination of the administrative operations of the Debtor and the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 case.  In addition, Claims would arise by

reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtor during the pendency of the Chapter 11 Case.

The foregoing types of Claims and such other Claims which may arise in the liquidation case or result from the pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay Claims arising on or before the Petition Date.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtor (net of the amounts attributable to the aforesaid Claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

In applying the "best interests" test, it is possible that Claims and Equity Interests in the chapter 7 case may not be classified according to the seniority of such Claims and Equity Interests as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all Claims arising on or before the Petition Date which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the chapter 7 case of the Debtor. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each creditor. Therefore, creditors who claim to be third-party beneficiaries of any contractual subordination provisions might have to seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. The Debtor believes that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full with interest, and no equityholder receives any distribution until all creditors are paid in full with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including: (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7; and (iii) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Case, the Debtor believes that confirmation of the Plan will provide each holder of a Claim or Interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis prepared by the Debtors and attached hereto as **Exhibit E** is premised upon a liquidation in a chapter 7 case following the consummation of the transactions contemplated by the Asset Purchase Agreement.

THE DEBTOR AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS BELIEVE THE RECOVERIES ESTIMATED TO BE AVAILABLE IN A CHAPTER 7 LIQUIDATION ARE LIKELY TO BE LESS THAN THOSE AFFORDED TO HOLDERS OF CLAIMS AND EQUITY INTERESTS UNDER THIS PLAN.

iv.     <u>Feasibility</u>

The Bankruptcy Code conditions confirmation of a plan on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. Considering that the Plan contemplates the sale of the equity of the reorganized Debtor and a liquidation of the remaining assets, this test is met for purposes of the Plan.

C.     <u>Cramdown</u>

In the event that any impaired class does not accept the Plan, the Debtor nevertheless may move for confirmation of the Plan. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.

i.     <u>No Unfair Discrimination</u>

A plan "does not discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to the legal rights of the non-accepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims or Equity Interests. The Debtor believes that under the Plan all impaired classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Equity Interests that are similarly situated, if any, and no class of Claims or Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Equity Interests in such class. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests.

ii.     <u>Fair and Equitable Test</u>

The Bankruptcy Code establishes different "fair and equitable" tests for secured creditors, unsecured creditors and holders of equity interests as follows:

(a)     <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

(b)     <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan, subject to the applicability of the judicial doctrine of contributing new value.

(c)    Holders of Equity Interests.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

THE DEBTOR MAY MOVE FOR CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE HOLDERS OF CLAIMS OR EQUITY INTERESTS IN ANY CLASS VOTE TO ACCEPT THE PLAN.

D.    Effect of Confirmation

Under Bankruptcy Code Section 1141, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equityholder, whether or not the claim or interest of such creditor or equityholder is impaired under the plan and whether or not such creditor or equityholder voted to accept the plan.  Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and equity interests of creditors and equityholders, except as otherwise provided in the plan or the confirmation order.

## XI.  INCOME TAX CONSIDERATIONS

EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH AN INDEPENDENT TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES, IF ANY, OF THE PLAN.

## XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has evaluated alternatives to the Plan, including, without limitation, the consummation of the transactions contemplated by the Asset Purchase Agreement followed by a liquidation of the Debtor under chapter 7 of the Bankruptcy Code and the liquidation of the Debtor under a "free-fall" chapter 11 plan.  After studying these alternatives, the Debtor has concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims and Equity Interests.  The following discussion provides a summary of the analysis of the Debtor supporting their conclusion that an alternative plan for the Debtor will not provide higher value to holders of Claims and Equity Interests.

A.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no plan of reorganization can be confirmed, the transactions contemplated by the Asset Purchase Agreement would be consummated and the Chapter 11 Case of the Debtor may be converted to a case under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtor for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code, and by that certain pre-petition settlement agreement by and between the Debtor and Best Buy dated December 3, 2010 (the "Best Buy Agreement") if assumed as contemplated by the Sale Order.  The Debtor believes that liquidation under chapter 7 (following the consummation of the transactions contemplated

by the Asset Purchase Agreement) would result in no more than equal, but likely smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7; and (3) the substantial increases in claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Case. Accordingly, the Debtor believes that confirmation of the Plan will provide each holder of a Claim or Interest with a greater recovery than it would receive pursuant to the consummation of the transactions contemplated by the Asset Purchase Agreement and subsequent liquidation of the Debtor under chapter 7.

B.      Alternative Plans

If the Plan is not confirmed, the transactions contemplated by the Asset Purchase Agreement would be consummated and any other party-in-interest could undertake to formulate a different plan. Such a consummation of the transactions contemplated by the Asset Purchase Agreement or plan would naturally involve a liquidation of the properties and interests in property of the Debtor. With respect to an alternative plan, the Debtor has entered into the contingent Asset Purchase Agreement which would be consummated if the Plan is not confirmed and consummated and has also examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtor believes that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the best recoveries under the present circumstances.

# XIII.  CONCLUSION

The Debtor believes that the Plan is in the best interest of all holders of Claims and Equity Interests, and urges all holders of impaired Claims against and Equity Interests in the Debtor to vote to accept the Plan and to evidence such acceptance by returning their ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: August 24, 2011

Partsearch Technologies, Inc.

By:____/s/ Lawton W. Bloom_____
Name:  Lawton W. Bloom
Title:   Chief Restructuring Officer